Transcript of the Testimony of

# Karen McIntosh

**Date:** October 17, 2018

**Case:** Karen McIntosh v. The Country Club of Little Rock, et al

**Bushman Court Reporting**
Janess Ferguson Smith
Phone: (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

KAREN MCINTOSH                              PLAINTIFF

VS.            CASE NO. 4:17-CV-757

THE COUNTRY CLUB OF LITTLE ROCK and
JUDITH M. REEVES a/k/a JODI REEVES,        DEFENDANTS

ORAL DEPOSITION OF KAREN MCINTOSH

October 17, 2018

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas  72201
501.372.5115

---

Page 2

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

BECKY MCHUGHES, ESQ.
The McHughes Law Firm, PLLC
P.O. Box 2180
Little Rock, Arkansas  72201

ON BEHALF OF THE DEFENDANTS:

DANIEL HERRINGTON, ESQ.
Friday, Eldredge & Clark, LLP
400 West Capitol
Suite 2000
Little Rock, Arkansas  72201

---

Page 3

I N D E X

EXAMINATION

By Mr. Herrington . . . . . . . . . . .     5

EXAMINATION

By Ms. McHughes . . . . . . . . . . . .   200

EXAMINATION

By Mr. Herrington . . . . . . . . . . .   202

E X H I B I T S

Exhibit No. 1 (Job Description). . . . . . . .    22
Exhibit No. 2 (5-2-16 Note). . . . . . . . . .    48
Exhibit No. 3 (7-31-15 Note) . . . . . . . . .    52
Exhibit No. 4 (4-14-16 Note) . . . . . . . . .    55
Exhibit No. 5 (7-29-16 Note) . . . . . . . . .    60
Exhibit No. 6 (7-27-16 Note) . . . . . . . . .    63
Exhibit No. 7 (7-29-16 Note) . . . . . . . . .    65
Exhibit No. 8 (Photograph) . . . . . . . . . .    81
Exhibit No. 9 (Diagram). . . . . . . . . . . .    82
Exhibit No. 10 (Exhibit E, Handwritten Notes).   101
Exhibit No. 11 (Handwritten Interview Notes) .   125
Exhibit No. 12 (Charge of Discrimination). . .   133
Exhibit No. 13 (Intake Questionnaire). . . . .   150
Exhibit No. 14 (Dismissal) . . . . . . . . . .   156
Exhibit No. 15 (11-17-16 Note) . . . . . . . .   157
Exhibit No. 16 (Payroll Status Form) . . . . .   159
Exhibit No. 17 (Plaintiff's Amended Responses)   165
Exhibit No. 18 (St. Vincent Records) . . . . .   184

EXHIBIT

A

PENGAD 800-631-6989

Page 4

1    ANSWERS AND DEPOSITION OF KAREN MCINTOSH, a
2  witness produced at the request of the Defendant, was
3  taken in the above-styled and numbered cause on the
4  19th day of October, 2018, before Janess Ferguson
5  Smith, Certified Court Reporter and Notary Public in
6  and for Saline County, Arkansas, at the Offices of
7  Friday, Eldredge & Clark, LLP, 400 West Capitol,
8  Suite 2000, Little Rock, Arkansas, at 8:57 a.m.
9              * * * * * * * * * *
10              S T I P U L A T I O N
11        It is stipulated agreed by and between
12  the parties through their respective counsel that the
13  deposition of KAREN MCINTOSH may be taken for any and
14  all purposes according to the Federal Rules of Civil
15  Procedure.
16              * * * * * * * * * *
17
18
19
20
21
22
23
24
25

---

Page 5

1              KAREN MCINTOSH,
2  the witness hereinbefore named, having first been
3  duly cautioned and sworn or affirmed to tell the
4  truth, the whole truth and nothing but the truth,
5  testified as follows:
6              EXAMINATION
7  BY MR. HERRINGTON:
8  Q.    Ms. McIntosh, good morning.  My name is Dan
9  Herrington.  I represent The Country Club of Little
10  Rock and Jodi Reeves in the lawsuit that you brought.
11        Of course, you know, Jodi's here with me
12  here today, and Blaine Burgess is here on behalf of
13  the country club.
14        You have sued the country club for age
15  discrimination and you have sued, I assume, the club
16  and Ms. Reeves for false imprisonment and the tort of
17  outrage; right?
18  A.    Uh-huh.
19  Q.    I will have to go over a few ground rules with
20  you.  One of them is you have to answer out loud,
21  "yes" or "no," or whatever the answer is.
22        The court reporter has a hard time picking
23  up nods of the head.  And the other, the other thing
24  that's hard for her to take down is "uh-huh" and
25  "huh-uh," because we can hear the difference, but she

---

Page 6

1  can't really spell it out any differently.
2  A.    Okay.
3  Q.    So you have to say "yes," or "no," or whatever
4  the answer is.  It doesn't have to be "yes" or "no,"
5  but you have to verbalize it if -- and I will try to
6  remind you, or the court reporter will remind you if
7  you say "uh-huh" or huh-uh."
8  A.    Okay.
9  Q.    We all do it, and you're not used to doing
10  these things, so that will be something that, that we
11  will need to work on.
12        Today is my one chance to get at the
13  factual support for your allegations under oath.  My
14  questions will be -- a lot of my questions will be
15  the same today as if we were at trial if this case is
16  not dismissed otherwise, so it's very important that
17  you stop me if you don't understand, ask me to
18  rephrase, ask me to repeat, whatever it takes.
19        I am not here to trick or mislead you.  I
20  will ask the question in such a way that you
21  understand and can give me a full and accurate answer
22  if you will just tell me my initial question you
23  don't understand; okay?
24  A.    Okay.
25  Q.    Have you ever given a deposition before?

---

Page 7

1  A.    No, sir.
2  Q.    Have you ever testified in court?
3  A.    Yes, sir.
4  Q.    Tell me the context in which you testified in
5  court.
6  A.    My son's murder trial.
7  Q.    Your, your son was murdered --
8  A.    Yes.
9  Q.    -- or he was accused?
10  A.    He was murdered.
11  Q.    Okay.  When was that?
12  A.    In '94.
13  Q.    Okay.  And you testified -- were you a witness
14  to it, or were you -- did you testify?
15  A.    I guess all I really did was I just gave the
16  victim impact statement.
17  Q.    And have you ever sued anyone or been sued?
18  A.    No.
19  Q.    Is there anything today that would keep you
20  from listening and understanding my questions and
21  giving full and accurate answers?
22  A.    No.
23  Q.    So if you answer, I can assume you gave me a
24  full and accurate answer?
25  A.    Yes.

Page 8

1  Q.    Did you bring any documents with you today?
2  A.    Not in here.
3  Q.    Did you review any documents to refresh your
4  memory or to prepare for your deposition today?
5  A.    No.
6  Q.    Are there any documents that you have or that
7  you provided to your attorneys that you believe
8  supports your contentions that you have been
9  discriminated against?
10  A.    Yes.
11  Q.    What?
12  A.    I don't have -- I have documents for doing a
13  good job, but none for discrimination.
14  Q.    Okay.  Do you have any documents that were from
15  the club that you have not produced in discovery?
16  For instance, did you ever send yourself emails from
17  work, you know, like forward yourself an email from
18  work to a personal email?
19  A.    Probably, yes.
20  Q.    Give me an example of what you would have
21  forwarded to a personal email.
22  A.    And I think the one was about hours being
23  changed, a lunch hour was an hour.
24  Q.    When was that, and tell me what it was about.
25  A.    It was about hours being changed, and I -- in

Page 9

1  May, April, of '16.
2  Q.    What do you mean "hours being changed"?
3  A.    Well, Jodi sent out an email stating that the
4  hours will be 8:30 to 5:00 and an hour for lunch.
5  Q.    Oh, okay.  Changed -- Jodi changed the work
6  hours?
7  A.    Uh-huh.
8  Q.    Okay.  And you forwarded that to your personal
9  email?
10  A.    Uh-huh.
11  Q.    Do you still have it?
12  A.    Honestly, I would have to go back and look.  I
13  do not know.
14  Q.    Okay.  Do you still have that same computer or
15  that same email address?
16  A.    Yes.
17  Q.    So you can log in and look?
18  A.    Yes.
19  Q.    Okay.
20  A.    Because she normally sent my, sent the stuff to
21  my personal email.
22  Q.    Who did?
23  A.    Jodi.
24  Q.    Oh, she did.  If she normally sent it to your
25  personal email, what email would it have been -- did

Page 10

1  you have a, did you have a work email?
2  A.    I did.
3  Q.    What was your work email?
4  A.    Karen, underscore, McIntosh -- I don't
5  remember -- at CCLR -- I'm not -- I don't remember.
6  Q.    Okay.  And what was your personal email?
7  A.    K.JMcIntosh@ATT.net.
8  Q.    So will you go back and look for that, that
9  email, or any emails that you forwarded from you work
10  email to your personal email?
11  A.    Sure.
12  Q.    And give those to Ms. McHughes?
13  A.    Sure.
14  Q.    Do you keep any type of journal, or diary, or
15  blog, or online resource where you described your
16  feelings, your thoughts, the things that might be
17  going on in your life that affected you emotionally?
18  A.    No, sir.
19  Q.    You never recorded anything that dealt with
20  your work, your hobbies, your personal life?
21  A.    I jotted down notes, but it was never on social
22  media.
23  Q.    Okay.  Well, that's why I said it could be a
24  journal or a diary.
25  A.    Right.

Page 11

1  Q.    It could be paper or --
2  A.    Right, yeah.
3  Q.    So what -- you have provided some notes in
4  discovery, and we will go through those.
5  A.    Okay.
6  Q.    Is that what you're talking about?
7  A.    Uh-huh.
8  Q.    Or did you keep, like, a paper diary?
9  A.    No.
10  Q.    And it doesn't have to be, like, with the
11  little lock and the, you know, dear diary kind of
12  thing, but people keep daytimers and calendars and
13  notebooks.
14  A.    No, mine was pretty much random, whatever was
15  handy to write on.
16  Q.    Okay.  And was that what you produced in
17  discovery here?
18  A.    Yes.
19  Q.    Did you continue that practice of making notes
20  of things that were important in your life after your
21  discharge?
22  A.    Uh-huh.
23  Q.    Would any of -- would any of those notes deal
24  with your claims against the club, efforts to find
25  employment, your alleged emotional distress, or

**Page 12**

1   anything like that?

2   A.   Yes.

3   Q.   Okay.  I don't believe I have seen any notes

4   past your discharge.  Have you provided those to your

5   attorneys?

6   A.   All of my job contacts.

7   Q.   Okay.  Is there anything besides job contacts

8   that we just talked about?

9   A.   My medical records maybe.

10  Q.   Okay.  But I'm talking about, like, notes that

11  you took like, you know, jotted down, even if it's,

12  you know, calendar entries or anything like that.

13  A.   Not to do with the club.

14  Q.   Okay.  But to do with any, perhaps any

15  stressors in your personal life?

16  A.   Yes.

17  Q.   Okay.  And what, tell me what that would be.  I

18  mean, not what the stressors are, but what the notes

19  would be.  Is it a diary?  A journal?  A daytimer?

20  Scraps of paper?

21  A.   It's a notebook and then some scraps of paper.

22  Q.   Okay.  So what kind of notebook, just a

23  spiral-bound notebook?

24  A.   Uh-huh.

25  Q.   Okay.  And it would have, that notebook would

**Page 13**

1   contain notes about things that -- I mean, just give

2   me -- I don't want to guess.  You tell me.  What kind

3   of thing do you jot down in this notebook?

4   A.   Well, I moved, so I jotted down everything that

5   led up to the move, dates and times, DirecTV, all of

6   those notes, anybody I had contact with on that move,

7   and then anybody I had contact with through the

8   funeral home.

9   Q.   The funeral home for what?

10  A.   My husband's death.

11  Q.   Okay.  When did that happen?

12  A.   March.

13  Q.   Of this year?

14  A.   Yes.

15  Q.   Of '18?

16  A.   Yes.

17  Q.   Would there be any -- would there be anything

18  in there that would pertain to your lawsuit, like

19  talking to potential witnesses, or recording efforts

20  to get a job, or writing down how you feel about

21  losing the job, or anything like that?

22  A.   I didn't write any feelings down on losing the

23  job.  And I did go through the notes and put them in

24  a little bit of order to give to Becky.

25  Q.   Okay.  So then we may have them, and we will

**Page 14**

1   talk about that.  Did you take anything with you when

2   you left?

3   A.   No.  My personal stuff.

4   Q.   Okay.  What did you have at the club?

5   A.   A radio.

6   Q.   Okay.  So you said you moved.  Where do you

7   live now?

8   A.   In Bryant.

9   Q.   Okay.  And how long have you lived there?

10  A.   Since July the 24th of '17.

11  Q.   And where did you live before that?

12  A.   Mabelvale.

13  Q.   And how long did you live at the Mabelvale

14  address?

15  A.   Twenty-nine years.

16  Q.   With your husband?

17  A.   Yes.

18  Q.   This may sound like an odd question, so I will

19  tell you why I am asking that.  I won't do that a lot

20  today --

21  A.   Okay.

22  Q.   -- but this one is kind of out of left field.

23  So we are in the Eastern District of Arkansas, Little

24  Rock Division, or Western Division in court, and so

25  the jury members, potential jury members will come

**Page 15**

1   from -- listen to these counties -- Conway, Faulkner,

2   Lonoke, Perry, Pope, Prairie, Pulaski, Saline, Van

3   Buren, White, and Yell Counties.  So what I need to

4   know is the, the names of relatives that live in any

5   of those counties.

6   A.   I only have one relative, and it's Lisa Martin,

7   and she lives in Garland County.

8   Q.   Oh, she lives in Garland, so that's not in it.

9   So I don't.

10  Q.   Okay.  And who is Lisa Morton [sic]?

11  A.   It's Lisa Martin.

12  Q.   Martin, okay.

13  A.   My sister.

14  Q.   Okay.  I will kind of tell you when we are

15  shifting gears.  Tell me briefly about your

16  education, high school and college.

17  A.   High school.

18  Q.   Where did you graduate high school?

19  A.   Jacksonville.

20  Q.   No college, business school, vocational,

21  anything?

22  A.   No, real estate school.

23  Q.   When was that?

24  A.   '71.

25  Q.   Okay.  And you decided it wasn't for you?

```
                                                    Page 16
1    A.    Correct.
2    Q.    Okay.  And then I have from the records that we
3    have been provided that you worked for
4    Browning-Ferris Industries from 1984 to 2007?
5    A.    Yes.
6    Q.    All right.  And what job did you do there?
7    A.    Accounting, payroll, risk management, safety,
8    accounts receivable, accounts payable.
9    Q.    And where -- where did you learn accounting,
10   payroll, safety, risk management, AR, AP, just on the
11   job?
12   A.    Uh-huh.
13   Q.    And I have from your discovery responses that
14   your supervisor was Richard Miksell?
15   A.    Miksell.
16   Q.    Miksell.  And why did you leave?
17   A.    I was a new grandmother.
18   Q.    And when was that?
19   A.    Maybe November.
20   Q.    Of 2007?
21   A.    I think so.
22   Q.    Okay.  Did you have, did you just want to spend
23   more time -- was it your daughter or your
24   daughter-in-law?
25   A.    My son.
```

```
                                                    Page 17
1    Q.    Your son, right, but that's what I mean.  And
2    then the baby's mom, was not married; is that what
3    you're saying?
4    A.    Correct.
5    Q.    Okay.  Did you have childcare responsibilities,
6    or did you just want to spend more time with them?
7    A.    More time.
8    Q.    You didn't have to --
9    A.    Just a change.
10   Q.    Okay.  You said in interrogatory, in your
11   response to Interrogatory Number 11 that you had
12   filed a harassment EEOC charge against Mr. Mike Self;
13   is that right?
14   A.    Correct.
15   Q.    Do you remember what year that was?
16   A.    Honestly, no.
17   Q.    What was the basis -- when you say harassment,
18   was it gender?  Was it sexual?  Was it race?
19   Religion?  Age?  What was it?
20   A.    Basically, he just didn't like me, so it was, I
21   guess -- I don't know what you would call it, but I
22   was instructed by the general manager to file it to
23   protect myself.
24   Q.    Who was the general manager?
25   A.    John Embry (phonetic).
```

```
                                                    Page 18
1    Q.    Okay.  And do you remember what year that was?
2    A.    I do not.
3    Q.    You don't know if it was -- so, if you, if you
4    didn't think he liked you, was it -- did you think he
5    didn't like you because of your race, your gender?
6    A.    Because I would not keep the books the way he
7    wanted them kept.  Vendors that weren't approved and
8    people that didn't pass drug screens, and...
9    Q.    So it didn't have anything to do with your
10   gender, per se.  It was because you wouldn't do shady
11   stuff he wanted you to do?
12   A.    Correct.
13   Q.    Okay.  Do you have any of those documents?  Do
14   you still have anything related to that charge?
15   A.    If I hadn't have moved I would say yes.  I,
16   honestly, don't know if I brought any of that with me
17   or not.  That could have been one of the dumpster
18   boxes.
19   Q.    Okay.  Can you make a quick look and let Ms.
20   Hughes know?
21   A.    I can.
22   Q.    So you don't know exactly the time, but when
23   was it in relation to your leaving in 2007?
24   A.    Oh, quite a while, because he had been
25   terminated.
```

```
                                                    Page 19
1    Q.    Okay.  Was he terminated because of your
2    complaint?
3    A.    Terminated because he couldn't pass a drug
4    test.
5    Q.    Okay.  So you think it was several years
6    before, or, like -- I mean, you worked there the
7    eighties, the nineties and the 2000s?
8    A.    Yeah.
9    Q.    Was it eighties, nineties or 2000s?
10   A.    He was probably -- let's see, when was Richard
11   there?  He might have been there in the late nineties
12   or early 2000s.
13   Q.    Okay.
14   A.    It's on, it's on record with EEOC.
15   Q.    Well, they won't -- if we are not a party to
16   it --
17   A.    Okay.
18   Q.    -- they won't give it to us.
19   A.    Okay.
20   Q.    So then you came to The Country Club of Little
21   Rock in 2009?
22   A.    Correct.
23   Q.    All right.  So between 2007 and 2009 did you
24   look for any other positions?
25   A.    I did.
```

Page 20

1  Q.   So when did you start looking?

2  A.   Probably about six months after I was home.

3  Q.   Okay.  All right.  So let's turn, then, to --

4  oh, have you ever gone by any other name besides

5  Karen McIntosh?

6  A.   Uh-huh.

7  Q.   What is your maiden name?

8  A.   Martin.

9  Q.   Were you a Martin or a McIntosh when you worked

10  for BFI?

11  A.   McIntosh.

12  Q.   Okay.  Do you know if BFI merged with Waste

13  Management?

14  A.   No, they did not.

15  Q.   They didn't?

16  A.   No.

17  Q.   They are completely different?

18  A.   Yes.

19  Q.   Okay.  I'll turn -- let's turn to your work

20  history at Country Club of Little Rock.

21  A.   Okay.

22  Q.   All right.  You were hired May 11th, 2009; is

23  that right?

24  A.   Sounds right.

25  Q.   Okay.  And you were discharged November 18th,

Page 21

1  2016?

2  A.   Yes.

3  Q.   Okay.  And Jodi Reeves, the Controller of the

4  club, hired you?

5  A.   Yes.

6  Q.   And your supervisor was Jodi?

7  A.   Yes.

8  Q.   You were 56 at the time?

9  A.   Sounds right.

10  Q.   Sometimes when I am trying to do the math I am

11  like, Well, wait a minute, are we before or after the

12  birthday, but I think it was 56.

13  A.   Yeah.

14  Q.   Well, let me, what is your date of birth?

15  A.   7-10-53.

16  Q.   We can check my math if we need to.  So the

17  accounting department at The Country Club of Little

18  Rock is a three-person department; is that right?

19  A.   Yes.

20  Q.   So when you were first hired, was it you and

21  Jodi and Susan Hill?

22  A.   Yes.

23  Q.   And then we will get into these in more detail,

24  but Susan was discharged, and then Joan Holder

25  (phonetic) was hired; is that right?

Page 22

1  A.   Yes.

2  Q.   And then at the time of your discharge, Holder

3  was still there?

4  A.   Yes.

5  Q.   So the entire time you worked in that

6  department the, the four people that would have been

7  in that department would have been you and Jodi and

8  Joan Holder and Susan Hill; right?

9  A.   Yes.

10  Q.   Okay.  And you were age 63 at discharge?

11  A.   Yes.

12  Q.   I will hand you what we will mark as Exhibit

13  Number 1.

14          (Exhibit No. 1 was marked.)

15  BY MR. HERRINGTON:

16  Q.   Is that the job description for your position

17  as a billing clerk at Country Club Little Rock?

18  A.   (Witness reviews document.)  No.  I was never

19  instructed to give the deposit slips and stuff to the

20  controller.

21  Q.   Okay.  So you're saying the last paragraph on

22  page one is not accurate?

23  A.   I was never told that.

24  Q.   Well, were you -- were you ever given a copy of

25  the job description?

Page 23

1  A.   Not this one.

2  Q.   Okay.  Do you have a different one?

3          MS. MCHUGHES:  We provided that in

4          discovery.

5  A.   Yeah, that was turned in.

6  Q.   Well, let's go through this one, and you tell

7  me what else is inaccurate.

8  A.   (Witness reviews document.)  I only turned in

9  adjustments once a month.

10  Q.   Where is that at, which paragraph?

11  A.   The third one.

12  Q.   Okay.  So you are just saying you did that one

13  time a month?

14  A.   Uh-huh.

15  Q.   Okay.  All right.

16  A.   I would fill out a billing adjustment for the

17  pro shop, but I'd always get them to okay it before

18  it was ever entered into the adjustment system.

19  Q.   Okay.

20  A.   I didn't file anything in the member file in

21  the admin office, but I gave it to whoever was at

22  that desk to file.

23  Q.   Which paragraph is that?

24  A.   For junior members.

25  Q.   So what, what part of that did you do, and what

Page 24

1  part did you give to the front office?
2  A.    I did all, all of it, but where it says file --
3  Q.    Except that?
4  A.    -- file one copy, I didn't file anything down
5  there.
6  Q.    Okay.  But as, as accounts payable your main
7  job was to make sure --
8  A.    Accounts receivable.
9  Q.    Accounts receivable, your main job was to make
10  sure that members got billed for the services that
11  they used at the club?
12  A.    Correct.
13  Q.    Okay.  And then made sure that that money got
14  posted in the right place in the accounting system?
15  A.    Correct.
16  Q.    So that would have included data entry; right?
17  A.    Uh-huh.
18  Q.    Mailing invoices?
19  A.    Uh-huh.
20  Q.    Remember, you have to say "yes" or "no."
21  A.    Yes, yes.
22  Q.    Would you create the invoices in our computer
23  system?  Would you create the invoices?
24  A.    When it was computer generated.
25  Q.    Okay.  So like if they went, if they were at

Page 25

1  the mixed grill, and they had dinner, the computer
2  system would generate an invoice, and you would make
3  sure they got sent out at the end of the month;
4  right?
5  A.    Yes.  Yes.
6  Q.    Did you take calls from members?
7  A.    Yes.
8  Q.    So if they had a question about their bill, you
9  would be the first person they talked to?
10  A.    Yes.
11  Q.    And were you also responsible for setting up
12  rosters and billing for the annual golf tournament?
13  A.    Yes.
14  Q.    Was providing invoices to members for catering
15  or events part of your job when you first started?
16  A.    I am trying to think.  It would be on their
17  bill, and most of the time they would call and want a
18  copy of it, yes.
19  Q.    Okay.  And did that change in 2014 or '15 when
20  the club added a catering package to the club's
21  software system?
22  A.    Well, then I think it came from the catering
23  director.
24  Q.    Okay.  And do you know why that was changed,
25  why that job duty was shifted to the catering

Page 26

1  director?
2  A.    They got a new system.  She would, or I would,
3  but I had copies of all of them.
4  Q.    Were you trained on that catering package in
5  the software system?
6  A.    Yes.
7  Q.    When were you trained?
8  A.    Oh, when Amy was there.  I don't know what year
9  it was.
10  Q.    Who is Amy?
11  A.    She was in catering.
12  Q.    Who did the training?
13  A.    It was over the phone.  I don't know.
14  Q.    Would it -- I mean the training provided by
15  who?
16  A.    Whoever they went through with the new software
17  system.
18  Q.    I mean the vendor.
19  A.    Yes.
20  Q.    How long did that training last?
21  A.    Oh, it was short, an hour or two.
22  Q.    Were some members set up on automatic bank
23  draft?
24  A.    Yes.
25  Q.    And tell me how that process worked each month.

Page 27

1  A.    Well, it changed, because when I first started
2  they had an assessment.
3  Q.    What does that mean?
4  A.    Well, two separate parts their bill, one for
5  their club dues, and one for the assessment to help
6  pay for the golf course.  You could -- you had to
7  hand enter it into the Regions side and write it all
8  down.
9  Q.    Uh-huh.
10  A.    Well, after the assessment was paid, all you
11  had to do was just hit the plus key, and it
12  automatically popped it up for you how much their
13  bill was, and then you entered that from that sheet
14  of paper into Regions.
15  Q.    So every month, though, you would go into the
16  Regions system and have to key in the member name and
17  their account number --
18  A.    No.
19  Q.    -- to draft it?
20  A.    No.
21  Q.    So you didn't have to do that?
22  A.    No.
23  Q.    Then how did you do it?
24  A.    Just enter the amount that was already set up.
25  Q.    Okay.  Who set that up?

Page 28

1   A.    It was set up before I got there.  I changed it
2   every month it needed to be changed.
3   Q.    What is your level of proficiency with
4   Microsoft Excel?
5   A.    I would say good, on what I was taught.
6   Q.    What were you taught?
7   A.    The job that I did.  And I self-trained a lot
8   for spreadsheets and my own little way of keeping
9   track of things.
10  Q.    How did you use Excel spreadsheets?
11  A.    Well, I had it for the junior members, and I
12  had it for equity, and I had it for write-offs.  I
13  had it for -- I am trying to think of all I had it
14  for.  Birthdates.
15  Q.    And what, what did you use -- let's just say,
16  just pick one, junior members, what did you use an
17  Excel spreadsheet to keep up with with respect to the
18  junior members?
19  A.    Their payoff, their -- I don't know what I am
20  trying to say -- analyze how much they owed each year
21  until they paid their full initiation.
22  Q.    Okay.  Junior members got a payment plan for
23  their initiation fee?
24  A.    Uh-huh.
25  Q.    Did you set -- so was there an amortization

---

Page 29

1   schedule created within that spreadsheet with
2   formulas?
3   A.    Uh-huh.
4   Q.    Who did that?
5   A.    Jodi set them up, and then I continued them on.
6   I say she did.  It was set up when I got there.
7   Q.    So you didn't have to write formulas for any of
8   these spreadsheets?
9   A.    Only when they changed.
10  Q.    Well, give me an example.  When you say "when
11  they changed," what do you mean?
12  A.    When the dues went up.
13  Q.    Oh, okay.
14  A.    And then the birthdates changed.  Instead of
15  being a member, it would be spouse, and just little
16  changes.
17  Q.    Do you know how to link spreadsheets?
18  A.    Uh-huh.
19  Q.    How do you do that?
20  A.    You mean through the Excel?
21  A.    Uh-huh.
22  A.    I know how to do the copy and paste.
23  Q.    You do what now?
24  A.    Copy and paste.
25  Q.    Okay.  I'm talking about linking two

---

Page 30

1   spreadsheets.  Do you know how you to do that?
2   A.    I never had to do that.  I was never required
3   to do that.
4   Q.    What is your level of proficiency with
5   Microsoft Access?
6   A.    I didn't use Microsoft Access much.
7   Q.    So you say you weren't very proficient, then?
8   A.    Probably not, but I can do anything I am taught
9   to do.
10  Q.    When did you create -- you didn't keep up with
11  any member information in Access, or did the club?
12  Let me ask it that way.  Did the accounting office
13  use Microsoft Access to keep up with member
14  information?
15  A.    Probably the birthdates and children, and Jodi
16  always did, did all of that and gave it to
17  downstairs.
18  Q.    When you say "downstairs," what do you mean?
19  A.    Well, whoever was the membership director.  I
20  was never required to do that.  All I did was I'd go
21  back behind her and check it.
22  Q.    So one of the things we are keeping up with
23  with respect to junior members is if they have aged
24  out of the junior member category?
25  A.    That, uh-huh.

---

Page 31

1   Q.    How old do you have to be to age out?
2   A.    You are asking me something that I don't know
3   that I remember.
4   Q.    Okay.  But to figure out whether they would age
5   out, did you set up an Access table, or did Jodi?
6   A.    She did, and, again, I would -- she would ask
7   me to go behind and check her, and so did the
8   membership director.
9   Q.    When you say "go behind and check," what do you
10  mean?  You mean go back and hand calculate ages to
11  make sure you have done it right?
12  A.    Yeah, just to glance over it, yes, and to see
13  if the count was right.
14  Q.    Okay.  When did you learn that the club was
15  upgrading to a new computer system?
16  A.    I was never told for sure that they were.
17  Q.    What were you told?
18  A.    They were looking into it.
19  Q.    By whom?
20  A.    Natalie was working on it.
21  Q.    Who is Natalie?
22  A.    She was a membership director.
23  Q.    Do you remember when this was?
24  A.    I do not.
25  Q.    Do you remember being told that the billing

Page 32

```
1   module would be an SQL database?
2   A.    I remember her saying we would get a new one.
3   She didn't go into any specifics.
4   Q.    Okay.  Do you know what that is?
5   A.    No, but I'm sure I could have learned it.
6   Q.    Do you know how to generate reports using SQL
7   queries or databased-writing programs?
8   A.    It was never required.
9   Q.    So that's "No"?
10  A.    That would be "no."
11  Q.    Can you give me an example of a time when you
12  were proactive in learning a new skill or making
13  yourself more efficient in your job at CCLR?
14  A.    Anytime I was asked.
15  Q.    Well, can you give me an example?
16  A.    Well, I worked with Amy, and then I worked with
17  Beth on the banquet stuff, because some of the taxes
18  were wrong.  Some of the liquor stuff was wrong.
19  Q.    What do you mean?
20  A.    It wasn't folding over and calculating like it
21  should.
22  Q.    When you say it, what kind of program are we
23  talking about?
24  A.    Club Soft, Club Connect, whichever one it is,
25  the banquet system they have got.
```

Page 33

```
1   Q.    When you say you worked with Amy and Beth, tell
2   me who Amy and Beth are.
3   A.    Catering.
4   Q.    What is Amy's last name?
5   A.    Ramage.
6   Q.    And Beth?
7   A.    Something with an E.
8   Q.    Were they there at the same time, or were
9   these --
10  A.    No, no, no.
11  Q.    -- in succession?
12  A.    Yes.
13  Q.    Okay.  So when you say you worked with them,
14  what did you do?
15  A.    We worked to get the taxes correct.
16  Q.    So you mean when somebody had a catering bill
17  for an event or something, that the system would add
18  the correct amount of tax?
19  A.    At the beginning it did not.
20  Q.    Okay.
21  A.    But it was straight before it went out to the
22  member.
23  Q.    Uh-huh.  Before it was automated, who had to
24  figure the tax?
25  A.    It did it -- the other side did it.
```

Page 34

```
1   Q.    What do you mean "the other side"?
2   A.    The old system did it.
3   Q.    Okay.  Oh, you are saying when we got the new
4   catering package?
5   A.    Right.
6   Q.    Okay.  Give me an example of a time when you
7   were proactive in asking for training on a skill or
8   program to make you more efficient in your job?
9   A.    I didn't -- if I needed something that needed
10  to be done and changed, I usually just did it.
11  Q.    Well, can you give me an example?
12  A.    Well, on some of the tickets.
13  Q.    What do you mean?
14  A.    Showing up wrong charges.  I wished I had
15  copies of those, but I would go back, and I would
16  look at some of the liquors or pull some of the food.
17        And like one dining room the soup was a
18  dollar more than it was in the other dining room, and
19  it wasn't supposed to be, according to the chef.  And
20  I checked things like that to get them straight.
21  Q.    Okay.  So who -- somebody would have had to
22  bring that to your attention, though?
23  A.    Well, no.  I would just sporadically check
24  things, and then occasionally a member would point it
25  out.
```

Page 35

```
1   Q.    So what were you checking on your own
2   initiative?
3   A.    Just to look and see if anything was out of
4   whack from here to there.  I am trying to -- I can't
5   think of a good example.
6         I would check the employees, because some
7   of the employees were eating three or four times a
8   day.
9         Then I would look at the new liquors that
10  came in, because some of them wouldn't pull a correct
11  tax.  And so then I would get with Mike, and Mike
12  would go back in and change it so it would pull the
13  taxes.
14        And when they would set up the pool, I
15  would go back and look, because a lot of times there
16  were mistakes when it would pull it over in the pool.
17        So I would check, go back behind and check
18  all of that and see if it was pulling correct and see
19  if it was selling for the same price inside as it was
20  outside.
21  Q.    You mean like a menu item?
22  A.    Correct.
23  Q.    Or a drink?
24  A.    Correct.
25  Q.    They were selling for the same price in each of
```

Page 36

1    your outlets?
2    A.    That's what I would go back and check.
3    Q.    Okay.  And why would you do that?
4    A.    Just to make sure it was correct.
5    Q.    Was that because of member inquiries on their
6    bills?
7    A.    The only one I remember, a member inquiring on
8    the pool side bill was a milkshake qualifying as a
9    food.
10   Q.    Oh, because they have a minimum monthly --
11   A.    Yes.
12   Q.    -- that they have to purchase?
13   A.    Yes.
14   Q.    Well, would members call you and say that there
15   was a charge on their bill that wasn't supposed to be
16   on it?
17   A.    Oh, Lord, yes.
18   Q.    Okay.  And would you just write that off?
19   A.    No.
20   Q.    What would you do?
21   A.    I would pull all of the tickets and find out if
22   it was theirs or not theirs, or see if it was correct
23   or incorrect.
24   Q.    Uh-huh.
25   A.    And if it was incorrect, I would call and tell

Page 37

1    them.  If it was correct, I would call and tell them.
2    Q.    Okay.  I will hand you a copy of your
3    Complaint.  Sometimes you can -- you might want to
4    look at it.  I don't think you will, necessarily.
5            In paragraph eight of the Complaint you
6    said that during your interview you were warned of
7    the possibility of yelling and working in tight
8    quarters --
9    A.    Uh-huh.
10   Q.    -- thus you began to and continued to
11   contemporaneously take notes and keep documentation
12   of events that took place within the department.  Did
13   I read that correctly, paragraph eight?
14   A.    Uh-huh.
15   Q.    Remember you have to say "yes" or "no."
16   A.    Oh, yes.
17   Q.    Who warned you?
18   A.    Jodi.
19   Q.    What did she say exactly?
20   A.    In my interview she told me that it was tight
21   quarters, and sometimes there was a lot of yelling
22   going on up in here.
23   Q.    Did she say who would be yelling up in here?
24   A.    Well, there was only three of us, so I assumed
25   it was one of the three.

Page 38

1    Q.    All right.  All right.
2    A.    Or two of the three.
3    Q.    Okay.  And did she give you any examples?
4    A.    Huh-uh.
5    Q.    Did you ask any follow-up questions?
6    A.    Not that I recall.
7    Q.    All right.  If you recall -- that's a good
8    place to remind you, if -- it happens in every
9    deposition I take that you don't remember something.
10   A.    Uh-huh.
11   Q.    And because we are going to be here several
12   hours today, it's likely that you will remember it
13   later --
14   A.    It could be.
15   Q.    -- while we're here.  And if you do, if it's
16   ten minutes or two hours --
17   A.    Okay.
18   Q.    -- still just call timeout and say, Hey,
19   remember earlier you asked, and I didn't remember,
20   and now I do.
21   A.    Okay.
22   Q.    All right?
23   A.    Sure.
24   Q.    And if it happens, and I have had this happen
25   several times in my career, it'll be, you will be

Page 39

1    driving home from the deposition, and you will be
2    thinking about it tomorrow, and you will remember
3    something that I asked --
4    A.    In the shower.
5    Q.    -- in the shower.  Write it down on your
6    waterproof notepad --
7    A.    I will.
8    Q.    -- and then call, then call Ms. McHughes and
9    tell her, and then she will let me know.  Okay?
10   A.    Okay.
11   Q.    So the notes that you took, are those the notes
12   that have been, the photocopies that have been
13   provided in this case?
14   A.    Uh-huh.
15   Q.    Okay.  Remember to say "yes" or "no."
16   A.    Yes.
17   Q.    And, and so there are some copies that are from
18   a spiral-bound notebook, and then there are some
19   copies that are on, like, you know, some advertising
20   notepad --
21   A.    Uh-huh, yes.
22   Q.    -- probably from a club vendor or something?
23   A.    Yes.
24   Q.    Is that what you're talking about, though --
25   A.    Yes.

Page 40

```
 1   Q.    -- in this paragraph eight?
 2   A.    Yes.
 3   Q.    So the yelling and tight quarters didn't scare
 4   you off?
 5   A.    Well, I thought it was awful weird, but no.
 6   Q.    Well, I mean, obviously it didn't dissuade you
 7   from taking the job?
 8   A.    No, it didn't, as long as they weren't yelling
 9   at me.
10   Q.    You're not a -- well, did she say that -- did
11   she say who the yelling would be directed toward, if
12   anyone?
13   A.    No.
14   Q.    Okay.  Would you consider yourself a shrinking
15   violet?
16   A.    No.
17   Q.    You're not overly sensitive; are you?
18   A.    Not usually.
19   Q.    When would be the circumstance that you are
20   overly sensitive?
21   A.    I guess if you said something bad about my
22   family I would be.
23   Q.    Okay.  When you were hired and while employed,
24   did you consider yourself normal or average at being
25   able to handle stress?
```

Page 41

```
 1   A.    Yes.
 2   Q.    Above average --
 3   A.    Probably.
 4   Q.    -- in terms of dealing with yelling or
 5   confrontation or hard conversations at work?
 6   A.    I only had one instance of that.
 7   Q.    And what was that?
 8   A.    That was when Susan Hill and I had gone
 9   sideways.
10   Q.    Okay.  So tell me about that, because you
11   work -- when you first started you worked with Jodi
12   and Susan; right?
13   A.    Uh-huh.
14   Q.    So what, what issues did you have with Susan?
15   A.    I didn't have any.
16   Q.    Okay.  Well, what was the confrontation?
17   A.    Honestly, I don't know what brought it on, but
18   she yelled something about looking at her or
19   something.  And so I just politely walked in Jodi's
20   office, and she just sat there and listened to it.
21   Q.    Okay.  She, you mean Jodi listened to it?
22   A.    Yes.
23   Q.    Jodi listened to you, or listened to Susan?
24   A.    Pretty much Susan.
25   Q.    So y'all all three went into Jodi's office?
```

Page 42

```
 1   A.    Yes.  She took up looking down at her desk and
 2   writing.
 3   Q.    Okay.  So what was Susan's complaint about you?
 4   A.    I think she said I looked at her wrong, or
 5   don't give her looks, or -- but I was in shock, so I,
 6   I couldn't tell you the exact words.
 7   Q.    You were shocked, because you weren't doing
 8   that?
 9   A.    Yeah.  I mean, it was -- I didn't say -- I
10   think she said a tone of voice, and I didn't say
11   anything in a tone of voice.
12   Q.    And when was Susan fired?
13   A.    Well, I -- right after my son died, so May or
14   June of '15.
15   Q.    Of '15?  I had, I had that it was June 15, '15.
16   Do you have any reason to doubt that?
17   A.    No.
18   Q.    So when was this getting sideways with you,
19   when was that in relation to her discharge?
20   A.    April of '14.
21   Q.    Is that something you made note of in your
22   notes?
23   A.    I don't think so.  I just remember it because
24   that's right before I bought my car.
25   Q.    April 14 of '15?
```

Page 43

```
 1   A.    No, '14.
 2   Q.    Of '14.  Okay.
 3   A.    April or May of '14.
 4   Q.    Oh, when you say April of '14, you didn't mean
 5   April 14th?
 6   A.    No, I did not.
 7   Q.    Oh, I thought you --
 8   A.    Maybe it -- see, I bought my car -- it was
 9   after I bought my car, so it was probably May of '14.
10   Q.    Okay.  All right.  So a year-ish before she was
11   fired?
12   A.    Yes.
13   Q.    What was Jodi's response?
14   A.    To that incident?
15   Q.    Uh-huh.
16   A.    Not a word.
17   Q.    Okay.  So you guys just came in.  She said her
18   piece.  Did you defend yourself?
19   A.    Well, I'm sure I did, "I didn't do it," or,
20   "You took it wrong," or -- I can't remember.
21   Q.    Uh-huh.  So Jodi didn't say anything?
22   A.    No.
23   Q.    So y'all just sat there?
24   A.    Uh-huh.
25   Q.    Were y'all both sitting down in chairs?
```

## Page 44

1  A.    No.  I was sitting in the chair in Jodi's
2  office, and Susan was in the file cabinet.
3  Q.    You mean on the file cabinet?
4  A.    Well, filing.
5  Q.    Oh, okay.  So then how did the conversation
6  end, if Jodi didn't say anything?
7  A.    I think I got up and left.
8  Q.    Okay.  And Susan was 57 when she was fired?
9  A.    Yes.
10  Q.    Do you know why she was fired?
11  A.    I do not.
12  Q.    Do you know who hired her?
13  A.    Jodi.
14  Q.    Do you know how old she was when she was hired?
15  A.    I do not.
16  Q.    And then Jodi hired Joan Holder to replace
17  Susan Hill; is that correct?
18  A.    Correct.
19  Q.    And Joan was about 60 when she was hired?
20  A.    I don't know.  I am assuming it was 60.
21  Q.    So Joan -- do you know whether Joan was older
22  than Susan when Jodi hired her?
23  A.    I do not.
24  Q.    And Joan still works there?
25  A.    I, I wouldn't know.

## Page 45

1  Q.    Did she work there at the time you were
2  discharged?
3  A.    Yes.
4  Q.    Any idea how old Jodi is?
5  A.    My sister's age; she was born in '65.
6  Q.    When Susan was fired, what part of her job did
7  Jodi ask you to take over for the time being?
8  A.    Accounts payable.
9  Q.    Because you have -- just in this three-person
10  department, you have Jodi is the controller; right?
11  And then you were accounts receivables?
12  A.    Uh-huh.
13  Q.    Which meant billing members and getting money
14  in, and Susan was accounts payable, which meant
15  paying the club's bills?
16  A.    And payroll?
17  Q.    And payroll, because that's money going out.
18  She is in charge of the money going out, and you are
19  in charge of the money coming in; right?  Sort of
20  just two sides of the ledger; right?
21  A.    Correct.
22  Q.    So was that -- was that permanent or temporary?
23  A.    Temporary.
24  Q.    Okay.  And what did you have to learn
25  necessarily or be trained on in terms of computer

## Page 46

1  systems or processes to be able to do that job?
2  A.    Well, I was trained on the accounts payables
3  section of the software to pay the bills.
4  Q.    What year was that?
5  A.    2015.
6  Q.    Well, yeah, April, May of -- June of '15;
7  right?
8  A.    Yes.
9  Q.    Okay.  And who, who trained you on it?
10  A.    Jodi.
11  Q.    Okay.  Was it her decision to assign those
12  duties to you and to give you that training?
13  A.    Yes.
14  Q.    And you were 60 years old in June of 2015?
15  A.    Sounds right.
16  Q.    Okay.  Have you reviewed the club's EEOC
17  response?  Did you ever read that when your attorneys
18  got a copy of it from the EEOC?
19  A.    Yes.
20  Q.    Okay.  Do you remember anything in there that
21  you disagreed with?
22  A.    Oh, I would have to reread it.
23  Q.    Okay.  So do you know how old Joan was when you
24  were fired?
25  A.    A year and a half older, 62 maybe.

## Page 47

1  Q.    So just a year younger than you?
2  A.    Uh-huh.
3  Q.    Okay.  I asked you, right, Jodi hired Joan to
4  replace Hill?
5  A.    Uh-huh.
6  Q.    Was there an issue in May of 2016 where you
7  failed to process the team roster spreadsheet for the
8  annual golf tournament on time?
9  A.    The team roster?
10  Q.    Uh-huh.
11  A.    I always had all of the names and all of the
12  teams in there.
13  Q.    When would you, when would you do that?
14  A.    As they would come in.
15  Q.    Okay.
16  A.    As the golf shop would give them to me.
17  Q.    But then when you have the names in a
18  spreadsheet, then what do you have to do to get that
19  billed?
20  A.    You have to bill it.
21  Q.    I mean, what, what process at your desk?
22  A.    You have to take, take their names and put it
23  into the system and bill them.
24  Q.    Okay.  And that's got to be done when in
25  relation to the golf tournament?

Page 48

1   A.    May, April.  I can't -- it's billed prior to
2   the month, so I guess it would be April.
3   Q.    When did you say you had to do that?
4   A.    I think April, because they played in May.
5         (Exhibit No. 2 was marked.)
6   BY MR. HERRINGTON:
7   Q.    I will hand you what I have marked as
8   deposition Exhibit Number 2.  This was Exhibit E to
9   the club's EEOC response.  Do you recall reviewing
10  that when you got the EEOC response?
11  A.    (Witness reviews document.)  Yes.
12  Q.    Okay.  So did Jodi come to you and say, Hey,
13  where's the, where's the final billing, so we can get
14  this run on the last day of April?
15  A.    Yes.
16  Q.    All right.  And you said you thought it was
17  done in May?
18  A.    I did.
19  Q.    Okay.
20  A.    I'd always had somebody help me with it.
21  Q.    Who would --
22  A.    Check me on it?  Susan always followed up
23  behind me.  It got done.  It was never not done, and
24  it was done in two or three hours, if that.
25  Q.    Okay.  But what Jodi has record here in

Page 49

1   deposition Exhibit Number 2 is accurate; right?
2   A.    She always took the spreadsheets with all of
3   the people playing down to Darrell herself.
4   Q.    Was there a little bit of a scramble in 2016
5   that hadn't happened in prior years?
6   A.    What do you mean?
7   Q.    Well, she comes to you, right, on the last day
8   of April and says, Hey, do you have this done?  And
9   you didn't; is that right?
10  A.    Yes.
11  Q.    All right.  So then you -- but you guys had to
12  get it done by the end of that day?
13  A.    Yes.
14  Q.    All right.
15  A.    Anytime in the past she would have asked me
16  before the last day of the month.
17  Q.    Okay.  Had it -- it had been the same process
18  or procedure?
19  A.    I understand.
20  Q.    No, I'm asking.  Had it been the same process
21  or procedure every year that you had done it?
22  A.    Yes.
23  Q.    Okay.
24  A.    I say yes.  Sometimes -- she would always come
25  and say, You need any help with it?  Are you okay

Page 50

1   with it?  This particular year she didn't.
2   Q.    Had it -- so you were hired when, 2009; right?
3   A.    Yes.
4   Q.    And so since 2009 it had been your job to do?
5   A.    I didn't do it in 2009.  It was already done.
6   Q.    Okay.  All right.  So for every tournament
7   after your employment it was your job to do; right?
8   A.    Yes.
9   Q.    Could you sort the Excel spreadsheet of
10  players, or did Jodi have to do that?
11  A.    I could do it.  She wanted to do it.  She
12  wanted to do it, so she could take a copy down to
13  Darrell.
14  Q.    Did you fail to confirm that members were
15  billed for the annual member guest in October of '16?
16  A.    I don't recall that.  A lot of times I didn't
17  get anything even telling me there was a golf
18  tournament.  I never failed to bill anybody.
19  Q.    So there was at least one, what did you call
20  it, getting sideways with Susan?
21  A.    One.
22  Q.    One.  Any problems with Joan?
23  A.    I didn't really know Joan.
24  Q.    She was hired, she was hired when, June of '15?
25  A.    I don't know.

Page 51

1   Q.    June or July of '15?
2   A.    I am assuming.
3   Q.    Okay.  So you guys worked together a year and a
4   half, or a year and 15, 16 months; is that right?
5   A.    Sounds right.
6   Q.    Well, did you work well together?
7   A.    Well, we worked.  We didn't carry on
8   conversations.
9   Q.    Did you have a problem with her?
10  A.    I didn't know her.
11  Q.    Did you like her?
12  A.    I didn't know her.
13  Q.    Did you dislike her?
14  A.    I didn't know her.
15  Q.    For 15 months she sat in the cubicle next to
16  you --
17  A.    That is correct.
18  Q.    -- and you didn't form a like, or a dislike, or
19  an opinion of her --
20  A.    That is correct.
21  Q.    -- one way or the other?
22  A.    I just merely came in and did my job and went
23  home, like I did most of the time.
24  Q.    Did Holder complain to Jodi about your
25  treatment of her?

Page 52

1    A.    I would not know.

2    Q.    So you can't say she didn't?

3    A.    No, nor can I say she did.  I will tell you I

4    never complained about her.

5    Q.    Do you remember Joan coming into the office the

6    first day she was hired?

7    A.    Uh-huh.

8    Q.    Did she try to shake your hand?

9    A.    If she tried to shake my hand, I shook her

10   hand.

11   Q.    Do you recall one way or the other?

12   A.    I'm pretty sure we shook hands.  I have never

13   refused to shake a hand.

14         (Exhibit No. 3 was marked.)

15   BY MR. HERRINGTON:

16   Q.    I am going to hand you what I have marked as

17   Exhibit Number 3. This was Exhibit B to our EEOC

18   response.  Do you recognize that as Jodi's

19   handwriting?

20   A.    I recognize the handwriting.

21   Q.    So on July 31, 2015, Jodi wrote that Joan held

22   out her hand to shake hands with Karen, and Karen

23   turned completely away from us, basically turned her

24   back on us.

25   A.    On the 31st?

Page 53

1    Q.    Uh-huh.  Or no, hired yesterday, so this would

2    have been the 30th.

3    A.    I know she was hired late in the afternoon

4    after I had gone home.  Yeah, I remember her coming

5    in, and I remember her standing there.

6    Q.    Okay.

7    A.    But I did not refuse to shake hands with her.

8    Q.    Well, did you just, like, maybe miss her that

9    she was holding her hand out and turn around after

10   your introduction?

11   A.    No, I would not have refused to shake hands.

12   Q.    Well, did you or did you not shake hands with

13   Joan on the day she was hired?

14   A.    Honestly, I can't swear that I did or I didn't,

15   but I know I can swear that I did not refuse to shake

16   hands.

17   Q.    Okay.  Why would Jodi write such a thing on

18   July 31st?

19   A.    You would have to ask Jodi that, and if that's

20   true, why didn't she say something to me about it?

21   See what I am saying?  I would not be that rude as to

22   not shake someone's hand.

23   Q.    So why do you think -- and so you are saying

24   Jodi made this up; right?

25   A.    I am --

Page 54

1    Q.    Is there any possibility that Jodi could have

2    been mistaken?

3    A.    Possible.

4    Q.    Okay.  If you think she intentionally

5    misrepresented it, what is your opinion as to why she

6    would have done that?

7    A.    Well, she tends to wear two different colors

8    occasionally.

9    Q.    Tell me what you mean by that.

10   A.    Jekyll and Hyde.

11   Q.    Tell me what you mean by that.

12   A.    One minute sweet, and the next minute mean.

13   Q.    Give me an example.

14   A.    This.

15   Q.    This, you mean Exhibit 3?

16   A.    Yes.

17   Q.    Did, did you and -- I mean, did you think Jodi

18   had -- you think Jodi liked you or disliked you?

19   A.    I think she used to like me.

20   Q.    Why do you think that changed?

21   A.    She is jealous of Susan and I being friends.

22   Q.    Okay.  Did you get into a dispute with the

23   dining room supervisor in April of 2016?

24   A.    That would be?

25   Q.    That would be -- you are asking me who it was?

Page 55

1    A.    Yes.

2    Q.    Okay.  Let's see if we can figure it out.  Mike

3    Self?

4    A.    No.

5    Q.    You never got into it with Mike Self in April

6    of '16?

7    A.    No.  I kidded with Mike all of the time, but I

8    never got into it with Mike.

9    Q.    Did you get into it with Joan about a check

10   request for beverages?

11   A.    I'm sure I questioned her about the check.  I

12   know there was something to do with a check.

13   Q.    I am going to hand you --

14   A.    But I didn't ever get into it with Mike Self.

15   Q.    All right.  I will hand you what we will mark

16   as Exhibit Number 4.

17         (Exhibit No. 4 was marked.)

18   A.    Well, '16 was the year to take notes.

19   Q.    So this was Exhibit C to the club's EEOC

20   response.  It's a note dated April 14th, 2016, by

21   Jodi Reeves.

22         It says -- I won't read the whole thing,

23   but the first line is, "Incident report as told to me

24   by Joan Holder, accounting clerk."

25         Did I read that correctly?

Page 56

1   A.   Yes.

2   Q.   And she goes on to say, and I'll paraphrase,

3   that on April 13th, Mike Self, the dining room

4   manager, brought you a check request for beverages.

5        Did he do that?  Do you recall?

6   A.   Well, yeah, I mean, Mike brought me all, all of

7   the time.

8   Q.   Do you recall giving him -- this is what the

9   note says, that you gave him a hard time because you

10  were unaware there would be another order.

11  A.   I always gave Mike a hard time, and it was all

12  in joke and fun.

13  Q.   Okay.  So would you have then, as this note

14  says, had to prepare a check request to fund the

15  revolving account and give that to Joan?

16  A.   Yes.

17  Q.   Did you put it in her inbox?

18  A.   If I had a check request, I'm sure I did.

19  Q.   Okay.  And then did you shortly thereafter go

20  over to her and say, You had better get the check

21  request processed right now?

22  A.   No, probably not in that way, no.

23  Q.   One of the things about a deposition is the

24  court reporter is taking down everything we say.

25  A.   Okay.

Page 57

1   Q.   So if you talk over the end of my sentence --

2   A.   I'm sorry.

3   Q.   -- it gets really hard for her to --

4   A.   I'm sorry.  Okay.

5   Q.   So let me finish, and I will let you finish;

6   okay?  So the note here says, All of the sudden,

7   Karen comes over to her desk and says, quote, You had

8   better get that check request processed right now.

9   If you have a problem with it, we can go see Blaine.

10       Did you say that to Joan?

11  A.   I did not.

12  Q.   Do you have any reason to doubt that that's

13  what Joan told Jodi?

14  A.   No.

15  Q.   Okay.  So if Joan now is making something up

16  about you, why would Joan do that?

17  A.   I might have gone over and suggested that we

18  get the check request, because Mike is waiting on it,

19  but I would never have directed her in the response

20  that way, If you have a problem we will go see

21  Blaine.

22  Q.   So do you recall what you said?

23  A.   I'm sure if I had a check request that

24  definitely had to be right then.  So to get it in

25  there so that that check wouldn't bounce, yeah, I

Page 58

1   probably did tell that we need to do it now.

2   Q.   Okay.  Do you recall Joan saying, You worry

3   about your job, and I'll worry about mine?

4   A.   She said that more than once, so.

5   Q.   Okay.  Did you have any reason to dispute that

6   Joan told Jodi that you were using a threatening and

7   angry tone and that your face was red?

8   A.   I wouldn't have blown up on her, no, sir.

9   Q.   That's not my question.  My question is do you

10  have any reason to dispute that that's what Joan told

11  Jodi?

12  A.   No.

13  Q.   So do you admit or deny that?

14  A.   That that's what she told her?

15  Q.   Uh-huh, right.

16  A.   Well, I mean, if Jodi wrote it down, I'm

17  assuming Joan told her.

18  Q.   Okay.  So if Joan is making something up about

19  you, why would Joan make that up?

20  A.   I just said that I don't think that I went to

21  her directing her if I didn't like it we would go see

22  Blaine.  That's the only part that I'm disputing.

23  Q.   Okay.  So what, what motivation would Joan have

24  to make that up?

25  A.   Well, I don't know that I was even using an

Page 59

1   angry tone or my face was red, and I'm assuming she

2   wrote it down as -- I don't know.  I don't recall the

3   date and the time of all of the conversations that

4   took place.

5   Q.   So do you have any -- I mean, what's the -- but

6   my question is if you're saying that Joan lied to

7   Jodi, my question is what motivation would Joan have

8   to lie about you?

9   A.   Well, maybe she doesn't like me.

10  Q.   Why?

11  A.   I don't know.  I didn't, I didn't speak to her.

12  That was vice versa.

13  Q.   Did you park in the member parking lot in July

14  of 2016?

15  A.   I parked there one time; I did.

16  Q.   And when Jodi asked you why, you said, Because

17  it's raining?

18  A.   I did.  And I go to lunch at 11:00, and the

19  club didn't open until 11:30, I would have been out

20  of the members parking lot before the members got

21  there.

22  Q.   So was the rule that you could park in the

23  member parking lot when the club was closed, or was

24  the rule that you can't park in the member parking

25  lot, period?

Page 60

1   A.   It might have said period, unless it was
2   Monday.
3   Q.   Was July 29th a Monday?
4   A.   It was not, but I don't think that it says that
5   we can park on a Monday either, but everybody did.
6   Q.   But this wasn't a Monday?
7   A.   No, but the club is closed on Monday.
8   Q.   Okay.  And there had been previous
9   communications to employees about parking, about not
10  parking in the member parking lot; right?
11  A.   Yes, but I immediately got up and moved.
12  Q.   Uh-huh.
13  A.   I wasn't the only one that parked up there.
14  Q.   Who else did?
15         (Exhibit No. 5 was marked.)
16  BY MR. HERRINGTON:
17  Q.   I will hand you what we have marked as Exhibit
18  Number 5.
19  A.   Well, I know Natalie did for a while.
20  Q.   This is Exhibit D to our EEOC response.  Is
21  that -- have you looked at this before?  Have you
22  looked at this document?
23  A.   I have glanced through these documents, yes.
24  Q.   So not parking in the member lot is in the
25  handbook; right?

Page 61

1   A.   Uh-huh.
2   Q.   And then you signed an acknowledgment of the
3   member handbook; right?
4   A.   Yes.
5   Q.   And then, then you parked there anyway?
6   A.   Before the club official -- yes.
7   Q.   And in addition there were emails out to staff
8   about staff parking prior to that?
9   A.   Yes.
10  Q.   Okay.  So you did, but you said -- so you're
11  saying your intention was you would have gone to --
12  A.   Lunch before the club opened.
13  Q.   Okay.  And then parked in the --
14  A.   When I came back from lunch was you needed the
15  parked in the employee parking lot.
16  Q.   Who is Natalie?  You said Natalie parked --
17  A.   Membership director.
18  Q.   Okay.  When did she park in the --
19  A.   Most of the time.  There at the last she did
20  start parking down at the employee lot.
21  Q.   What is Natalie's last name?
22  A.   Fielding.
23  Q.   When did she leave?
24  A.   I don't know.
25  Q.   Do you know how old Natalie is?

Page 62

1   A.   I do not.
2   Q.   What is the board book?
3   A.   It's a book that keeps track of the minutes and
4   finances and correspondence and new members.
5   Q.   And why would you have need of the board book?
6   A.   To set up the new members and terminate the
7   ones that asked to be terminated.
8   Q.   Do you remember having a conversation with Jodi
9   in July of 2016 that you didn't need the entire
10  membership, or you didn't need the entire board book
11  to prepare the membership section?
12  A.   I needed the new members, and I needed the
13  correspondence from the members that wanted to be
14  terminated.  And I all I got was the new members.  I
15  did not get any correspondence.
16  Q.   Okay.  And do you need the entire book to get
17  the correspondence?
18  A.   No.  I just needed those two sections.
19  Q.   Okay.  I will hand you --
20  A.   But I didn't get those two sections.  I only
21  got one.
22  Q.   Who was supposed to give it to you?
23  A.   Natalie.
24  Q.   All right.
25  A.   And all I did was ask Natalie for the

Page 63

1   correspondence.
2         (Exhibit No. 6 was marked.)
3  BY MR. HERRINGTON:
4   Q.   This, again, purports to be a note by Jodi of
5   July 27th, 2016, and it says when she told you to
6   make the changes, your response was you needed the
7   rest of the board book to know when to add members to
8   the off course cart list and when to overturn late
9   fees?
10  A.   Yes, I needed that.
11  Q.   Is that right?
12  A.   I needed that.  I needed those.
13  Q.   Okay.  Was Jodi's response that she would tell
14  you when that happens, or that Darrell or Blake would
15  inform the office of cart additions?
16  A.   Yes.
17  Q.   Okay.  Did you, nevertheless, go to Natalie and
18  directly ask for the full board book?
19  A.   I did not.  I asked for the correspondence to
20  know what date to terminate the members.
21  Q.   Okay.  Any reason to doubt that Natalie told
22  Jodi that you asked for the full board book?
23  A.   Right.  Now, Natalie could have misunderstood
24  when I said "board book" I just need the section with
25  the correspondence from the members.

Page 64

1    That's all I need.  I didn't need any of
2  the other stuff, because some wanted to terminate at
3  the end of the month.  Some wanted to terminate at
4  the first of the next month.  That's all I needed.
5  Q.    In July of '16, did Joan ask you for -- was
6  Joan looking for some receipts that couldn't be
7  found?
8  A.    I remember something about some receipts, yes,
9  sir.
10  Q.    Okay.  Did Joan ask you if they were maybe
11  attached to some of the paperwork you had?
12  A.    I think it was from Tennis, and I did not have
13  them.  I went through everything I had from Tennis.
14  Q.    Okay.  Did you tell them her that you were
15  trying to figure out why billing wasn't working?
16  A.    Yeah, seems like that particular day I couldn't
17  get it to close, or I couldn't get it to do
18  something.
19  Q.    Okay.
20  A.    Trying to get statements out.
21  Q.    Did you ever tell Joan that you had looked and
22  didn't have them?
23  A.    I told her I didn't have them.
24  Q.    Okay.  Was this, was there some dispute between
25  you and Joan about this?

Page 65

1  A.    I don't remember a dispute about, about the
2  tickets, but, I mean, I didn't have the tickets.
3  There wasn't -- they didn't come up with the tennis
4  stuff.
5  Q.    Do you have any reason to doubt that Joan told
6  Jodi that you never told her whether or not you had
7  those missing receipts?
8  A.    I don't doubt, no.  Now, I didn't tell her
9  immediately, because I still had all of the tennis
10  stuff to go through, but I did tell her I don't have
11  any tickets, later in the day.
12    (Exhibit No. 7 was marked.)
13  BY MR. HERRINGTON:
14  Q.    I am going to hand you what we have marked as
15  Exhibit Number 7.  It is Exhibit G to the EEOC
16  response.
17    Did you -- again, it purports to be a note
18  by Jodi Reeves, 7-29-16 incident.  Did you go to the
19  members bathroom and stay in there for 30 minutes?
20  A.    I don't, I don't recall staying in the restroom
21  for 30 minutes.  I could have been gone from my desk
22  for 30 minutes.
23  Q.    Did you tell -- who is Barrie Burnam?
24  A.    Worked in the tennis shop.
25  Q.    Did you tell Barrie that you hated your job and

Page 66

1  the people you worked with?
2  A.    I probably showed disgust at it at times, the
3  same as she did.
4  Q.    But did you tell that -- did you tell her that?
5  A.    That I hate it?
6  Q.    I hate my job and the people I work with?
7  A.    I could have used the word "hate."
8  Q.    Okay.  Any facts to refute that Barrie reported
9  to Reeves that that was your attitude towards your
10  work?
11  A.    I don't doubt she told, no.
12  Q.    If Barrie told Jodi that, do you think it would
13  influence Jodi's opinion on your attitude toward
14  working at the club?
15  A.    Well, I can remember times where she said she
16  hated her job, so, I mean, I don't know that it would
17  change an attitude.
18  Q.    If Barrie told Jodi that you had said that you
19  hated your job and the people you worked with, do you
20  think that would influence Jodi's opinion about your
21  attitude toward working at the club?
22  A.    Yeah.
23  Q.    Would you agree with me that accolades for five
24  years of service in 2014 do not indicate whether you
25  would be proficient on a new computer system

Page 67

1  implemented in 2016?
2  A.    Well, if I was doing a good job, I had to learn
3  it when I got there, when I was hired, and anything
4  new would have been new to everybody.  So I'm not
5  sure I understand your question.
6  Q.    And I'm happy to rephrase.  Your lawyer has
7  attached to the Complaint -- I just kind of file them
8  under the heading of accolades; right?
9  A.    Okay.
10  Q.    Atta boys, whatever you want to call it.  From
11  the club, they attached them to your Complaint, I
12  assume purporting to show that you were doing a good
13  job.
14    The first one, and I will hand you -- here
15  is the original Complaint.  No, that's the amended.
16  It just doesn't say "Amended."  It confused me there
17  for a second.
18    And if you look at -- if you kind of flip
19  toward the middle, there is an Exhibit A.  Do you see
20  that --
21  A.    Uh-huh.
22  Q.    -- handwritten note from Blaine?
23  A.    Correct.
24  Q.    It's actually page 11 of 22.  And it just -- I
25  won't read the whole thing.  It says, Congratulations

Page 68

1   on achieving five years of service to The Country
2   Club of Little Rock and its members.
3               Did I read that right?
4   A.    Yes.
5   Q.    Okay.  So do you know whether he sent that to
6   everybody who reached the five-year milestone?
7   A.    I wouldn't know.
8   Q.    Okay.
9   A.    I would assume, but.
10  Q.    Okay.  Do you think this is evidence that you
11  were fired in 2016 because of your age?
12  A.    Well, I was doing a good job.
13  Q.    So is that a "yes" or a "no"?
14  A.    Ask me again.
15  Q.    So does this note in May of '14 that says,
16  Congratulations on achieving five years of service,
17  does that, in your mind is that evidence that you
18  were fired because of your age in November of '16?
19  A.    I wouldn't think the two had anything to do
20  with each other.
21  Q.    Look at page 13, and the pages are at the top.
22  Do you do see that?
23  A.    Yeah, that's got a stamp on top of it.  I
24  didn't see it.
25  Q.    Yeah, look at page 13.  Go the other way.

Page 69

1   A.    Oh, 11 of 22.
2   Q.    Yeah.  Do you know what year this -- this note
3   on page 13 of your Amended Complaint, do you know
4   what year that was?
5   A.    There is a check stub that has a bonus, '15, I
6   believe.
7   Q.    And so you got a, you got like a little bonus
8   check?
9   A.    Yes.
10  Q.    Do you remember how much?
11  A.    I think it was 500.
12  Q.    So what did you do that was above and beyond
13  your normal job duties to earn that $500?
14  A.    Well, as he says, Keeping things organized and
15  smooth.
16  Q.    Isn't that part of your job, though?
17  A.    It should be part of everybody's job.
18  Q.    Uh-huh.  Was this -- so this was just related
19  to, like, handling the members for the score ball?
20  A.    Yeah, and getting all of the sheets together
21  and the billing together, and staying in touch with
22  the golf shop.
23  Q.    Do you think that evidences your aptitude to
24  learn a new computer system in 2016?
25  A.    I don't know why it wouldn't.  Yes.

Page 70

1   Q.    Why would it?  Explain.
2   A.    Well, if you're doing such a great job, you're
3   willing to go a little mile further.
4   Q.    So you think it evidences your attitude toward
5   learning?
6   A.    Yes.
7   Q.    Does it evidence your aptitude toward learning
8   the new computer system?
9   A.    I think both, yes.
10  Q.    How so?
11  A.    Well, all of your handling and related billing,
12  and keeps us organized, and when it's a busy time,
13  willing to learn.
14  Q.    What did you learn new with respect to the 2015
15  Four Ball, or was it just doing what --
16  A.    I --
17  Q.    Let me finish.
18  A.    Okay.
19  Q.    Doing well what you always did?
20  A.    If memory serves me correct, that was the year
21  that they took pictures on their phone, and they sent
22  it to me, and everything was color coded.
23  Q.    What do you mean?
24  A.    Ones that had color code if you were a member,
25  if you were a guest, if you had played before, if

Page 71

1   they put up a deposit, just different things.  I
2   can't remember.
3               Jeremy came up with it, and Cory might have
4   been involved in it, too.  I think that's the year I
5   had the big, the big card instead of the handwritten
6   stuff that they normally did.
7   Q.    Okay.  Do you think that Blaine's note is
8   evidence that you were fired in November of '16
9   because of your age?
10  A.    Again, I don't know what the two has to do with
11  anything, with each other.
12  Q.    Look at page 14 of the Amended Complaint with
13  me.  That shows you got a three percent raise in
14  2013; is that right?
15  A.    Correct.
16  Q.    All right.  Do you know if that was standard,
17  more or less than other people got a raise that year?
18  A.    I got mine on merit.  I don't -- I'm not sure
19  who or what got -- who got raises.  I wasn't privy to
20  any of that info.
21  Q.    Did you -- who informed you of the raise?
22  A.    Jodi.
23  Q.    Okay.  Did she make any comments about it in
24  May of '13?
25  A.    Not that I remember.

Page 72

1    Q.    Okay.  Does that indicate your aptitude to
2    learn a new computer system in 2016?
3    A.    Anytime you get a pat on the back, you're
4    always willing to go a mile further, yes.
5    Q.    You think it's evidence that you were fired
6    because of your age in November of '16?
7    A.    Again, I don't see what the two has to do with
8    each other.
9    Q.    You didn't get any raises in '14, '15, or '16;
10   did you?
11   A.    I did not.
12   Q.    Do you know why?
13   A.    I didn't get a review either.  I do not know
14   why.  The only comment I heard was I wasn't going to
15   get one if Jodi wasn't going to get one.
16   Q.    Who made that comment?
17   A.    She made the comment.
18   Q.    Jodi?
19   A.    Yes.
20   Q.    When?
21   A.    Fourteen.
22   Q.    Okay.  What about '15 or '16?
23   A.    There was no comments.
24   Q.    Okay.  Did you ever ask?
25   A.    I did not.

Page 73

1    Q.    Page 15 reflects a Christmas bonus in 2012; is
2    that right?
3    A.    Yes, Christmas distribution.
4    Q.    Okay.  Did everybody get a flat amount, or some
5    percentage of their pay, or do you know?
6    A.    I think it was based on years of service.
7    Q.    Okay.
8    A.    But the comment, Thank you for all of your hard
9    work during 2012, is the one on top that says bonus,
10   not the Christmas distribution.
11   Q.    So they are two different things?
12   A.    Yes, sir.
13   Q.    So you got a bonus of $635?
14   A.    Yes.
15   Q.    And a Christmas distribution of $204?
16   A.    That is correct.
17   Q.    Okay.  Do you know if everybody got bonuses?
18   A.    Not to my knowledge.
19   Q.    Okay.  Who got bonuses?
20   A.    I'm not sure.  Jodi usually gave myself and
21   Susan one.
22   Q.    Do you know the criteria for the bonus?
23   A.    I do not.
24   Q.    Do you think getting a bonus in 2012 is
25   evidence that you were fired because of your age in

Page 74

1    2016?
2    A.    Again, I don't see the two.
3    Q.    Look at page 16 with me.  This is a bonus of
4    $500 in February of '13?
5    A.    Yes.
6    Q.    So that would be year-end for '12; right?  Is
7    that right?
8    A.    Sounds right.
9    Q.    Do you know if every -- did everybody get a
10   $500 bonus year-end?
11   A.    I do not know.
12   Q.    So you don't know who got what or if --
13   A.    I do not know.
14   Q.    Do you think that getting a bonus for work done
15   in 2012 is evidence that you were fired because of
16   your age in 2016?
17   A.    Again, I don't see that the two.
18              MS. MCHUGHES:  Dan, can we take a
19         break for just a second?
20              MR. HERRINGTON:  Sure.
21              (Seven-minute break.)
22   BY MR. HERRINGTON:
23   Q.    Turn to the discharge meeting itself; okay?
24   A.    Okay.
25   Q.    Try to -- I try if I can remember to tell you

Page 75

1    when you we are taking an off ramp.  So the discharge
2    meeting happened to in Jodi's office; is that right?
3    A.    Correct.
4    Q.    And that's in the accounting suite or office,
5    whatever you want to call it; right?
6    A.    Yes.
7    Q.    And the accounting office is kind of a weird
8    place in the club; right?
9    A.    Correct.
10   Q.    Up the stairs, kind of tucked off by itself.
11   Do you remember what time of day it was?
12   A.    Oh, it was early, a little after nine maybe.
13   Q.    Okay.  And you were at your desk in the
14   accounting office; right?
15   A.    Correct.
16   Q.    Did Joan leave before Jodi came in?
17   A.    The phone rang and she left.
18   Q.    Okay.  And then -- so you and Joan are in the
19   office; Jodi is not?
20   A.    Correct.
21   Q.    Jodi -- Joan leaves?
22   A.    Correct.
23   Q.    Jodi and Blaine come in?
24   A.    Correct.
25   Q.    As they're walking into her office, Jodi asked

**Page 76**

```
 1   you to join them in the office; is that right?
 2   A.    No.  There was conversation before then.
 3   Q.    Okay.  Tell me about the conversation before
 4   then.
 5   A.    Blaine locks the door.
 6   Q.    What door?
 7   A.    The accounting door.
 8   Q.    Okay.
 9   A.    And I jump up and I said, Oh, hell no.
10   Q.    Okay.  Tell me about that reaction.
11   A.    Yeah.  I knew what was going on.
12   Q.    What did you know was going on?
13   A.    You -- I'm figuring I'm being fired.
14   Q.    Okay.  So what else did you say?
15   A.    And I asked Blaine, he said, You don't know
16   what is going on, Karen.  I said, Oh yeah, I do.  And
17   I said, Who is she?  Is she Jodi Reeves, or is she
18   HR, because she cannot be both.
19   Q.    What does that mean?
20   A.    I mean, they are on that side, I thought I
21   should have someone on my side in there with me.
22   Q.    Okay.  What else did you say in the outer
23   office?
24   A.    I think that was it.
25   Q.    Okay.  And he just said you're not -- you don't
```

**Page 77**

```
 1   know what is going on?
 2   A.    That's correct.
 3   Q.    Why, why did you think you were going to be
 4   fired?
 5   A.    Up until they walked in and shut the door like
 6   that and locked it, I didn't ever think I was going
 7   to be fired.
 8   Q.    Okay.  Had anything happened the day before
 9   that you thought might get you in trouble?
10   A.    Jodi and I had a conversation, but it wasn't --
11   I mean, it was not a bad conversation.
12   Q.    What was the conversation about on the day
13   before?
14   A.    Joan.
15   Q.    Tell me about it.
16   A.    She said she thought after 18 months that her
17   and I would be friends, would be getting along.
18   Q.    What was the impetus or genesis of that
19   conversation?  What made that come up?
20   A.    I, I don't know, because the day before it was
21   an employee meeting that I didn't find out about
22   until the last minute, but -- and I don't know, I was
23   sitting at the table with Carisa and Warren Simpson
24   (names phonetic), and a few others, and that was the
25   employee meeting.  Then the Thursday came up -- I
```

**Page 78**

```
 1   don't know.  I don't know what brought out the
 2   Thursday meeting.
 3   Q.    Okay.  So, I mean, on the Thursday meeting, did
 4   Jodi called you into her office and say, You'd think
 5   after 18 months y'all would be friends?
 6   A.    Uh-huh.
 7   Q.    And your response was?
 8   A.    I said -- what did she say?  I wrote it down.
 9   Let me think.  She said, I thought after 18 months
10   y'all would be getting along better.
11         And then she said that there was going to
12   be some changes.  I might be doing accounts payable.
13   Was I okay with Joan telling me, instructing me,
14   giving me things to do, asking me to do things.
15         And I just looked at her and laughed and
16   said, Well, it depends on if she asks me nicely, just
17   making a joke out of it.
18         And she -- something else was brought up,
19   and I asked her what Joan said in response to the
20   question, and she said she hadn't talked to her.  She
21   asked if we could work together, yeah --
22   Q.    Okay.
23   A.    -- which we had been for 18 months.
24   Q.    What else did she or you say in her office on
25   that day, the kind of conversation about change is
```

**Page 79**

```
 1   coming.
 2   A.    I don't, I don't remember if she -- that's one
 3   of those y'all are going to have to let me think.
 4   Q.    Take all of the time you need.  We haven't even
 5   made it to lunch yet.  Take all of the time you need.
 6   A.    I can tell you what time it was.  It was 10:55.
 7   Q.    The conversation with you and Jodi the day
 8   before your discharge?
 9   A.    Yes.
10   Q.    Okay.  All right.
11   A.    And I know that because I go to lunch at 11:00
12   every day, and she said, Do you have just a minute?
13   Q.    Okay.
14   A.    So I know it was 10:55.
15   Q.    All right.  Well, tell me everything else you
16   recall about that conversation with you and Jodi.
17   Was -- was it -- did she close the door to her
18   office, or did you close the door?
19   A.    No, I didn't close the door, and I -- yeah, it
20   was closed.
21   Q.    Because Joan would have been right outside?
22   A.    Yes.
23   Q.    Okay.  So how long -- so did it last -- were
24   you done by 11?
25   A.    It was done by 11.
```

Page 80

1  Q.    Okay.  So what else -- tell me what else was
2  said in that conversation?
3  A.    I can't think right now.
4  Q.    Okay.
5  A.    I know I wrote it down --
6  Q.    Okay.
7  A.    -- after the conversation.  You'll just have
8  to, you'll just have to let me think on that.  I
9  can't think right now.
10  Q.    Is it in the notes that you gave to your
11  lawyers and that we got?
12  A.    If I wrote it down it is.
13  Q.    I have on -- and this is Bates Number 72, is
14  the little number down at the bottom.
15  A.    Oh.
16  Q.    You don't have it.  I am going to hand it to
17  you.  We will make this an exhibit later, or I will
18  be out of order, but on Plaintiff doc production 72,
19  you have 11-17-16, Jodi called me into her office
20  about -- you can read -- about Joan.
21  A.    And how I'd need to help with accounts payable.
22  Q.    Okay.  Does that refresh your recollection as
23  to any of the, any additional conversation in that,
24  her office that day?
25  A.    Well, no.  I mean, I told you that part

Page 81

1  already.  No, I would have to think.  I mean, that's
2  what I told you she said.  I thought I wrote more of
3  the conversation, but obviously I just wrote that
4  part.
5  Q.    What was the, the employee meeting that you
6  were talking about the day before?  You said there
7  was some --
8  A.    There was a meeting Blaine put on.  It might
9  have been -- it wasn't open enrollment.  I can't
10  remember what the context of that was.  I know we had
11  to draw pictures, maybe just a thank you meeting.
12  Q.    Okay.  So back to the discharge meeting.
13  A.    Okay.
14  Q.    All right.  I am going to hand you what we will
15  mark as Exhibit 8.
16         (Exhibit No. 8 was marked.)
17  BY MR. HERRINGTON:
18  Q.    Is that a picture of the accounting office?
19  A.    Yes.
20  Q.    Okay.  And your cubicle would be in the
21  foreground on the left?
22  A.    Yes.
23  Q.    And then Joan's cubicle would be the
24  foreground, or, I mean, in the background --
25  A.    Yes.

Page 82

1  Q.    -- right?  And Joan's cubicle is closest to the
2  printer --
3  A.    Yes.
4  Q.    -- right?  So if you have to -- if you print
5  something, you have to go walk over there and get it;
6  right?
7  A.    When they moved it I did, yes.
8  Q.    Okay.  It was, it was in the location reflected
9  in this picture?
10  A.    Yes.
11  Q.    That's where --
12  A.    Yes.
13  Q.    Let me finish.  That's where it was in November
14  of '16?
15  A.    Yes.
16  Q.    Okay.  And then you can see there's another
17  office with a door on the far right-hand corner of
18  this picture.  Is that Jodi's office?
19  A.    Yes.
20         MR. HERRINGTON:  Okay.  I will hand
21      you what we will mark as Exhibit Number 9.
22         (Exhibit No. 9 was marked.)
23  BY MR. HERRINGTON:
24  Q.    Would this -- again, this is just a schematic
25  or a diagram of the accounting offices.  Is that a

Page 83

1  fair and accurate representation of the kind of just
2  the floor plan layout of Jodi's office?
3  A.    You mean on the day of termination?
4  Q.    Uh-huh.
5  A.    Well, Blaine was sitting next to the wall.
6  Q.    So the, where he is indicated in the circle, is
7  that where he was or not?
8  A.    He was -- no.
9  Q.    So you, you draw an "x," then, where --
10  A.    (Witness complies.)
11  Q.    So the chair was just pushed up against the
12  wall --
13  A.    Correct.
14  Q.    -- instead of being closer to Jodi's desk?
15  A.    Correct.
16  Q.    Okay.  Hang on to that.  Okay.  So they come
17  in.  You said Blaine locks the exterior door?
18  A.    Uh-huh.
19  Q.    Which would be on Exhibit 9, which would be the
20  door in the far left-hand corner, bottom left?
21  A.    Uh-huh.
22  Q.    And you said -- what did you say?
23  A.    I didn't -- I wasn't the first one that spoke
24  when we got into Jodi's office.
25  Q.    No, no.  When they walked in the suite and they

Page 84

```
 1   -- he locked -- you said he locked the door, and they
 2   asked you to come into her office?
 3   A.    No.
 4   Q.    Okay.  Tell me, then.  I don't want to put
 5   words in your mouth.  You tell me what happened.
 6   A.    The first thing I said was, Oh, hell no.
 7   Q.    Okay.  Before anybody said anything?
 8   A.    Yeah.
 9   Q.    Okay.  All right.  And --
10   A.    As he was locking the door.
11   Q.    Right.  And that's because you suspected you
12   were about to be fired?
13   A.    Well, something was going down, yeah.
14   Q.    Okay.  And we talked through that.  And then
15   Blaine says, You don't know what's going on.  And
16   then did somebody ask you to go to Jodi's office?
17   A.    Jodi asked me to, to come in.
18   Q.    Okay.  Well, let's just take it one step at a
19   time, because I don't want to miss something here.
20   So what else was said in the outer office when you
21   are still at your desk?
22   A.    I think that was, that was it.
23   Q.    Okay.  Again, the same deal, if you remember
24   something, as we talk through it or later in the day
25   or even after, just let us know.
```

Page 85

```
 1   A.    Okay.  Sure.
 2   Q.    Okay.  So then Jodi asked you to come into her
 3   office?
 4   A.    Correct.
 5   Q.    All right.  And do you?
 6   A.    Yes.
 7   Q.    You follow them in.  And so then on Exhibit 9,
 8   you're in the chair where it says Karen, and Jodi is
 9   in her chair behind her desk?
10   A.    No, she told me I just needed to sit down.
11   Q.    Okay.  But is that, is that where --
12   A.    Yes.
13   Q.    Where y'all were?
14   A.    Yes.
15   Q.    And you said Blaine was closer to the wall;
16   right?
17   A.    Correct.
18   Q.    Okay.  By the time you walked in, they were
19   both seated, because they went in before you?
20   A.    Yes.
21   Q.    When she said come into my office, what was
22   your response, if anything?
23   A.    I don't think I said anything.  I walked in and
24   stood at the chair.
25   Q.    Okay.  So you stood, and she said sit?
```

Page 86

```
 1   A.    Uh-huh.
 2   Q.    Okay.  So they shut the door to the outer
 3   office.  Her door stayed open?
 4   A.    No.
 5   Q.    Okay.  Who shut her door?
 6   A.    Blaine shut her door and locked it.
 7   Q.    What kind of lock is it?
 8   A.    One of those twist things.
 9   Q.    Just a little twist --
10   A.    Yes.
11   Q.    -- on the handle, not a deadbolt?
12   A.    Well, it's key operated.
13   Q.    Okay.  From the inside of her office, you need
14   a key to lock it or unlock it?
15   A.    No.
16   Q.    Right.  It's typical.  I mean, no different
17   than any other door lock?
18   A.    Okay, okay.
19   Q.    Just like the one as we sit here today; right?
20   There's a --
21   A.    Yeah.
22   Q.    There a door handle and a thumb lock?
23   A.    Yeah, yeah, yeah.
24   Q.    Like on an office, like on a restroom; right?
25   A.    Right.
```

Page 87

```
 1   Q.    Okay.  What did you say -- did you say anything
 2   when he locked the door?
 3   A.    No.
 4   Q.    Okay.  Tell me, then, I just kind of want to
 5   walk through the conversation.  After Jodi says you
 6   need to sit down -- what did she say?  I don't want
 7   to put words in her mouth either.  What did she say
 8   to indicate you needed to sit down?
 9   A.    I think she said, "I need for you to sit down."
10   Q.    Okay.
11   A.    Or, "Are you not going to sit down?"  No, I
12   think she said, "I need for you to sit down."
13   Q.    Okay.  But it could have been, "Are you not
14   going to sit down?"
15   A.    I don't think she asked -- gave me a question.
16   Q.    Okay.  So how long -- before we get into the
17   specifics, how long did this conversation last?
18   A.    Well, it seemed like forever, but...
19   Q.    But it probably wasn't?
20   A.    No.  You know, in those situations it's not --
21   five, eight, ten minutes.
22   Q.    So what -- so when you walked in, was the first
23   thing Jodie saying to sit down?
24   A.    Uh-huh.
25   Q.    All right.  So then tell me, I mean, it may not
```

Page 88

```
1   be exactly chronological, but just walk me through
2   the conversation.
3   A.    She said, Blaine and I had a conversation last
4   night, and we're getting in some new software, and,
5   unfortunately, you don't have the skills to go
6   forward, and your services are no longer needed.
7   Q.    Okay.
8   A.    And I said, You don't know what skills I have.
9   You didn't even try.
10  Q.    Okay.  What next?
11  A.    I am trying to think.  What came next?
12  Q.    Take your time.
13  A.    Again, it's written down.  At one point I
14  looked at Blaine and said, You don't know what goes
15  on in here.  And he said, I think I do.  And I said,
16  No, you don't, or Jodi wouldn't be here.
17        And I said, And due to Joan, I said, you
18  don't go start a new job and not speak to your new
19  coworker unless somebody has said something to you
20  about not speaking to you, and that somebody was Jodi
21  Reeves.  And that's what I told her.
22  Q.    You told Jodi and Blaine that you thought Jodi
23  told Joan not to talk to you when she started work?
24  A.    Exactly.  You don't, you don't start a new job
25  and not speak to your new coworker.
```

Page 89

```
1   Q.    I'll hand you -- again, the -- these are
2   documents that your lawyers produced starting at
3   Bates Number 75.  Are those the notes you took of the
4   discharge meeting?
5   A.    Yes.
6   Q.    When did you take those?
7   A.    I wrote -- I think the day I got home.
8   (Witness reviews document.)  No, she did say, "You
9   come into my office."  That's what I wrote, so that's
10  what -- yes.
11  Q.    You say, "I've got pictures and notes" --
12  A.    Yes.
13  Q.    -- down at the bottom of page 75.  What did you
14  mean by that?
15  A.    I have got all of the notes.
16  Q.    You're saying the notes that accompany --
17  A.    Yes.
18  Q.    -- this Plaintiff's document production; right?
19  A.    Yes.
20  Q.    Is that what you're talking about?
21  A.    Yes.
22  Q.    Okay.  And then I guess out in the left-hand
23  margin you have "JR."  That's Jodi Reeves?
24  A.    Yes.
25  Q.    And then "me"?
```

Page 90

```
1   A.    Yes.
2   Q.    Which is you, and then "BB" is Blaine; right?
3   A.    Yes.
4   Q.    Okay.  And then it says, Jodi Reeves, "No one
5   said anything."  Did -- is that -- did she say those
6   words, or were you --
7   A.    No, she just didn't make --
8   Q.    -- or were you writing down -- were you
9   memorializing that no one said anything in response
10  to your comment?
11  A.    Yes.
12  Q.    Okay.  And then you -- so what you're saying
13  here is they just sat there; right?
14  A.    For --
15  Q.    No one said anything?
16  A.    Correct.
17  Q.    And then you said, "I am not going to argue
18  with you."
19  A.    Well, she wanted to talk about Four Ball and
20  about sorting and this, that, and something else, and
21  at that time I'm just -- I'm up, no, that's not true.
22        This was after we were done.  I cannot tell
23  you the last words that were said, but I got up to
24  leave, and when I got to my desk, she started
25  hollering to me about, "You couldn't even sort Four
```

Page 91

```
1   Ball."
2         That's when I went back in, and I said, "I
3   am not going to argue with you."  Then that's when I
4   got my stuff and left.
5   Q.    Okay.  So they didn't say anything in the
6   office, and then you said, "I'm not going to argue
7   with you," as you were leaving; right?
8   A.    Yes.
9   Q.    So is there anything else in that gap between
10  the time where you said "I've got pictures and
11  notes," and they didn't respond.  Did you just get up
12  and leave at that point?
13  A.    Seems like something else was said, but,
14  honestly, I can't recall exactly what it was.
15  Q.    Gist is fine.  By whom?
16  A.    I am thinking Jodi said the last thing before I
17  left, but I can't -- I mean before I left the office.
18  Q.    Her interior?
19  A.    Yes.
20  Q.    If you recall, just let me know.
21  A.    Again, again I --
22  Q.    So you just got up, unlocked the door and
23  walked to your desk.
24  A.    I can't remember if I unlocked the door or
25  Blaine unlocked the door.
```

1   Q.   Okay.  So then you're going to your desk.  Did

2   you say anything as you were exiting?

3   A.   I said it twice.  I think I told her again that

4   I wasn't going to argue with her before I -- because

5   she started in on something.  I don't even remember

6   what it was.

7         "I'm not going to argue with you," and got

8   to my desk.  I was getting my radio, and that's when

9   she hollered at me, "You couldn't even sort Four

10   Ball."

11   Q.   So Jodi -- so you think she was going to say

12   something about your job performance, and you said,

13   "I'm not going to argue with you" in the office, in

14   her office?

15   A.   I am not going to argue with her over sorting

16   Four Ball.

17   Q.   Well, no, I'm just trying to get the -- I'm not

18   arguing with you.  I'm just saying that, asking.  Did

19   Jodi start to explain her reasoning in her interior

20   office, and you said, "I'm not going to argue with

21   you" and left?

22   A.   I had already left when she hollers this out.

23   Q.   Okay.

24   A.   She had the chance to say it when I was sitting

25   in there.  She waited for me to leave.

1   Q.   Okay.

2   A.   Then she started in again.

3   Q.   Okay.

4   A.   When I left the first time, I was done.

5   Q.   Okay.

6   A.   I mean, there was no reason to stay.

7   Q.   Right.  So you go to your -- if you remember

8   anything else about the conversation in Jodi's

9   office, let me know; okay?

10   A.   Okay.

11   Q.   So now we are moving, though.  Somebody unlocks

12   the door.  You walk out.  You go to your desk to get

13   your radio.

14   A.   Uh-huh.

15   Q.   She is, what, standing in her doorway?

16   A.   No.

17   Q.   Where is she at?

18   A.   I didn't -- she wasn't in the doorway.  I'm

19   assuming she was still at her desk.

20   Q.   And she said, "You couldn't even sort Four

21   Ball"?

22   A.   Yes.

23   Q.   What does that mean, can't sort --

24   A.   Again, talking about sorting names, numbers.

25   Q.   In the spreadsheets?

1   A.   Correct.

2   Q.   And the billing information?

3   A.   Correct.

4   Q.   Because the Four Ball would include members and

5   guests, and you have got to sort all of that out?

6   A.   Correct.

7   Q.   Okay.

8   A.   She sorted it every year I was there, so she

9   could take it to Darrell.

10   Q.   And you said, "I'm not going to argue with

11   you"?

12   A.   Yes.

13   Q.   Okay.  What else was said in the office?

14   A.   That was basically -- that was basically it.  I

15   mean, I told Blaine that he didn't know what went on

16   up there.

17   Q.   Look at the next page.  It's a continuation, it

18   looks like, of that conversation on Plaintiff's Bates

19   76.

20   A.   Oh, yeah.

21   Q.   Jodi Reeves, you talk out of both sides of your

22   mouth?

23   A.   Uh-huh.

24   Q.   And then it says, "I get up and walk out of the

25   office."

1         Do you mean her office?

2   A.   Yes, her office.

3   Q.   Okay.  And then she yells, "You couldn't even

4   sort Four Ball"?

5   A.   Yes.

6   Q.   You say, "Oh no, you wanted to sort Four Ball."

7   She shakes her head.  So you could see her to know

8   she was shaking her head; right?

9   A.   Yes.

10   Q.   Okay.  And then you say, again, "I'm not going

11   to argue with you."

12   A.   Yes.

13   Q.   Did Blaine say anything else?

14   A.   No.

15   Q.   Did you say anything else?

16   A.   I don't think so.

17   Q.   Did Jodi say anything else?

18   A.   I don't think so.

19   Q.   Look at page 77.  When did you make this note?

20   A.   I don't know.  Some of the notes I originally

21   wrote when it happened when I came home --

22   Q.   Uh-huh.

23   A.   -- were so jumbled up and scribbled up that I

24   rewrote some.  So I can't tell you the exact date.

25   Q.   You think this is a rewrite of the notes that

Page 96

1  you wrote the day of?
2  A.    It possibly could be, but I wouldn't swear to
3  it.  But I wrote -- I know, I wrote -- as soon as I
4  got home, I wrote it down.  That I've learned in
5  life, you write it down when it happens.
6           I could have just taken these notes,
7  because I know some I did that was scribbled, so
8  scribbled, and kind of put them in chronological
9  order, so I could give them to Becky.  But this right
10 here looks like the original.
11 Q.    Okay.  I think it will be clear which ones are
12 rewrites as we walk through it, but that's actually
13 later in my outline.
14           Did you bring up -- you brought up Joan
15 when you said, "They don't work with you without
16 talking to you, unless somebody has told them
17 something"; right?
18 A.    Correct.
19 Q.    Okay.  Did Blaine say that's not what this
20 meeting is about?
21 A.    Not to my knowledge.
22 Q.    So kind of, again, taking it one step at a
23 time.  You go back to your desk to get your radio.
24 Jodi yells about sorting the Four Ball.  Y'all had
25 that conversation.  Then do you just unlock the outer

Page 97

1  door and leave?
2  A.    Uh-huh.  Randy was standing there.
3  Q.    Randy who?
4  A.    Randy Prieur.
5  Q.    Okay.  Is that P-r-i-e-u-r?
6  A.    Yes.
7  Q.    Where was Randy standing?
8  A.    In the hall.
9  Q.    Okay.  There is sort of a hall and a landing --
10 A.    Yeah.
11 Q.    -- and then some stairs?
12 A.    Right.  He just come up the stairs from the --
13 on the landing coming up the stairs.
14 Q.    Okay.  And what is Randy's job?
15 A.    I don't know.  House manager?  I don't know.
16 Q.    Here, I am just stealing the original.  On the
17 original where I have in ink a "B" in a circle, is
18 that where you say Blaine was?
19 A.    Yeah, right there at the door.
20 Q.    Okay.  I was just going to give that to the
21 court reporter.  Okay.  I didn't want to mark on the
22 original.  I was going to mark on mine.  So Randy
23 Prieur was outside the door on the landing?
24 A.    Yes.
25 Q.    Okay.  And he is the club house manager?

Page 98

1  A.    I think, I think that's his title.
2  Q.    And off and to the left, obviously not on this
3  sheet of paper, but what is to the left of your
4  office?  Obviously, this is an outer wall on the
5  schematic, right, on Exhibit 9?
6  A.    A hallway.
7  Q.    Okay.  So where does the hallway go?
8  A.    To the break room.
9  Q.    Well, here, let's -- you take -- this is the
10 original.  You write where Randy was, and then write
11 where the break room is.
12           And this is on the second floor, right, of
13 the club, or would it be considered a third?  What's
14 to the left of this, your office in the schematic?
15 A.    Nothing.
16 Q.    I mean, is there a wall or --
17 A.    A wall.
18 Q.    Okay.
19 A.    And an elevator.
20 Q.    Where -- mark where the elevator is.
21 A.    It was right across from the landing.  The
22 elevator would be right here.
23 Q.    You can just put an "EL."  And then where's the
24 stairs?
25 A.    Right going down here.

Page 99

1  Q.    Okay.  Can we write, just write "stairs" right
2  here.  Is that correct?
3  A.    Yes.
4  Q.    Your line is where the stairs were?
5  A.    Yes.
6  Q.    Okay.  Not to scale, obviously.  Do you have
7  any idea why Randy was in the hall?
8  A.    I guess to make sure I got out.
9  Q.    But that's your assumption?
10 A.    That's my assumption.
11 Q.    You never had any conversation with anybody
12 about why Randy would have been up there?
13 A.    Huh-uh.
14 Q.    Okay.  Could he have been going to the break
15 room?
16 A.    I doubt it.
17 Q.    Why?
18 A.    I never saw Randy in -- well, I don't know if
19 he goes in there or not.  I didn't use the break
20 room.
21 Q.    Okay.  So in your Complaint you say that -- in
22 paragraph 12 -- I want to read that -- you said, "Had
23 insults yelled at her while she was leaving."
24           Was that, "You can't even sort Four Ball"?
25 A.    Yes, yes.

Page 100

1  Q.    Okay.  Any other insults?

2  A.    Not that I recall at the moment.

3  Q.    Okay.  What you recalled when your Complaint

4  was filed was the "You can't sort Four Ball"?

5  A.    Oh yeah.

6  Q.    Okay.  All right.  Same deal, if you remember

7  something, any other insults, let me know; okay?

8  A.    Yes.

9  Q.    Okay.  So this is when the office, the outer

10 office door is still closed.  Who could hear that

11 besides Blaine and Jodi and you?

12 A.    Well, if you're standing in the hall, you

13 probably could hear us.

14 Q.    So you assumed Randy might have heard that?

15 A.    No.

16 Q.    You don't assume that?

17 A.    No, no, because it looked like he -- he looked

18 like he just got --

19 Q.    Walking --

20 A.    Yeah, that's Randy.

21 Q.    Walking up the stairs?

22 A.    Yeah.

23 Q.    Okay.  So that's what I am saying.  Are you

24 aware of anyone else who heard that insult besides

25 you and Blaine and Jodi?

Page 101

1  A.    No.

2  Q.    Do you still have that?  Do you still have

3  these notes?  Let's make those 10.  I'll mark it for

4  you.

5        (Exhibit No. 10 was marked.)

6  BY MR. HERRINGTON:

7  Q.    For the record, Exhibit 10 is your document

8  production Bates 56 to 77.

9  A.    Okay.

10 Q.    Do you still have a copy of the Amended

11 Complaint, or the Complaint?

12 A.    Yes.

13 Q.    You do?

14 A.    Yes.

15 Q.    Look at paragraph 38 with me.  So in paragraph

16 38 it says, "Defendant Reeves continuously insulted

17 Ms. McIntosh in the presence of Blaine Burgess and

18 proceeded to yell insults at Ms. McIntosh as Ms.

19 McIntosh was leaving."

20       Did I read that correctly?

21 A.    Yes.

22 Q.    Okay.  And so what you're -- the specific facts

23 that you're referring to in paragraph 38 are what you

24 have just described to me at the discharge meeting?

25 A.    Yes.

Page 102

1  Q.    Okay.  Any other insults that you recall today?

2  A.    Well, other than I didn't have the skills, and

3  I couldn't go forward, and -- you take -- that's a

4  very bad insult, I mean, "You're not trainable."

5  Q.    But that's what Jodi said in the office?

6  A.    Yes.

7  Q.    In her office before you walked out?

8  A.    Yes.

9  Q.    Okay.  And she didn't yell that; did she?

10 A.    She didn't yell those.

11 Q.    Okay.

12 A.    Just the Four Ball one.

13 Q.    Okay.  I want to make sure I understand the

14 sequence.  You're in Jodi's office.  You say, "I'm

15 not going to argue with you" and leave to go to your

16 desk.  And she yells, "You couldn't even sort Four

17 Ball"?

18 A.    Correct.

19 Q.    And then you say again, "I'm not going to argue

20 with you"?

21 A.    Uh-huh.

22 Q.    Okay.  Do you understand that you have sued

23 Jodi individually for a claim called the tort of

24 outrage?  Do you understand that?

25 A.    Yes.

Page 103

1  Q.    Okay.  What did Jodi do that was outrageous?

2  A.    Are you talking about just that one time, or

3  are you talking about all incidents?

4  Q.    Let's stick with that day, and then we'll go

5  from there.

6  A.    Well, when Jodi gets real mad, her face turns

7  real red, which is a known fact, very definite tone

8  of outrage when she said, "You don't have the skills

9  to move forward."

10       Then, as I stated, she didn't know what

11 skills I had.  She didn't even try.  She stated

12 again, "You don't have the skills."

13 Q.    So that's -- what we are talking about right

14 now is the conversation in her office --

15 A.    Correct.

16 Q.    -- the day of discharge.  Okay.  So -- and you

17 think it's outrageous that she said, "You don't have

18 the skills," when she didn't even try?

19 A.    That, and I think it was outrageous that she

20 talked, whatever she said to Joan about me, as to

21 Joan wouldn't ever talk to me.

22       And if Jodi knew that for 18 months, she

23 should have solved the problem back then, if she

24 thought it was a problem.

25 Q.    Okay.  What else did Jodi say or do that you

Page 104

1  contend goes beyond all bounds of decency in a
2  civilized society?
3  A.    You mean the time I was there, the whole time?
4  Q.    Uh-huh.
5  A.    Well, let's see, she has --
6  Q.    If we have exhausted what we are talking about
7  the day of.
8  A.    As far as I -- again, remember, on the day of.
9  Q.    Right.
10 A.    That's, that's all I can remember right now on
11 that day.
12 Q.    Okay.  And that's all you wrote down in your
13 notes; right?
14 A.    I think so, yes.
15 Q.    Okay.  So, now, if you contend that she engaged
16 in conduct that rose to the level of constituting the
17 tort of outrage during your employment, tell me what
18 that is.
19 A.    When you say "outrage," you mean as to her tone
20 or --
21 Q.    Well, I, I don't --
22 A.    -- things that she asked me to do that
23 shouldn't have asked or, I mean?
24 Q.    Well, let me -- your lawyers can agree or
25 disagree with me on the description of the tort,

Page 105

1  okay, but the tort of outrage very succinctly stated
2  is when a defendant engages in conduct that is
3  totally outrageous and beyond all bounds of decency
4  in a civilized society.
5        That is one description that the Courts
6  have made.  So it's a high bar; okay?  So I -- and,
7  frankly, I don't think you can chin it, so I want to
8  hear from you today what it is that you think Jodi
9  did that constitutes this tort of outrage.
10 A.    Well, the day she came busting through the
11 terrace room door.
12 Q.    All right.  Tell me about busting through the
13 terrace room door.
14 A.    Well, I don't, I don't know what her intent was
15 there, and I was standing outside the terrace room
16 door talking when she came busting through there.
17 Q.    When was this?
18 A.    Oh, Lord.  I'm going to assume '16, '15 or '16.
19 Q.    Did you make a note of it?
20 A.    I don't, I don't think I did on that one, or it
21 could have, be one of the little side notes over
22 here.  I don't remember.
23 Q.    Take your -- I mean, you can take your time and
24 flip through there.
25 A.    (Witness reviews document.)

Page 106

1  Q.    But it was -- it was in '15 or '16 prior to the
2  day of your discharge?
3  A.    Yes.
4  Q.    How long -- just give me a ballpark.  Was it,
5  like you said, a year before?  Six months before?
6  A.    I know it wasn't cold outside.
7  Q.    So when you say "busting through the terrace
8  room door," you guys were -- you and Barrie were
9  outside?
10 A.    Uh-huh.
11 Q.    And so she is coming from inside to outside?
12 A.    Uh-huh.
13 Q.    So just describe for me what you mean when she
14 busted through the door.
15 A.    Well, you could tell she hit the door hard by
16 the sound, instead of just pushing it open.
17 Q.    Okay.  Was she coming to talk to you guys, or
18 was she --
19 A.    She said she was going to her car, but I have
20 never known her to go through the terrace room, but
21 that's neither here nor there.  But I'm assuming she
22 saw us on camera talking and came down.
23 Q.    But after she hit the door and came out onto
24 the terrace where you were, what happened next?
25 A.    She was shocked, look of shock on her face, and

Page 107

1  said she was going to her car to get something.  I
2  don't even know what she was going to her car to get.
3  I don't recall seeing any car keys in her hand.
4  Q.    Anything else to you or about you?
5  A.    Not that I remember, no.
6  Q.    Okay.  What, what else did she do that was
7  outrageous?
8  A.    I can't read that and think at the same time.
9  Well, I was uncomfortable when she asked me to find
10 out, and I don't know if it was considered
11 outrageous, who had a broken knee or foot at the
12 club.
13 Q.    What do you mean?
14 A.    It was on the insurance.  She wanted me to
15 snoop around and see if I knew who it was.
16 Q.    What, what do you guys get in the accounting
17 office that shows insurance claims?
18 A.    I didn't get anything.  I am assuming Jodi did.
19 Q.    When was this?
20 A.    Probably '13 or '14.  I thought I had a note on
21 it with a date.
22 Q.    So we get -- so it's your assumption that Jodi
23 gets some sort of aggregate information about
24 claims --
25 A.    Uh-huh.

Page 108

1   Q.    -- paid by the club's insurance?
2   A.    Uh-huh.
3   Q.    Did you have Blue Cross, or QualChoice, or
4   Health Advantage, or somebody?
5   A.    United Health Care.
6   Q.    Well, of course, I would guess the one.  So
7   it's a -- I mean, it's a fully-funded plan.  I mean,
8   it's a full-insured insurance plan; right?
9   A.    Uh-huh.
10  Q.    I mean, do employees pay premiums, or does the
11  club pay all of the premiums?
12  A.    The employees pay a portion.
13  Q.    Okay.  Even for individual coverage?
14  A.    Yes.
15  Q.    Okay.  So you assumed that Jodi saw something
16  in the information from, who, Health Advantage?
17  A.    United Health Care, I'm assuming.
18  Q.    United Health Care, that's right, United Health
19  Care, that some employee had had a claim for a broken
20  foot or ankle or something?
21  A.    Uh-huh.
22  Q.    So what did she say exactly?
23  A.    She just asked me if I knew who it was, and I
24  said, No.  She said, Well, sneak around and see if
25  you can find out who it is.  Well, that's, that's

Page 109

1   wrong.
2   Q.    What else, what else did she say about that?
3   A.    Nothing.
4   Q.    Did she ever follow up with you on it?
5   A.    I don't think so.
6   Q.    Okay.  What else did she do that was --
7   A.    Kept asking -- I broke my wrist, not at the
8   office, and kept asking me if I was going to get the
9   money back, get reimbursed, if I was going to sue.
10  Q.    When did that happen?
11  A.    Golly.
12  Q.    When did you break your wrist?
13  A.    October of '12 maybe.
14  Q.    October of 2012?
15  A.    Yes.
16  Q.    Okay.  And she just asked you if you -- so what
17  happened, briefly?  I don't need all of the details.
18  A.    I fell.
19  Q.    Where did you fall?
20  A.    At a Holiday Inn.
21  Q.    Okay.  So did you ever make a claim against the
22  Holiday Inn?
23  A.    I talked to an attorney, and he filed
24  something, but they didn't have some kind of
25  insurance, so it was all dropped.  I mean, I

Page 110

1   didn't -- there wasn't anything thing we could do.
2   Q.    Never got a -- you never got any money from the
3   Holiday Inn?
4   A.    No.  No.
5   Q.    So did you slip at their pool or something?
6   A.    Yes.
7   Q.    On a wet deck?
8   A.    Yes.
9   Q.    Who was the lawyer?
10  A.    I don't remember.  I could -- I know his
11  address, I mean, where he's at, but.
12  Q.    Was it Holiday Inn here in Little Rock?
13  A.    No, North Little Rock.
14  Q.    North Little Rock.  So had you mentioned to
15  anyone at the club that you might talk to a lawyer
16  and pursue that against that hotel?
17  A.    Her and Susan talked me into going to talk to
18  one.
19  Q.    You mean Jodi and Susan?
20  A.    Yes.
21  Q.    So what did Jodi and Susan say?
22  A.    That they thought I needed to go talk to an
23  attorney over this.
24  Q.    Did you find -- I mean, did you disagree?  I
25  mean, there are lots of slips and fall cases that get

Page 111

1   claimed and filed.
2   A.    I'm -- that's not really me.  I mean, come on,
3   it's a pool deck, was my way of thinking.
4   Q.    But you went to see a lawyer, and he thought
5   there was merit enough to write a demand letter?
6   A.    Yeah, something about some insurance, if they
7   have got some kind of something insurance.  I don't
8   remember exactly what he called it, but anyway, they
9   didn't have it.
10  Q.    So what did Jodi say exactly about whether you
11  are going to sue or not that you think was
12  outrageous?
13  A.    Asking -- so that means the club will get their
14  money back.
15  Q.    Because the club's insurance paid?
16  A.    Yes.
17  Q.    It's not really the club's money; is it?  Isn't
18  it United Health Care's?  I mean, who, who paid your
19  medical bills, United Health Care?
20  A.    United Health Care.
21  Q.    Are you familiar with the term "subrogation"?
22  A.    Yes, but define it again.
23  Q.    So that means if, if United Health Care pays
24  your medical bills, and then somebody else is held
25  responsible, then United Health Care gets their money

Page 112

```
 1   back; right?
 2   A.    Yes.
 3   Q.    So why would Jodi then press you to see a
 4   lawyer?
 5   A.    Well, you get better premiums if you have less
 6   claims.
 7   Q.    What else did Jodi do that you think was
 8   outrageous?
 9   A.    Well, asking me not to tell the truth but not
10   to lie.
11   Q.    Are you -- if you are looking at a note, and
12   that's on there, just mention the page at the bottom.
13   A.    Sixty-nine.
14   Q.    Which number?
15   A.    Six.
16   Q.    On 69?
17   A.    Yeah.  Am I looking at it right?
18   Q.    Well, it says 2014, number 6, 5-20-14, Jodi's
19   husband Bob gets fired from Dillard's?
20   A.    Yes.
21   Q.    Where does she ask you to -- what do you say
22   to -- I don't want to put words in your mouth.
23   A.    Not to lie but don't tell the truth.
24   Q.    Not to lie but not to tell the truth?
25   A.    Yeah.  Nobody knew that Bob, her husband, got
```

Page 113

```
 1   fired from Dillard's and had moved to Fayetteville,
 2   and she was looking for a job.
 3   Q.    Okay.  So what did she ask you to not lie but
 4   not tell the truth about?
 5   A.    Don't tell anyone that Bob has moved to
 6   Fayetteville.
 7   Q.    Okay.  It says in number seven, "Jodi swears
 8   Susan and I to secrecy."
 9   A.    Yes.
10   Q.    Is that what you're talking about?
11   A.    Yes.
12   Q.    Okay.  So just don't tell anybody?
13   A.    Uh-huh.
14   Q.    What else?
15   A.    Well, she got a new pair of shoes and twisted
16   her ankle at the club and asked us not to tell.  She
17   didn't want to file a workman's comp claim.
18   Q.    Oh, when was that?
19   A.    Well, whenever she broke her ankle.
20   Q.    Okay.  What else?
21   A.    She said that they had been noticing that I was
22   still taking the bank deposit, and they decided that
23   Carlos, I think his name is Carlos, was going to take
24   the bank deposit.
25            But the strange thing of that, she said
```

Page 114

```
 1   something to me about the bank deposit the day
 2   before, and I said, Oh, I don't mind, because it
 3   gives me a chance to get out of here for a little
 4   while.
 5            Well, the next day when I come in, I was no
 6   longer taking the bank deposit.  So I asked her whose
 7   idea that was.  She tells me Blaine's, but Randy told
 8   me it was Jodi's idea.
 9   Q.    When was that?
10   A.    I wrote it down on there somewhere.  3-23 of
11   '16.  No, no, no.  That's not right.
12   Q.    I do recall seeing that, so don't worry about
13   it.
14   A.    Okay.
15   Q.    So you think she took that duty away from you
16   just because you enjoyed doing it?
17   A.    Yes.
18   Q.    What else do you -- if we are talking about the
19   tort of outrage, what else, what other claims would
20   you put under there?
21   A.    When my vacation hours got changed.
22   Q.    When did that happen?
23   A.    Oh, there is a copy of it in there.
24   Q.    Well, just describe to me, when you say, "My
25   vacation hours got changed," what does that mean?
```

Page 115

```
 1   A.    I put in for 12 hours, and they changed it to
 2   16.
 3   Q.    For when?
 4   A.    There is a check copy in there.
 5   Q.    So why do you think --
 6   A.    Oh, 3-28, I'm sorry.
 7   Q.    3-28 of what?
 8   A.    Of '16.
 9   Q.    Is the vacation hours?
10   A.    Yes.
11   Q.    On what page are you looking at in your notes?
12   A.    Seventy-one.  Number 19.
13   Q.    Joan changed your approved vacation hours from
14   12 to 16?
15   A.    Yes.
16   Q.    So that resulted in you getting four more hours
17   of pay but not having four more hours in the bank, so
18   to speak; right?  Right?
19   A.    Yes.
20   Q.    Okay.  But Joan did that?
21   A.    Per Jodi's request.
22   Q.    So do you remember how many hours in March of
23   '16 you would have had accrued?
24   A.    No.
25   Q.    Would it have been, I mean, a week or two in
```

Page 116

1   addition to these 12 or 16 hours?
2   A.    I still had four, four days accrued when I
3   left.
4   Q.    Okay.  So other than getting four hours of pay
5   that you didn't expect on your check, what is the
6   harm of her changing that?
7   A.    I requested 12 hours.  I was coming in the next
8   day for four hours.
9   Q.    Uh-huh.
10  A.    So I didn't have to use all of my vacation
11  days.  Jodi left the day before I was going to go on
12  the, come in on the four hours and work.  She left
13  that day like she always did when we went on
14  vacation, Go ahead if you have got your desk clean
15  and get out of here early.
16        I assumed that meant, you know, leave today
17  and start your vacation, even though I requested 12
18  hours.
19  Q.    So you were an hourly employee?
20  A.    No.
21  Q.    You weren't?
22  A.    No.
23  Q.    You were paid a salary?
24  A.    Yes.
25  Q.    So you expected to be able to leave early and

Page 117

1   not have to take vacation --
2   A.    Yes.
3   Q.    -- on that day?
4   A.    Yes, that was, that was the way it was always
5   in the past.  And then she admitted that she didn't
6   even read what she signed.  She thought it said --
7   she didn't know it said 12 hours.
8   Q.    So meaning Jodi?
9   A.    Jodi.
10  Q.    Okay.  What else?
11  A.    My point was that nobody else has checked to
12  see if they are working four hours when they are
13  going to take four or not.  I was the only one that
14  they changed hours on.
15  Q.    As far as you knew.
16  A.    Well, Joan said that she changes all of the
17  time.
18  Q.    So it wouldn't be just you then?
19  A.    She said she changes times all of the time.  I
20  don't know who else it was or if it was clock in or
21  clocks out, that, I don't know.
22  Q.    What else under this heading of conduct that
23  goes beyond all bounds of decency in a civilized
24  society?
25  A.    (Witness reviews document.)  I don't know if it

Page 118

1   falls under that heading, but the day she was
2   screaming on the phone at Wes, the IT tech guy.
3   Q.    It wasn't screaming at you?
4   A.    No, but it was loud.
5   Q.    When was that ballpark?
6   A.    '15 or '16.  It was after New Year's on '16.
7   Q.    Okay.  What else?
8   A.    Yeah, here's the note I made about the vacation
9   hours.
10  Q.    What page is that on?
11  A.    Sixty.
12  Q.    Okay.  What else?  The last thing you said was
13  screaming at Wes the IT guy.
14  A.    The conversation itself was full of lies, but
15  that's --
16  Q.    What conversation?
17  A.    That she was having with Wes.
18  Q.    Okay.  Did it have anything to do with you?
19  A.    No.
20  Q.    Okay.  Well, then we'll skip that.  What else
21  under this heating of outrage, tort of outrage?
22  A.    I don't see anything that's sticking out right
23  now that I'm going through this.
24  Q.    All right.  Well, if anything else occurs to
25  you, let me know.

Page 119

1   A.    Okay.
2   Q.    Let's turn to your age claim.  If you look at,
3   again, your Amended Complaint.  If you look at
4   paragraph 25, it says, Ms. McIntosh was terminated
5   effective November 18, 2016.
6         The stated reasons for termination were
7   false and protectual in nature, were truly motivated
8   in whole or in part by age.
9         Did I read that correctly?
10  A.    Correct.
11  Q.    So why do you think that it was motivated in
12  whole or in part by age?
13  A.    I was near retirement, the same as several
14  people.
15  Q.    Do you think that was part of the reason?
16  A.    I do.
17  Q.    Okay.  Why?
18  A.    Because I was nearing retirement, and I was
19  comfortable with my finances.
20  Q.    What does that mean, "I was comfortable with my
21  finances"?
22  A.    Well, I mean, it was obvious she knew I was
23  putting away all of my check in either savings or
24  401(k).
25  Q.    Okay.  So Jodi knew that you were putting away

Page 120

1    all of your paycheck?
2    A.    Yes.
3    Q.    Why would that motivate her to terminate your
4    employment?
5    A.    Anytime you got comfortable and close to
6    retirement age, that seems to be the practice of
7    getting terminated.
8    Q.    And you were how old?
9    A.    Sixty-three.
10   Q.    Okay.  Had you discussed retirement?
11   A.    Oh yeah, moving to Florida and what I was going
12   to do.
13   Q.    Did you ever estimate when?
14   A.    I was hoping at 66.  If I could have made it at
15   65, I would have done that.
16   Q.    What would it have taken to make it at 65?
17   A.    Finances.  Insurance.
18   Q.    Was your husband retired?
19   A.    Yes.
20   Q.    Where was he retired from?
21   A.    Sandvick.
22   Q.    Did he have retiree health insurance?
23   A.    No.
24   Q.    So were you both on club's insurance?
25   A.    No.

Page 121

1    Q.    Was he on Medicaid, Medicare?
2    A.    Yes.
3    Q.    With a supplemental or something?
4    A.    I -- yes.
5    Q.    So he was already past 65, your husband?
6    A.    Yes.
7    Q.    Were there benefits that one would receive if
8    they, quote/unquote, retired from The Country Club of
9    Little Rock that you wouldn't if you were discharged
10   at age 63?
11   A.    I wouldn't receive any benefits from the club
12   after I retired, no.
13   Q.    Right.  That's what I'm saying.  There's no
14   magic age or years of service where you get some
15   pension benefit from the club?
16   A.    You got your 401(k), some contributions from it
17   that the club put in, and you got your Christmas
18   distribution, and every year you were there it went
19   up, the same as it went up on the other side.
20   Q.    So you think they fired you because they were
21   having to pay you bigger Christmas distributions?
22   A.    I think it was a total sum of all of it.
23   Q.    The, the -- but the bigger Christmas
24   distribution would have been based on years of
25   service?

Page 122

1    A.    Correct.
2    Q.    Okay.  And I'm still trying to connect the dots
3    on the retirement age thing.  You tell me your
4    opinion as to why a company would fire an employee as
5    they neared retirement age if they weren't preventing
6    you from getting some retirement benefit?
7    A.    For the pay from the time you were fired until
8    the time you would have stayed.
9    Q.    So they were firing you for the pay to keep you
10   from getting --
11   A.    No, it's for the age.
12   Q.    But when you say -- what I'm trying to
13   understand what you mean by that you said for the pay
14   you would have received between your discharge and
15   retirement; right?
16   A.    Pay had something to do with it.
17   Q.    Just explain why you think that, why your pay
18   had something to do with it.
19   A.    It would be a combination of all --
20   Q.    Okay.
21   A.    -- of the pay, of your living standards, how
22   comfortable you are.  Being jealous would be another.
23   Just there had been a whole conversation.  It wasn't
24   for the reason I was given.
25   Q.    Are you saying on the pay that your salary was

Page 123

1    higher because you had been there since 2009?
2    A.    It would have been higher than what they would
3    have got somebody else in for, yes.
4    Q.    You said age, salary, hire, comfortable
5    finances, I'm just paraphrasing, of course, just
6    trying to tick them off, and then you said jealousy.
7    What was Jodi jealous of?
8    A.    Me being able to retire.  Me having a new car.
9    Q.    What else?
10   A.    Well, I told you comfortable with my finances,
11   comfortable with my life, getting ready, getting
12   prepared, talking about it.
13   Q.    Do you think it had anything to do with her
14   taking sides with Joan?
15   A.    It could have.  I doubt it.  I mean, she said
16   it was my skill set, and Joan didn't know skill set,
17   so I don't know.  The taking sides is, is what I
18   would have worded that.
19   Q.    Well, you said you she talked to you the day
20   before your discharge about you would have thought
21   after 16, 18 months y'all would be friends; right?
22   A.    Yes.
23   Q.    I mean, and Jodi initiated that conversation?
24   A.    Yes.
25   Q.    So was it, was it your understanding, then,

Page 124

1 that Jodi didn't think y'all got along?

2 A.   Yes.

3 Q.   Do you think that had anything to do with your

4 discharge?

5 A.   No.

6 Q.   Does she, does she pick Joan over you?

7 A.   No.  Or it would have been, it would have been

8 in the termination letter.

9 Q.   Okay.  So if it's not in the termination

10 letter, it wasn't the reason?

11 A.   No.  But, I mean, skill set was the only thing

12 I was told.  And that's why I got all of those

13 bonuses and stuff was because of doing a good job.

14 Q.   You think -- you mentioned insurance and her

15 sort of fixation on insurance a couple of times, her

16 ankle?

17 A.   Uh-huh.

18 Q.   Your wrist?

19 A.   Uh-huh.

20 Q.   Somebody else's ankle or foot; right?

21 A.   Uh-huh.

22 Q.   You think that had something to do with your

23 discharge, because you cost the club money?

24 A.   No.

25 Q.   You don't?  I mean -- well, I mean, you

Page 125

1 mentioned it, I mean you brought it up.  That's why I

2 thought --

3 A.   No.

4 Q.   -- you might have thought she got rid of you

5 because you had this claim?

6 A.   No, no.

7 Q.   Or part of it?

8 A.   No.

9 Q.   You don't think that was even a part of it?

10 A.   No.

11        (Exhibit No. 11 was marked.)

12 BY MR. HERRINGTON:

13 Q.   I will hand you what we have marked as Exhibit

14 11.  Are these some additional notes that you took,

15 or are these notes you rewrote?

16 A.   Just points that hit my head that I jotted down

17 to make sure that I had an original note on it, so I

18 wouldn't forget.

19 Q.   So these were made sometime during the

20 litigation, Exhibit 11?

21 A.   No, probably before that.

22 Q.   Well, I mean, were they contemporaneous with

23 their employment, or were they written after your

24 discharge?

25 A.   These were put together after the discharge.

Page 126

1 Q.   That's what I thought.

2 A.   Yeah.  These pages, yes.

3 Q.   Like you were saying these are neater, kind of

4 a rewrite from some of the other stuff?

5 A.   Uh-huh.

6 Q.   Number one, it says that she came in and said,

7 They hired a new banquet director, she is 57, then

8 states that surprised her.

9 A.   Yeah.

10 Q.   Who would have been in charge of hiring the

11 banquet director?

12 A.   I guess Blaine.

13 Q.   Did she, did she elaborate on why that hire

14 surprised her?

15 A.   Other than she was old, 57, that surprised her.

16 Q.   Did she say old, or did she say 57?

17 A.   No, she said "old.  She's 57."

18 Q.   You didn't write "old" in your note --

19 A.   Okay.

20 Q.   -- did you?

21 A.   Yeah, doesn't it say, "And she's old"?

22 Q.   I thought it said -- okay.  I can't read that.

23 A.   It says old.

24 Q.   Okay.  "She's old," and, "She's 57."  So when

25 was this?

Page 127

1 A.   Whenever they hired Beth.

2 Q.   Beth who?

3 A.   Something with an E.

4        MS. REEVES:  Elinsky.

5 BY MR. HERRINGTON:

6 Q.   Elinsky?

7 A.   That sounds right.

8 Q.   E-l-i-n-s-k-y.  Do you remember what year that

9 was?

10 A.   Again, I think '16.

11 Q.   Okay.  So how old were you at the time?

12 A.   What, 63.

13 Q.   And how old was Jodi at the time?

14 A.   Fifty-one.

15 Q.   How old was Joan at the time?

16 A.   I don't know.  I forgot how old she said she

17 was, 60.

18 Q.   So Jodi hired Joan at 60 and then says she is

19 surprised that Blaine hired Beth at 57?

20 A.   Uh-huh.

21 Q.   Did she elaborate?

22 A.   No.

23 Q.   Did you ask any questions?

24 A.   No.  I did not.

25 Q.   Did anybody else?

Page 128

1  A.    No.

2  Q.    You say here, Without my knowledge, went behind

3  my back, called CCLR president, Tom Baxter, and asked

4  him how I could get out of jury duty?

5  A.    Correct.

6  Q.    When was that?

7  A.    I don't remember the year.  Twelve, '13.

8  Q.    Why did you write that down?

9  A.    Why did it write it down?  It came to my head.

10 Q.    Okay.  Do you think it's evidence that you were

11 fired because of your age?

12 A.    No.

13 Q.    Do you think she -- did you get out of jury

14 duty --

15 A.    No.

16 Q.    -- or did you go do it?

17 A.    I went and did it.

18 Q.    Do you think that that had something to do with

19 her decision of firing you?

20 A.    No.

21 Q.    Did Jodi say she wouldn't have hired her, or

22 did she just say that surprised her that Blaine would

23 hire her?

24 A.    That surprised her.

25 Q.    Look at -- again, we are still looking at

---

Page 129

1  Exhibit Number 11.  Number six on page three, it

2  says, "Jodi talked bad behind everyone's back about

3  them"?

4  A.    Yes.

5  Q.    So who did she talk bad about?

6  A.    She talked bad about Blaine, Javier (phonetic),

7  Randy, Heather, the chefs, the people at the pool.

8  Q.    Did she ever say anything related to their age

9  or them being old?

10 A.    Not of those.

11 Q.    Anyone else?

12 A.    Basically just Beth.

13 Q.    Back to Exhibit 10, do you still have that in

14 front of you?  Do you tell -- you do.  Look at page

15 61 with me.

16 A.    I happened to be there.

17 Q.    Can you read the first entry, or the first

18 three lines on 3-28-16?

19 A.    3-28-16, 12:30, requested from Nut copy of my

20 vacation request form.

21 Q.    Who is Nut?

22 A.    Joan.  I put "N" in there for it to be -- I

23 couldn't put "J" when I would make any notes, "J" for

24 Jodie, and Jo for Joan, so I put "N."  And then I saw

25 that icon nut, so I just -- a joke on my part.

---

Page 130

1  Q.    What do you mean icon?

2  A.    On my phone one day, so instead of putting "N"

3  I just put Nut.

4  Q.    Do you have these on your phone?

5  A.    No.  I said I saw the icon, the nut, on my

6  phone.

7  Q.    Oh, okay.  So "Nut" was referring to, to Joan?

8  A.    Yeah, normally I just put "N".

9  Q.    But so if I see "Nut" in here or "N," that's

10 Joan?

11 A.    That is correct.

12 Q.    Look at page 70 with me.  I thought it was 70.

13 I don't see it right offhand, but it says somewhere

14 in here about shredded reviews, do you know what I'm

15 talked about?

16 A.    Page 70, number 11.

17 Q.    Is it?  What does that mean?

18 A.    Jodi shredded mine and Susan's reviews.

19 Q.    So she actually did them and then put them in

20 the shredder.

21 A.    I don't know if she wrote them, but I was told

22 she shredded the reviews.

23 Q.    By whom?

24 A.    Susan.

25 Q.    Do you know if she did them, or did y'all do,

---

Page 131

1  like, employee self-evaluation or something?  What

2  are --

3  A.    We did a self-evaluation in the last year I had

4  one, '13.

5  Q.    So you had not, you had not done a

6  self-evaluation since 2013?

7  A.    Correct.

8  Q.    So what, what evaluations did Susan tell you

9  Jodi shredded?

10 A.    The reviews.

11 Q.    But which years, I mean?

12 A.    '14 and '15.

13 Q.    But you hadn't gotten a review in '14 or '15;

14 had you?

15 A.    That is correct.

16 Q.    And you hadn't done a self-evaluation in '14 or

17 '15; had you?

18 A.    That is correct.

19 Q.    So what did she shred, just the form, the blank

20 form?

21 A.    I am assuming the form.

22 Q.    Then look at 71, number 16, Confronted Jodi

23 about bank deposit.  Is that what we were talking

24 about, letting you do the bank deposit?

25 A.    Yes.

Page 132

1    Q.    And what did -- and so what did you say when

2    you confronted her?

3    A.    I said, Hey, I hear it's you I'm supposed to

4    thank for me not taking the bank deposits.  And she

5    said, No, it was Blaine.  I said, Well, that's funny,

6    I was told it was you.

7    Q.    Did you tell her who told you that?

8    A.    Natalie and Randy told me.

9    Q.    I mean did you tell --

10   A.    No, I didn't tell her, no.

11   Q.    Okay.  And her response was, It was Blaine?

12   A.    She just kept -- yes, and she just kept on

13   walking up the stairs.

14   Q.    Okay.  Is that, is that everything about that

15   confrontation?

16   A.    That particular one, yes.

17   Q.    Okay.  So did anyone else at the club say or do

18   anything that you believe shows that the club would

19   fire you because of your age?

20   A.    Did anyone else; is that what you asked me?

21   Q.    Yeah.

22   A.    I basically just only had conversations with

23   Jodi.

24   Q.    Okay.  The only conversation where Jodi

25   mentioned someone's age was this comment about Beth?

Page 133

1    A.    The only time she commented on someone's age,

2    yes.

3    Q.    So in terms of why you believe your age had

4    something to do with it, we had this long discussion

5    about nearing retirement; right?

6    A.    Uh-huh.

7    Q.    And then the comment about Beth's age.  What

8    else did anyone, Jodi, Blaine, anyone else at the

9    club say or do that makes you think you were fired

10   because of your age?

11   A.    Other than the other people that were nearing

12   retirement.

13   Q.    Okay.  Well, then we will talk -- and kind of

14   get into that then.  I will hand you what we will

15   mark as Exhibit 12.

16         (Exhibit No. 12 was marked.)

17   BY MR. HERRINGTON:

18   Q.    So in your charge you say a 57 year old

19   coworker who had 16 years on the -- over 16 years was

20   discharged, too.  Was that Susan?

21   A.    Yes.

22   Q.    Okay.  And she was fired back in '16.  We kind

23   of discussed that.

24   A.    No.

25   Q.    '15?

Page 134

1    A.    Correct.

2    Q.    I had '15 in my note.  I just read it wrong.

3    So she was fired in '15, and do you know the reason

4    stated why she was fired?

5    A.    I do not.

6    Q.    Were you present when she cussed Jodi?

7    A.    I was present when both of them were in Jodi's

8    office.

9    Q.    So tell me what, what you heard?

10   A.    I didn't specifically hear any words, just a

11   lot of, a lot of loud screaming.

12   Q.    So the door was shut?

13   A.    Yes.

14   Q.    Just her and Jodi in the room?

15   A.    Yes.

16   Q.    Okay.  But you -- it's your testimony here

17   today that you couldn't hear what they were saying

18   inside?

19   A.    That is correct.

20   Q.    So were you sitting at your desk that we have

21   looked at in the picture in the schematics?

22   A.    Yes.

23   Q.    Okay.  Were you wearing headphones?

24   A.    No.

25   Q.    Did you have your radio playing?

Page 135

1    A.    Yes.

2    Q.    How loud do you usually play that?

3    A.    Not real loud.

4    Q.    So even if the -- so her office is that

5    well-insulated that you can't hear even a loud

6    conversation sitting at your desk?

7    A.    Honestly, I didn't want to hear it.

8    Q.    Okay.  So but is it because you consciously

9    tuned it out, or because the sound proofing is that

10   good?

11   A.    I consciously tuned it out, and if I remember

12   correctly, I got up and left.

13   Q.    Why did you get up and leave?

14   A.    I didn't want to hear it.

15   Q.    Would you say 57 is nearing retirement?

16   A.    I think you start getting your ducks in a row.

17   Q.    Had Susan talked about getting her ducks in a

18   row to Jodi?

19   A.    Well, she had bought a new car, and her husband

20   was getting prepared in a few years to retire, and

21   Jodi knew, knew all of that, yes.

22   Q.    Did -- like you said, that you had sort of put

23   a timeline, 65 or 66; right?

24   A.    Yes.

25   Q.    Had Susan put a potential date, exit date that

Page 136

1  anybody knew about at the club?

2  A.   I know her husband was 66, and I'm thinking

3  that Susan had mentioned she was hoping to retire at

4  65.

5  Q.   So she was then eight years away from

6  retirement?

7  A.   Yes.

8  Q.   Okay.  So you got up and left, so you don't

9  know what Susan screamed at Jodi?

10 A.   I don't know what Jodi screamed at Susan

11 either.

12 Q.   But the answer to my question is you don't

13 know?

14 A.   No, I do not know.

15 Q.   What Susan screamed at Jodi?

16 A.   I do not.

17 Q.   So other than the fact that she was 57 years

18 old, what, what other facts would you point to to

19 indicate to a reasonable person that Jodi fired Susan

20 because of her age?

21 A.   Susan was comfortable.

22 Q.   Okay.

23 A.   You know.

24 Q.   Tell me about that.

25 A.   I think she had started putting more money in

Page 137

1  her 401(k), and I think she had put more money -- I

2  can't swear more money anywhere else, but I think she

3  had mentioned she put more money in 401(k), buying a

4  new car, doing things to her house to get ready,

5  while you're working to take care of things, your

6  finances.

7  Q.   And it's your testimony that Jodi knew this?

8  A.   Yes.

9  Q.   Okay.  Okay.  So you think Jodi knew that she

10 was comfortable and sort of making preliminary

11 steps -- so did the club match 401(k) at all?

12 A.   I think it was in percentages.

13 Q.   Like they would match a percentage of what you

14 chose to contribute?

15 A.   No, I think they matched a percentage of what

16 the members chose to contribute.

17 Q.   I don't understand.

18 A.   Well, I don't know where, where the

19 contribution money came from.

20 Q.   Here is what I am saying, I'm asking; all

21 right?  So you decide at the end of the year or in

22 each paycheck, I am going to put this much of my

23 pretax dollars in a 401(k); correct?

24 A.   Correct.

25 Q.   And there is some cap; right?

Page 138

1  A.   Yes.

2  Q.   Does the club match those contributions?

3  A.   I don't -- not so on the percentage, no.

4  Q.   The --

5  A.   They put some, they contribute, but it's not a

6  matching contribution.

7  Q.   Okay.  So there is no matching.  So what, what

8  is the criteria for the club's -- or, I'm sorry, the

9  club's contribution to any individual employee's

10 401(k)?

11 A.   I do not know.

12 Q.   Is it like every employee in the club get the

13 exact same amount?

14 A.   I wouldn't think so.

15 Q.   Is it a percentage of the employee's salary?

16 A.   Honestly, I don't know.  You just got a piece

17 of paper once a year that told you what the club put

18 in.

19 Q.   So I don't want to put words in your mouth, but

20 are you saying that you think that the club

21 terminates employees who are, in your words, nearing

22 retirement, because they are having to spend more

23 money on 401(k)?

24 A.   That's another reason, yes.

25 Q.   We asked in Interrogatory Number 6 for you to

Page 139

1  state in full detail the factual basis for your

2  allegations in paragraph 23 of your Complaint, that

3  CCLR employees are fired when nearing retirement,

4  including but not limited to the identity of the

5  employees to whom you are referring.

6       And you stated Keith Ihms, Debi Davies, and

7  Virginia Colbert, and Susan Hill --

8  A.   Correct.

9  Q.   -- right?  So we talked about Susan; right?

10 Right?

11 A.   Yes.

12 Q.   So let's talk about -- let's just take them in

13 the order that you listed them.  Keith Ihms?  What

14 was his job there?

15 A.   Golf maintenance manager.

16 Q.   Do you know why he was fired?

17 A.   I couldn't attest to the exact cause, no.

18 Q.   No, I guess I should have been more precise.

19 Do you know the club's stated reason for his

20 discharge?

21 A.   I do not.

22 Q.   So because you don't know the stated reason,

23 you can't testify whether that is or isn't accurate?

24 A.   Correct.

25 Q.   Okay.  Do you know how old he was?

Page 140

1   A.   In his sixties.
2   Q.   Do you know what his years of service was?
3   A.   Over ten.
4   Q.   Who was his -- who was the decision-maker?
5   A.   I'm sure Blaine.
6   Q.   Did Jodi any part in it?
7   A.   HR, she played a part.
8   Q.   But do you know?
9   A.   I'm sure she was probably in on the
10  termination.
11  Q.   And why, why do you say you're sure she
12  probably was?
13  A.   Because she is HR.
14  Q.   Okay.  You don't have any first-hand knowledge;
15  that's your assumption?
16  A.   That is correct.
17  Q.   Okay.  What year was he discharged?
18  A.   Oh, '14, '13.
19  Q.   Who was his immediate supervisor?
20  A.   Blaine.
21  Q.   When is the last time you talked to him?
22  A.   To Keith?
23  Q.   Uh-huh?
24  A.   He was still employed when I talked to him.
25  Q.   So you don't have any personal knowledge

Page 141

1   regarding his discharge?
2   A.   No.
3   Q.   You weren't involved in whatever situation it
4   was that led to his discharge?
5   A.   Well, I did some investigation on, on time
6   clocks.
7   Q.   What did you do?  What were you --
8   A.   Well, the people in the golf shop, maintenance,
9   where somebody was doing some clocking in and
10  clocking out for them, guarantying four hours.  I was
11  in on that investigation.
12  Q.   So Keith was, when it was bad weather, Keith
13  was clocking his folks in or out and getting them
14  hours where they weren't actually working?
15  A.   That's my understanding, yes.
16  Q.   And who asked you to investigate that?
17  A.   Blaine and Jodi.
18  Q.   Okay.  And what was your, what was your role in
19  the investigation, and what did you report to Blaine
20  and Jodi?
21  A.   All of the discrepancies in the time where it
22  was exact this and exact that.
23  Q.   Did it appear to you that someone was clocking
24  these employees in or out to get them more hours than
25  they actually worked?

Page 142

1   A.   That's what it looked like, yes.
2   Q.   Okay.  Have you had any conversation with
3   anyone who was involved in the decision to discharge
4   Keith about that decision?
5   A.   No.
6   Q.   Okay.  Other than your report to Jodi and
7   Blaine, what you found in your investigation?
8   A.   Yeah.  I mean, it was me and Susan and Jodi and
9   Blaine, as far as I know, were the only ones that
10  knew anything.
11  Q.   Okay.  Debi, Debi Davies?
12  A.   Yes.
13  Q.   Who is Debi Davies?
14  A.   She was banquet director.
15  Q.   And when was she fired?  Ballpark year.
16  A.   '13, '14.
17  Q.   Who fired her?
18  A.   Blaine.
19  Q.   Do you know how old she was when she was fired?
20  A.   Sixty something.
21  Q.   Do you know the reason given by the club as to
22  why she was fired?
23  A.   I can only tell you what I heard, hearsay.
24  Q.   Okay.
25  A.   Double booked a room for a banquet.

Page 143

1   Q.   Do you know whether that's true or not?
2   A.   Again, that's what I heard.
3   Q.   From whom?
4   A.   Just people talking.  I couldn't tell you
5   exactly who.  Actually, I think, I think Jodi told me
6   that.
7   Q.   Do you have any facts to refute that she double
8   booked a room?
9   A.   I don't.
10  Q.   So was Blaine the decision-maker?
11  A.   As far as I know, yes.
12  Q.   When is the last time you talked to Debi?
13  A.   I think I have spoken to her once since my son
14  died.
15  Q.   And that was in '15; right?
16  A.   Yes.
17  Q.   Okay.
18  A.   But it was a while, I spoke to her after he
19  did, so.
20  Q.   Was she calling about that?
21  A.   Yeah.
22  Q.   She was just calling to offer condolences?
23  A.   Yes.
24  Q.   And that was before you were discharged?
25  A.   Yes.  No, no, no, I think it was after, right

Page 144

1  after.

2  Q.  Right after you were discharged?

3  A.  No.  You have got me all confused.  I was

4  discharged in '16, and I moved in '17.  It was '17.

5  I had just moved in my house, because she called on

6  the condolences of Jonathan, and congratulations on

7  the new home.

8  Q.  Did you talk about your discharge?

9  A.  No.

10  Q.  Did you talk about her discharge?

11  A.  No.

12  Q.  Did you tell her you had a lawsuit pending?

13  A.  No.

14  Q.  You weren't involved in the situation leading

15  to her discharge?

16  A.  No.

17  Q.  You weren't involved in the decision to

18  discharge?

19  A.  To her discharge, no.

20  Q.  Okay.  And other than Jodi telling you she

21  double booked a room, did anybody else talk with you

22  about the decision the club made to discharge her?

23  A.  Not that I recall.

24  Q.  Okay.  So the reason you think she was fired

25  because of her age is simply because she was in her

Page 145

1  sixties and nearing retirement?

2  A.  That, and she had, was getting her house ready

3  to sell or had sold it at the time.  Getting

4  comfortable.  She had bought a new car.

5  Q.  Okay.  Who is -- any other evidence or facts

6  that you would point to to say she was fired because

7  she was in her sixties?

8  A.  Ask me that again now.

9  Q.  Are there any other fact -- if somebody said

10  why do you think Debi was fired because of her age;

11  what would you say?

12  A.  I would say because she was getting ready for

13  retirement, getting, nearing retirement age.

14  Q.  Okay.  Why would you say that?

15  A.  Because she was.

16  Q.  Okay.  But did anybody connected with her

17  discharge make any comments that you either heard or

18  had been told indicating they were firing her because

19  of her age?

20  A.  No.

21  Q.  Same question with Keith, anybody connected

22  with his discharge say anything that you could point

23  to to say that's evidence that they fired him because

24  of his age?

25  A.  No.  Again, other than just nearing retirement

Page 146

1  age.

2  Q.  If you're running the place, do you fire Keith

3  for time clock fraud?

4  A.  I do not.

5  Q.  Why not?

6  A.  If that's an agreement he made with his

7  employees, and I'm going on based on where I worked

8  before.  We guaranteed our employees four hours, and

9  that's what he did.  He guaranteed his employees four

10  hours.

11  Q.  But did he have the, did he have the authority

12  to guarantee that?

13  A.  I don't know.

14  Q.  Okay.  Virginia Colbert, who is Virginia?

15  A.  She worked there.  I took her place.

16  Q.  How old was she?

17  A.  I know she was in her sixties, and that's

18  basically all I know.

19  Q.  And how old were you?

20  A.  Sixty-three.

21  Q.  No, when you were hired.

22  A.  Oh, what did we decide, 50 --

23  Q.  Fifty-seven?

24  A.  Fifty-seven.

25  Q.  So she was the accounts receivable clerk.  Do

Page 147

1  you know who hired her?

2  A.  I am going to guess Jodi did.

3  Q.  Do you know how old she was when she was hired?

4  A.  I do not.

5  Q.  Do you know the reason given by the club as to

6  why she was fired?

7  A.  I do not.

8  Q.  So you can't refute it if you don't know what

9  it is.

10  A.  Again, the retirement age.

11  Q.  Okay.  And Jodi would have been the one to make

12  that decision --

13  A.  Yes.

14  Q.  -- as far as you know?  Have you ever talked to

15  her?

16  A.  No.

17  Q.  Do you know why -- I think -- do you know why

18  she was fired?

19  A.  I do not.

20  Q.  Okay.  Did anybody ever talk to you about why

21  she was let go?

22  A.  No.

23  Q.  How many people would you say -- how many

24  people were you personally aware of that were

25  discharged in the years that you worked there?

Page 148

```
1    A.    Only the people that I basically just knew?
2    Q.    Yeah, just the ones you knew about.
3    A.    I knew Keith, Kyle Bundy (phonetic), Debi,
4    Susan.  I think Floyd retired.
5    Q.    Floyd who?
6    A.    I don't know.
7    Q.    What was his job?
8    A.    Bartender, men's grill, yeah, men's grill.
9    Q.    How old was he, ballpark?
10   A.    I don't know how old Floyd was.  I think I -- I
11   don't know if he retired or was asked to resign.  I
12   don't know.
13   Q.    Okay.
14   A.    There was a guy in tennis that was terminated,
15   one of the tennis pros.
16   Q.    Which one, do you remember?
17   A.    The big tall one.
18              MS. REEVES:  Eric Korita.
19              MR. HERRINGTON:  Who was it?
20              MS. REEVES:  Eric Korita.
21              THE WITNESS:  Yeah.
22   BY MR. HERRINGTON:
23   Q.    Was it Eric Korita?  She can't ask, but I can.
24   A.    Yeah.
25   Q.    Who else do you -- again, I know I am just
```

Page 149

```
1    asking off the top of your head, people that you knew
2    who had gotten fired while you work there.
3    A.    There was a Martin somebody.
4    Q.    What did he do?
5    A.    Tennis.  Somebody named John Bobo (phonetic).
6    He was in the kitchen.  And that chef, I don't
7    remember what his name was.  He might have quit.  I
8    can't swear that all of these were fired or just left
9    on their own.
10   Q.    That's fine.
11   A.    There was some chef, I can't remember.
12   Q.    I mean, if you say, Well, I'm not sure, then
13   that's fine.
14   A.    There was a chef when I first got there.  I
15   don't remember what his name was.  He wasn't, he
16   wasn't there long.  I mean, we didn't work together
17   long.
18   Q.    Right.
19   A.    He could have been there for years.  Then there
20   was another chef that was there.  I know some guys in
21   the pro shop that left for other jobs, Cory and...
22   Q.    And if they left, don't worry about that.
23   A.    Yeah.
24   Q.    Just ones that you think -- again, I mean if --
25   A.    Yeah.
```

Page 150

```
1    Q.    -- it turns out that they quit, nobody is going
2    to go, "Aha."  Right?  So people that you think got
3    fired while you were there?
4    A.    I think that.
5    Q.    Okay.  How old is Kyle when he was fired?
6    A.    Forty.
7    Q.    What about Eric?
8    A.    I don't know, maybe the same.
9    Q.    What about Martin?
10   A.    Maybe in his fifties.
11   Q.    John Bobo.
12   A.    You can't tell, you can't tell by looking,
13   thirties maybe.
14   Q.    And then the chef that left in 2009?
15   A.    I want to say sixties.
16   Q.    And the other chef that you couldn't recall?
17   A.    Probably the thirties or forties.
18              MR. HERRINGTON:  Let's go off the
19         record.
20         (Fifty-seven minute lunch break.)
21         (Exhibit No. 13 was marked.)
22   BY MR. HERRINGTON:
23   Q.    I will hand you what I have marked as Exhibit
24   13.  Do you recognize that as the Intake
25   Questionnaire you filled out at the time you filed
```

Page 151

```
1    your EEOC charge?
2    A.    Yes.
3    Q.    Okay.  Look at the very last page.  Well, the
4    second to last page down at the bottom, it says,
5    better, number eight.  Do you see that?
6    A.    Yes.
7    Q.    And that corresponds to question number eight
8    on the second page that says, "Describe who was in
9    the same or similar situation as you and how they
10   were treated."
11         Did I read that correctly, on the second
12   page, question number eight, this answer here right.
13   A.    Uh-huh.
14   Q.    On the handwritten page on the second to last,
15   if you look at the second page of the document I
16   handed you, down at the bottom it has question number
17   eight.  Do you see that?
18   A.    Yes.
19   Q.    So your answer in the handwritten pages
20   corresponds with question number eight on the second
21   page; right?
22   A.    The numbers are the same.
23   Q.    Right, okay.  Well, so, and what is your answer
24   there?  Read that for me.  It says, "Better," and
25   then it says what?
```

Page 152

1  A.    "All employees who would be required to learn,
2  use new software were trained, not sure when."
3  Q.    Okay.  And who would that be?  Do you know who
4  the employees were that would be trained on this new
5  software?
6  A.    Well, it should be banquets, and Mike Self, and
7  all of the servers, bartenders, accounting.
8  Q.    Well, in terms of the servers and bartenders,
9  that's just where they are, like, inputting orders --
10  A.    Yes.
11  Q.    -- when they are waiting tables; right?
12  A.    Yes.
13  Q.    They do that with any system; right?
14  A.    Yes.
15  Q.    Okay.  But in terms of accounting employees who
16  would be trained, that would be Jodi and Joan; right?
17  A.    Yes.
18  Q.    Okay.  And then, of course, whoever they hired
19  in the future?
20  A.    Correct.
21  Q.    Before we go on on there, I was asking you with
22  respect to the individuals that you had named, Debi,
23  and Keith, et cetera, I asked you if you had talked
24  to them since your discharge.  Have you otherwise
25  communicated with them if you haven't talked to them?

Page 153

1  A.    No, just, just Susan and Debi.  That's it.
2  Q.    Okay.  When was the last time you talked to
3  Susan?
4  A.    Oh, what's today, Thursday, yesterday.
5  Q.    Okay.  Tell me about your conversation with
6  Susan yesterday.
7  A.    Her ex mother-in-law passed away, and she
8  called to tell me.
9  Q.    How often do you and Susan visit on the phone?
10  A.    Oh, on the phone, probably once a week.
11  Q.    Okay.  And in person?
12  A.    I try to once a week.
13  Q.    Okay.  And tell me the times you have talked
14  with Susan about this suit?
15  A.    Well, she knows it's happening.
16  Q.    Okay.  Well, tell me the times you have talked
17  to her about it?
18  A.    Actually, the only thing we talked about
19  yesterday about it was, Good luck, be calm, don't
20  stress.  They can't eat you.  You know, it was just a
21  pep talk.
22  Q.    Okay.  Did you talk to her before you listed
23  her as a witness?
24  A.    When did I list her, and I can tell -- oh, just
25  on this you mean, the EEOC?  I talked to her, but

Page 154

1  probably just to tell her that I was going to go talk
2  to EEOC.
3  Q.    Well, tell me, you, you said earlier in your
4  testimony that you purposefully tried not to hear the
5  conversation, right, between Susan and Jodi before
6  she was discharged?
7  A.    That is correct.
8  Q.    When did you talk to Susan after her discharge?
9  When is the first time you talked to her after her
10  discharge?
11  A.    Golly.  I don't think I talked to her the same
12  day.  I think it was next day.
13  Q.    Okay.  And did she tell you what the
14  conversation was in that?
15  A.    No, sir.
16  Q.    Office?  Did you ask her?
17  A.    No, sir.
18  Q.    Did you call her or did she call you?
19  A.    I think she called me.
20  Q.    To talk about what?
21  A.    She was upset.
22  Q.    Okay.  So she was upset, but she didn't tell
23  you what she was upset about?
24  A.    I didn't question her, and she -- well, she
25  told me when she was there that she got fired.

Page 155

1  Q.    Uh-huh.
2  A.    I mean, I knew she got fired.
3  Q.    Okay.
4  A.    And she just -- the only thing she told me was
5  that Jodi told her that our business relationship has
6  deteriorated.
7  Q.    Uh-huh.
8  A.    And the only other part she said was Blaine
9  said he had no choice but to back Jodi.  And she said
10  she shook, I think, Blaine's hand.
11       I didn't ask her.  She was crying.  We
12  didn't talk about it.  She was very upset.  I got --
13  we just didn't, not, not about her specific day of
14  termination, no.
15  Q.    How many times past that day after her
16  discharge have you talked with her about the
17  circumstances surrounding her discharge?
18  A.    Not so much the circumstances.
19  Q.    Has she ever said that she thought she was
20  fired because of her age?
21  A.    She has mentioned it, yes.
22  Q.    Tell me what she said.
23  A.    Well, she said, you know, I was getting
24  comfortable.  I had just bought a new car, and she
25  said I guess that just triggered Jodi and made her

Page 156

1   mad, and that's when she told me she was putting more
2   money in her 401(k).
3   Q.   An employee putting more money in a 401(k)
4   doesn't cost the club anything; does it?
5   A.   No, but it makes you feel secure and look
6   secure.
7   Q.   So back to Exhibit 13, it says on the second
8   page, "Worse, no one."  Does that mean you are saying
9   that people who are similarly situated who were
10  treated worse, you don't think there are any?
11  A.   Is that still with question eight?
12  Q.   Yeah, look on the second -- on the very last
13  page, it says, "Worse, no one.  Same, no one."
14  A.   Well, but is that still me writing --
15  Q.   I assume.  I mean, you tell me.
16  A.   (Witness reviews document.)  Honestly, right
17  now, I didn't put a number, so I don't -- I don't
18  know what I was answering.
19  Q.   That's fine.
20  A.   And I was answering question eight on the
21  second page.
22       (Exhibit No. 14 was marked.)
23  BY MR. HERRINGTON:
24  Q.   I will hand you what I have marked as Exhibit
25  14.  Tell me if that is the dismissal that you

Page 157

1   received from the EEOC.
2   A.   (Witness reviews document.)
3   Q.   Is that the dismissal that you received?
4   A.   Yes.
5   Q.   That's all I was needing on that one.
6       (Exhibit No. 15 was marked.)
7   BY MR. HERRINGTON:
8   Q.   I will hand you what I have marked as Exhibit
9   15.  We talked about earlier in the day that you and
10  Jodi had spoken about your relationship with Joan on
11  November 17th, 2016; right?
12  A.   Yes.
13  Q.   So this was Exhibit H to our EEOC response.
14  You may or may not -- you said you had reviewed it,
15  but it might have been a while.  Just read that, and
16  then I want to ask you a couple of questions about
17  it.
18  A.   About two --
19  Q.   Not out loud.
20  A.   Oh, okay.
21  Q.   I mean just read it.
22  A.   I'm used to reading to kids all day.
23  Q.   I understand, I have got a two-year-old.
24  A.   (Witness reviews document.)  Okay.
25  Q.   So when you and Jodi spoke on the 17th, did she

Page 158

1   say what's that all about?
2   A.   No, sir.
3   Q.   But she did say, After 15 to 18 months I would
4   expect you would be friends by now; right?
5   A.   Yes.
6   Q.   Okay.  Were you staring at Joan when you were
7   getting something off the printer?
8   A.   I could have glanced back, yes, sir.
9   Q.   Okay.  It says, Joan informed me on previous
10  occasions that Karen just stares her down as she
11  passes by to and from her desk to the printer."
12       Do you see where I have read that?
13  A.   Yes, sir.
14  Q.   Do you have any, any facts that would refute
15  that Joan told Jodi that?
16  A.   She also said she doesn't look up.
17  Q.   Right.  But do you have any facts to refute
18  that Joan told Jodi that you stare her down when you
19  are going to the printer?
20  A.   I am sure I have glanced at her several times,
21  but I don't remember staring her down.
22  Q.   What was the problem between you and Joan?
23  A.   You would have to ask Jodi.
24  Q.   Well, I mean, what -- from your perception,
25  what was the problem between you and Joan?

Page 159

1   A.   I think Jodi asked her not to speak with me.
2   Q.   I will hand you what I will mark as 16.
3       (Exhibit No. 16 was marked.)
4   BY MR. HERRINGTON:
5   Q.   This was Exhibit A to the company's EEOC
6   response.  Did you review it either back when it was
7   provided to you from the EEOC or at any point
8   thereafter?
9   A.   I never saw this until I got copies of the EEOC
10  file.
11  Q.   Okay.  Then -- so the first time you read it
12  was after you obtained the file?
13  A.   Correct.
14  Q.   Right?  Okay.  So tell me what's not accurate
15  on here?
16  A.   Well, I can create a Microsoft Excel
17  spreadsheet, and I can format, and I can do formula
18  calculations.  I knew the billing system.  I wasn't
19  aware there was anything else I needed to know with
20  it.
21  Q.   Did you ask Jodi about system interface and
22  revenue code file changes in setups?
23  A.   I am not sure I understand what you're...
24  Q.   Well, the sentence is, "She didn't demonstrate
25  the comfort level or aptitude for mastering the

Page 160

1  current billing system, as evidenced in the
2  continuing questions regarding the system interface
3  and revenue code file changes and setups, even though
4  I worked with her on the changes."
5        Did I read that sentence correctly?
6  A.   Correct.
7  Q.   Okay.  So her perception was you didn't
8  demonstrate a comfort level or aptitude because you
9  continued to ask her questions about those issues.
10 A.   I didn't set up revenue codes, except for the
11 golf, except for the tennis shop and the golf shop.
12 And I worked with Barrie and Cory or whoever was in
13 the golf maintenance, I mean the golf pro shop.
14 Q.   Did you ask Jodi questions about those issues?
15 A.   Well, sometimes where she would want to -- if
16 it was the pro shop's inventory or who was getting
17 paid for it, yeah, those kind of questions, but not
18 how to set them up.  I set them up all of the time.
19 Q.   When you say you set them up all of the time,
20 what did you set up?
21 A.   The new revenue codes.
22 Q.   What does that mean?  Explain that.  What is a
23 revenue code?
24 A.   Well, it tells it where to go in the system,
25 and also how it prints out on the members' statement.

Page 161

1  Q.   Give us an example for revenue code that would
2  need to be changed for some reason.
3  A.   Let's say the tennis shop got in, I think they
4  started restringing rackets.  So you would have to
5  set up a revenue code to restring the rackets, and it
6  was put out on their bill to string rackets.
7  Q.   Uh-huh.
8  A.   And then they were selling Cokes, and they
9  started selling beer, and things like that.
10 Q.   It says, "The new software uses SQL database
11 report writing and queries and is a more complex
12 system."
13        True or false?
14 A.   I don't know.
15 Q.   Okay.  It says, "There will be additional needs
16 for advanced use of Excel spreadsheets for setting up
17 and analyzing member data and revenue and expenses."
18        True or false?
19 A.   I'm sure there would be, yes.
20 Q.   So tell me if this is accurate, that your
21 disagreement with Jodi's assessment of your aptitude
22 and ability to learn this new system is really that
23 she didn't give you a chance?
24 A.   That is correct.  No one knew the system.
25 Q.   So you have also sued, I guess, the club, and

Page 162

1  Jodi for false imprisonment.
2             MR. HERRINGTON:  I will let you answer
3        that if you want to.
4             MS. MCHUGHES:  Yes.
5  BY MR. HERRINGTON:
6  Q.   So look at the Amended Complaint with me, at
7  paragraph 30.  So it says that there was an implied
8  threat of force in that Ms. McIntosh was afraid of
9  being claimed insubordinate if she refused to comply.
10        Did I read that correctly?
11 A.   Yes, sir.
12 Q.   So is there any other implied threat of force,
13 other than you were afraid you might be claimed
14 insubordinate?
15 A.   I was going to -- I didn't want to cause any
16 trouble, so I, I didn't know what was going to
17 happen, so I did as requested.
18 Q.   Because your, because your supervisor asked you
19 to come into her office, you went into her office?
20 A.   Well, not willingly, but I did, yes.  Yes, I
21 did.
22 Q.   And it also says that if you -- I'm just
23 reading, Insubordination and misconduct would risk
24 the possibility of a severance payment pursuant to
25 Personnel Policy 6.13 in the employee handbook.

Page 163

1        So you did as you were requested because
2  you didn't want to risk losing a severance payment;
3  is that right?
4  A.   At the time it happened I did -- no, at the
5  time I didn't -- the severance package wasn't
6  entering my mind until we were into the meeting.
7  Q.   Okay.  So the -- and then paragraph 31 says you
8  were compelled to go where you did not want to go?
9  A.   That is true.
10 Q.   The compelling force was your desire not to be
11 claimed insubordinate, and nothing else; correct?
12 A.   That's a confusing question.  I didn't want the
13 boat to be any more upset than it was, so I tried to
14 go in and listen.
15 Q.   Now, the lot -- so in paragraph 32 it says the
16 locking the doors restrained you of your liberty to
17 come and go.  The doors were always locked from the
18 same side of the door you were on; correct?
19 A.   Correct.
20 Q.   So you had the ability at any moment to unlock
21 them?
22 A.   If I -- yes.
23 Q.   How many times had you been asked to go to
24 Blaine's office in the seven years that you worked
25 there?

## Page 164

1  A.    Oh, one or two.

2  Q.    Did you go every time you were asked?

3  A.    Yeah.  Yes, sir.

4  Q.    How many times had you been asked to go to

5  Jodi's office in the seven years you worked there?

6  A.    Three or four.

7  Q.    Did you go every time you were asked?

8  A.    Yes.

9  Q.    In those seven years prior to this date did you

10 ever think there was anything inappropriate about

11 them asking you to come to their office?

12 A.    No.

13 Q.    What were you discussing on those occasions,

14 ballpark?  I know you are not going to remember the

15 details.

16 A.    Usually with Blaine it was a member situation,

17 and Jodi it was the Joan deal, the -- they are going

18 to change our working hours from 8:30 to 5:00, an

19 hour for lunch, no leaving early on Monday anymore.

20 Now, she brought me in one time because she was

21 crying because something about Susan.

22 Q.    At BFI were you ever called to the office to

23 talk to your supervisor, or HR, the manager, or

24 anybody in their office?

25 A.    I talked to HR.

## Page 165

1  Q.    You wouldn't think it's unusual that a

2  supervisor asks a subordinate to come to their office

3  to discuss an employment matter; would you?

4  A.    I'm sorry.  Do what now?

5  Q.    Would you think it was unusual for a supervisor

6  to ask a subordinate to come to their office to

7  discuss an employment matter?

8  A.    No.

9  Q.    I will hand you your discovery responses.  I

10 will make them Exhibit 17, so I don't have to go find

11 them.

12           (Exhibit No. 17 was marked.)

13 BY MR. HERRINGTON:

14 Q.    Look at Interrogatory Number 2 and 3.  I think

15 the -- well, let's go with number three.  Blaine

16 never got out of the chair before you left the

17 office; did he?

18 A.    No.

19 Q.    So on Interrogatory Number 3 you list potential

20 witnesses, and I just want to visit with you about

21 these folks briefly.

22           We have talked about Debi Davies.  Have you

23 had any text messages with any of the people listed

24 in Interrogatory Number 10, I mean Interrogatory

25 Number 3?

## Page 166

1  A.    Do I have any text messages; is that what you

2  asked?

3  Q.    Yes.

4  A.    I texted Natalie and said congratulations on

5  the twins.  And I texted Amy and said congratulations

6  on her baby.

7  Q.    So when did Debi leave?  When did she get

8  fired?

9  A.    I'm going to guess '13.

10 Q.    So she was gone three years before you were

11 fired?

12 A.    Yes.

13 Q.    So what information relating to your

14 termination or your skills to perform your duties

15 would she have?

16 A.    Debi and I worked together on the banquets.

17 Q.    What does that mean?

18 A.    On the accounting side.  She would want a

19 special invoice typed up for certain members, and I'd

20 type them up.  We would work together on that and

21 change and correct anything that was wrong.

22 Q.    When you say type up an invoice, was there a

23 template for invoices?  Was it just a Word document?

24 A.    Just a Word document.

25 Q.    Okay.  So you would just fill in the

## Page 167

1  information for -- like, if somebody had reserved the

2  terrace room for some brunch, you would create the

3  invoice for that?

4  A.    I would break it down sometimes for them, yes.

5  Q.    Okay.  But then you would just put the

6  information on the invoice with the description and

7  the dollars and total it up; right?

8  A.    Correct.  That I set up.

9  Q.    Okay.  Well, what information does she have

10 related to your termination?

11 A.    Oh, well, she knows, she knows I was fired.

12 Q.    Because you told her?

13 A.    Uh-huh.

14 Q.    Who is Natalie Fielding?

15 A.    Actually, I think Jodi called and told her.

16 Q.    Jodi called Debi and told her?

17 A.    Yeah.

18 Q.    When is the last time you talked to Debi?

19 A.    Last year.

20 Q.    What is Natalie's -- what was her job there?

21 A.    Membership director.

22 Q.    And when was she -- when did she leave?

23 A.    I don't know.  For all I know she is still

24 there.

25 Q.    Okay.  What would she know about your

Page 168

1  termination?
2  A.   Well, I think she was one of the ones standing
3  in the hall when I got terminated.
4  Q.   Went you say "standing in the hall," where
5  would she have been?
6  A.   In the main entrance.  There was about six of
7  them standing there.
8  Q.   Downstairs?
9  A.   Correct.
10 Q.   Like --
11 A.   Where the new receptionist's desk is.
12 Q.   That's a long way from Jodi's office; isn't it?
13 A.   Yes, sir.
14 Q.   And who was -- so who was standing at the
15 receptionist's desk?
16 A.   That new guy, Tyler, and that -- whatever the
17 receptionist's name is, and Beth, and -- oh, there
18 was four or five of them.  I just had tunnel vision
19 and walked out.
20 Q.   So, I mean, this is just the main hallway in
21 the, in the country club; right?
22 A.   Yes.
23 Q.   Okay.  And do you think they were there because
24 you were being fired?
25 A.   Uh-huh, yes, sir.

Page 169

1  Q.   Okay.  And why do you think that?
2  A.   Because I went in the main office Thursday, and
3  when you walk in, and everybody shuts their mouth,
4  but I didn't think anything about it that Thursday.
5  But it clicked as soon as they came in the department
6  on Friday and terminated me.
7  Q.   Okay.  But then you think these people knew it
8  was going down the day it went down?
9  A.   Yes, sir.
10 Q.   And your, and the basis for that is the people
11 in the main office showed up on Thursday when you
12 walked in?
13 A.   Except for one chef, when he jumped out of
14 Blaine's office and hollered, Hello, Karen, real
15 loud, which was totally out of character.  And,
16 again, I didn't think anything of it that Thursday
17 until, until Friday happened.
18 Q.   Okay.  So she, she witnessed you walk by after
19 you were fired; right?
20 A.   I'm pretty sure Natalie was there.
21 Q.   What other information about your termination
22 would she have?
23 A.   I'm not sure what all Blaine -- I don't know
24 for sure what she would know.  She just sent me a
25 text.

Page 170

1  Q.   What text?
2  A.   I think she just had a crying face.
3  Q.   Do you still have it?
4  A.   Oh, I would have to look.
5  Q.   If you have any texts to or from any of the
6  people listed in Interrogatory Number 3, will you
7  provide them to your counsel, so we can get copies?
8  A.   Sure.
9  Q.   So she texted you the day after, is that what
10 you're saying, or the day of?
11 A.   I don't -- I think it was the day of.
12 Q.   Okay.  Have you talked to her since?
13 A.   Except for -- no, except for to send her that
14 text and congratulations on the twins.
15 Q.   Have you spoken to her about this lawsuit or
16 your claims at all?
17 A.   No.
18 Q.   Amy Ramage, who is that?
19 A.   She was, again, catering director.
20 Q.   Do you know if your attorneys have talked -- if
21 your attorneys talked to any of the individuals
22 listed on Interrogatory Number 3?
23 A.   Not to my knowledge.
24 Q.   All right.  Amy Ramage, when is the last time
25 you talked to her?

Page 171

1  A.   I talked to her after she got fired.
2  Q.   What was she fired for?
3  A.   No.  I think she quit.  She did.
4  Q.   Okay.  Why did she quit?
5  A.   She got a job at Alotian.
6  Q.   What was your conversation with her?
7  A.   Oh, congratulations, and going just on her new
8  job.
9  Q.   How did you know?  How did you know that she
10 had quit and taken this job at Alotian?
11 A.   She told me.
12 Q.   You had to have talked to her to know that?
13 A.   We went to lunch that day, and that afternoon
14 is when she gave her notice, and she told me.
15 Q.   Okay.
16 A.   Still at the club.
17 Q.   So you're still working at the club?
18 A.   Yes.
19 Q.   Okay.
20 A.   And on that question you asked me earlier if I
21 knew anybody else that was terminated --
22 Q.   Uh-huh.
23 A.   -- I thought of somebody else.
24 Q.   Okay.  Who?
25 A.   Javier somebody.

## Page 172

```
1   Q.    Cappuccino (phonetic)?
2   A.    Yeah.
3   Q.    He was fired.  Was he one of the chefs?
4   A.    I don't know if he was fired or not, but Jodi
5   made the comment it took her five years to get rid of
6   him.
7   Q.    How old was he when she got rid of him?
8   A.    I don't know how old Javier was.
9   Q.    He wasn't very old; was he?
10  A.    I think he was older than he looked, but I
11  wouldn't swear.  I'm going to guess in his fifties,
12  forties, fifties.
13  Q.    Did Jodi make any other comments about his
14  discharge, other than, It took me five years to get
15  rid of him?
16  A.    No.
17  Q.    He didn't report to her; did he?
18  A.    No, but neither did a lot of the ones she
19  helped get fired.
20  Q.    How did she help get Javier fired?
21  A.    That, I'm not sure of.  I just know what her
22  comment was on him.
23  Q.    Tell me what Amy's job was.
24  A.    Catering director, banquet manager -- I don't
25  know -- one of them.
```

## Page 173

```
1   Q.    So what information would she have regarding
2   your termination or your skills to perform your
3   duties?
4   A.    If I put that in there, I don't know that she
5   would know anything about my termination, but she
6   would know about my skills.
7   Q.    Bonnie Burnam is Barrie Burnam; right?
8   A.    Barrie.
9   Q.    B-a-r-r-i-e?
10  A.    I think so.
11  Q.    Why does Barrie have a 901 number?
12  A.    I think that should be 501.
13  Q.    And it says she has information related to your
14  skill set?
15  A.    Correct.  We worked quite a bit together on
16  different projects and setting up the revenue codes
17  and going over court times and so forth with the
18  tennis shop.
19  Q.    When is the last time you talked to Barrie?
20  A.    It was while I was still employed.
21  Q.    You haven't talked to Joan; have you?
22  A.    No, sir.
23  Q.    What about Virginia Colbert, she was your
24  predecessor?
25  A.    Correct.
```

## Page 174

```
1   Q.    Have you talked to her --
2   A.    No.
3   Q.    -- or had any other contact with her?
4   A.    No.
5   Q.    Texts, emails, et cetera?
6   A.    No.
7   Q.    How did you get her contact information?
8   A.    Internet, social media.
9   Q.    Her phone number is on the internet?
10  A.    I'm assuming it was, yes.
11  Q.    You didn't get it from somebody else like
12  Susan?
13  A.    No, sir.
14  Q.    How would she have information related to your
15  termination if she was fired, what --
16  A.    Well, she could state her --
17  Q.    -- eight years before you left?
18  A.    Well, I mean, she could state her, her
19  circumstances also probably paralleled with mine.
20  Q.    So she doesn't know anything about your
21  termination?
22  A.    Correct.
23  Q.    And then Beth, Beth Elinsky, have you talked to
24  her since you left?
25  A.    I have not.
```

## Page 175

```
1   Q.    And when I say "talked," I mean communicated
2   with.
3   A.    No.
4   Q.    Okay.  Did you just have her information before
5   you left?  How did you get her information?
6   A.    All of it's on, look it up, on internet.
7   Voter registration I think it's called.
8   Q.    Keith Ihms, have you talked to him since you
9   left?
10  A.    I have not.
11  Q.    Who is Heather Majors?
12  A.    She was membership director.
13  Q.    Now, Keith, he was fired before you were fired;
14  right?
15  A.    Yeah, and his paralleled with mine.
16  Q.    So he wouldn't have information about your
17  termination, he would have information about his
18  termination?
19  A.    Yes, that it would parallel with mine.
20  Q.    Who is Heather Majors?
21  A.    Membership director.
22  Q.    When is the last time you talked to her?  Is
23  she still there?
24  A.    No.
25  Q.    Okay.  Former membership.  So when is the last
```

1  time you communicated with her?
2  A.    The last day I guess she worked.
3  Q.    Ballpark that for me.
4  A.    I don't know.
5  Q.    I mean what year?
6  A.    In '13.
7  Q.    Who were the employees in the office on the, on
8  that Thursday that you walked in?  You say "the
9  office employees that knew that the Plaintiff would
10  be terminated on Friday."
11       Who were those employees that were in the,
12  kind of the main club office?
13  A.    Oh, in the main -- okay.
14  Q.    When you walked in that day?
15  A.    What is the chef's name?  I think his name is
16  Paul.
17  Q.    Chef Paul?
18  A.    Tyler was there.
19  Q.    Who is Tyler?
20  A.    That does maintenance.  There were quite a few
21  people.  I can't -- there might have been somebody
22  from golf maintenance in there.  Blaine was in there.
23  Natalie might have been in there.  Beth might have
24  been.  Randy.
25  Q.    I mean, it's a suite of offices, and then there

1  are desks kind of in the main area; right?
2  A.    Yeah.  Just two little desks, correct.
3  Q.    Okay.  Who else?  We have got Chef Paul, Tyler,
4  Blaine, Natalie, Beth, Randy.
5  A.    I think her name is Maggie.  She's a dining
6  room something.  I can't think of anyone else right
7  now.
8  Q.    Okay.  And then of those -- then tell me who,
9  who were the people Friday in the hall?
10  A.    Tyler, Beth, Randy was upstairs -- Tyler, Beth,
11  that receptionist, I don't know what her name is.
12  Q.    The receptionist was at the receptionist's
13  desk?
14  A.    Yeah.  I think Mike Self was there.  That's all
15  I can remember seeing right now.
16  Q.    Have you asked any of the folks listed in
17  Interrogatory Number 3 to be witnesses?
18  A.    Have I?
19  Q.    Uh-huh.
20  A.    Personally asked them, no, sir.
21  Q.    Anyone on your behalf?
22  A.    Not to my knowledge.
23  Q.    I want to kind of shift gears now.  Again, kind
24  of sticking with your discovery responses, I want to
25  ask you about emotional distress type damages.

1       We asked in Interrogatory Number 13 if you
2  contend you have been physically or mentally harmed
3  by the conduct of the Defendants.  Tell us all of the
4  people you have seen because of that.
5       You only have listed Dr. Susanna Shermer,
6  M.D.  What have you seen -- is she your primary care
7  doctor?
8  A.    Yes, sir.
9  Q.    How long has she been your primary care doctor?
10  A.    Dates, probably six years.
11  Q.    Okay.  And so you were first treated by her,
12  like, six years ago?
13  A.    I think so.
14  Q.    And without getting into a lot of detail, what
15  for?
16  A.    Just primary care doctor, just checkups.
17  Q.    When is the last time you were seen by her?
18  A.    This is October.  May, June.
19  Q.    Has she been, has she been at 1100 North
20  University the whole time?
21  A.    To my knowledge.
22  Q.    Okay.  And -- so, I mean, you have seen her for
23  sinus infections and respiratory infections and just
24  kind of general, right, checkups, general practice,
25  kind of the stuff we see doctors for?

1  A.    Just checkups.
2  Q.    Okay.  Just checkups?
3  A.    Pretty much.  I mean, I didn't have anything
4  else.
5  Q.    Okay.  Well, then in terms of some alleged
6  physical or mental harm caused by the Defendants,
7  what have you seen her for?
8  A.    High blood pressure, heart trouble.
9  Q.    What does "heart trouble" mean?
10  A.    I just had a stent put in my heart.
11  Q.    So your contention is that you had a blockage
12  because of the conduct of the Defendants?
13  A.    I am saying stress can do a lot of things to
14  you.
15  Q.    Has your doctor said that?
16  A.    Yes.
17  Q.    That, that stress caused the blockage in your
18  artery that needed --
19  A.    No, but stress, stress is not good for it, for
20  you.
21  Q.    When did you get the stent?
22  A.    Six weeks, eight weeks ago.
23  Q.    Has any health care provider attributed that to
24  the conduct of the Defendants?
25  A.    Not that, no.

**Page 180**

1  Q.   Okay.  How long have you had high blood
2  pressure?
3  A.   I was first diagnosed with it right after I got
4  terminated.
5  Q.   Do you remember what it was?
6  A.   Honestly, I don't.
7  Q.   When were you first -- were you prescribed
8  medicine for your high blood pressure?
9  A.   Yes.
10 Q.   Did the doctor tell you why you had high blood
11 pressure?
12 A.   Well, no.
13 Q.   So no health care professional has attributed
14 your high blood pressure to the conduct of the
15 Defendants?
16 A.   Again, other than she stressed to me not to
17 stress.
18 Q.   So is it your contention that being fired
19 caused your high blood pressure?
20 A.   Yes, sir.
21 Q.   Okay.  And upon what facts would you base such
22 a contention?
23 A.   I had been through -- I had buried two sons,
24 and my blood pressure didn't go up.  That's a
25 different emotional type stress than what you are

**Page 181**

1  stressed when you are terminated.
2  Q.   Do you think it was the -- so how long after
3  your discharge were you diagnosed with high blood
4  pressure?
5  A.   I think I went in like 30 days after.
6  Q.   Was it a checkup, or was it because you were
7  feeling bad?
8  A.   I think it might have been a checkup, because I
9  go twice, twice a year.  I'd have to ask her, and
10 then she told me my blood pressure was high.
11 Q.   Had it ever been high prior to that?
12 A.   No, sir.
13 Q.   Did she prescribe medication?
14 A.   Yes, sir.
15 Q.   What?
16 A.   I'd have to look it up.  I don't know.
17 Q.   Do you still take it today?
18 A.   I do.
19 Q.   Once a day?
20 A.   I take that one -- I take hers once a day, and
21 I take the one from the cardiologist once a day.  I
22 have two blood pressure pills.
23 Q.   Who is your cardiologist?
24 A.   Dr. Siddiqui.
25 Q.   Where is he at?

**Page 182**

1  A.   On -- he is over there by Baptist.  He is on
2  Kanis.
3  Q.   Heart Clinic Arkansas?
4  A.   Yes.
5  Q.   When did you start seeing Dr. Siddiqui?
6  A.   June.
7  Q.   Of '18?
8  A.   Yes.
9  Q.   Were you referred to him because of the
10 blockage?
11 A.   When I first started I was, because my feet
12 were cold, and she thought it might be some blockage
13 in the heart, so I was referred to him.
14 Q.   So what is it exactly that you're saying the
15 Defendants did that was wrongful that caused your
16 high blood pressure?
17 A.   Terminated me.  I mean, when you're terminated
18 at 63, you have got more distress than you do when
19 you are terminated at 40.
20 Q.   So it was the fact of the termination?
21 A.   And age.
22 Q.   Well, okay.  Have you seen any other health
23 care providers in 2016, '17, or '18, other than
24 Shermer or Siddiqui?
25 A.   Yes.  An ear doctor.  And I do not remember

**Page 183**

1  what his name was.  It could have been more.  I'm not
2  sure.
3  Q.   You are not saying that had anything to do with
4  the discharge; are you?
5  A.   No.
6  Q.   The ear doctor?
7  A.   No.
8  Q.   So the doctors that you claim to have seen
9  because of the conduct of my clients is Shermer and
10 Siddiqui; right?
11 A.   Correct.
12 Q.   Any others?
13 A.   No.
14 Q.   Okay.  How much were you making when you were
15 let go?  You don't remember?
16 A.   I do not.  I saw 30 something in one of these
17 pages.
18 Q.   Look at paragraph 26 of the Amended Complaint.
19 A.   Okay.
20 Q.   It says in the second sentence, "Applicants 55
21 and over have a significantly more difficult time
22 finding work than those who are younger."
23      Did I read that correctly?
24 A.   Yes.
25 Q.   It sites some study on Monster.com?

Page 184

```
1   A.    Yes.
2   Q.    You haven't read that article; have you?
3   A.    No, sir.
4   Q.    Without, without giving any credence to that
5   article in Monster.com, you were 56 years old when
6   you were hired by Jodi Reeves at The Country Club of
7   Little Rock; weren't you?
8   A.    Yes, sir.
9   Q.    So The Country Club of Little Rock is the
10  exception, not the rule; right?
11  A.    I'm not sure.  Maybe.  I don't know.  I didn't
12  read, I didn't read that article.
13  Q.    You said in -- when did you say the stent was
14  placed, six weeks ago?
15  A.    Yeah, I think it was about six weeks, six or
16  eight weeks.
17              (Exhibit No. 18 was marked.)
18  BY MR. HERRINGTON:
19  Q.    Look at the third page of Exhibit 18.  I will
20  tell you, I am sure you have seen these.  These are,
21  these are billing records that your attorneys have
22  provided to us.
23  A.    I haven't seen them, but that's okay.
24  Q.    This is doctor, this is Dr. Shermer; right?
25  You saw her on May 31, '17.  Do you remember what
```

Page 185

```
1   for?
2   A.    I'm trying to think if that -- that's not when
3   I had my earache, because that was before.  And then,
4   again, it could have just been my checkup with all of
5   lab charges on here.
6   Q.    Well, there are codes -- there is hypertension
7   and depression, and then there are three that are
8   redacted?
9   A.    Yeah, I take --
10  Q.    Did you see -- did you present -- did you
11  present with other symptoms to Dr. Shermer on the
12  17th that required you to go see a doctor?
13  A.    That's last year.  She had me go see -- because
14  I had a spot on my neck, and she sent me to see some
15  doctor, but there wasn't nothing wrong.
16        That could have been the 17th.  That was
17  right before I moved in.  And, yeah, I take a, I take
18  a pill for depression.
19  Q.    How long have you been taking that?
20  A.    Since November of '16.
21  Q.    What do you take?
22  A.    I do not know.  I went from taking no pills to
23  11 a day, so I don't know.
24  Q.    How many of those pills are you claiming are to
25  treat issues caused by my clients?
```

Page 186

```
1   A.    Well, the depression pill and the two high
2   blood pressure pills.
3   Q.    What are the other eight for?
4   A.    One is for chest pains.  One is an iron pill.
5   Plavix, something so you can take the Plavix, where
6   it doesn't hurt your stomach, three vitamins.
7   Q.    Do you know what else you would have been
8   seeing Dr. Shermer for on the 17th, 5-31-17?  I'm
9   sorry.
10  A.    Offhand, no, I do not.
11  Q.    You were talking about your, the documents we
12  related to your job search?
13  A.    Yes.
14  Q.    Do you remember seeing those, providing those
15  to your attorneys?  And we have copies.  I don't have
16  a copy in here with me, though.
17        Exhibit B-1 in your amended discovery
18  responses showed 56 applications or resumes between
19  your discharge in November of '16 and March 22nd of
20  '17.  Does that sound about right?
21  A.    That sounds about six months.
22  Q.    Okay.  Why did you stop looking for a job six
23  months after you were fired?
24  A.    That's when my husband went downhill.
25  Q.    Okay.  So at what, at what point in time -- let me ask
```

Page 187

```
1   it this way.  Has there been any point in time since
2   November of '16 that you have been unable to work
3   either physically or because of life circumstances?
4   A.    I have always been able to work.  There has
5   been no -- ask me again, because I --
6   Q.    That's what I am saying, either because of some
7   physical issue or because of some life circumstance,
8   like having to be home to take care of your husband?
9   A.    I didn't have to be home.  I chose.
10  Q.    Okay.
11  A.    Because he just went straight downhill at the
12  beginning of '18.
13  Q.    So that's -- so at the beginning of -- but I'm
14  talking about -- all right.  Well, you just told me.
15  When did you choose to take care of your husband
16  instead of looking for a job?
17  A.    I didn't choose to take care.  I didn't stay
18  home to take care of him, but when he got so bad, I
19  could not work at that particular time and try to
20  take care of the two little boys.
21  Q.    Okay.  So who are the two little boys?
22  A.    My grandsons.
23  Q.    Okay.  They live with you?
24  A.    Yes, sir.
25  Q.    How long have they lived with you?
```

Page 188

1  A.    Since 2010.
2  Q.    Okay.  So then let me rephrase it.  At what
3  point in time did you say I can't be looking for a
4  job because I have got to take care of the grandkids
5  because my husband can't?
6  A.    Pretty much in June of '17.
7  Q.    Okay.  So you haven't looked for a job since
8  June of '17?
9  A.    Well, no, the game plan was as soon as I moved
10 into my house and got the boys situated to look for
11 one, and that's when, again, he started going down
12 real bad, because he went to the hospital the day we
13 moved in.
14 Q.    What day was that?
15 A.    The 24th of July.
16 Q.    So, essentially, for the last year you have
17 made a life decision not to work?
18 A.    When you say "life decision," I made the only
19 decision that I saw that I could make.
20 Q.    No one is criticizing.  I am just trying to
21 understand why you didn't look for a job in the last
22 year.  And it was because you had other
23 responsibilities; right?
24 A.    Correct.  I have got two boys to get to school
25 and back.

Page 189

1  Q.    Did you draw unemployment?
2  A.    Yes.
3  Q.    Did you draw unemployment for six months?
4  A.    Yes.
5  Q.    So after March 22nd, 2017 did you look for a
6  job anywhere else?
7  A.    Yes.
8  Q.    Where did you look between March of '17 and
9  June of '17?
10 A.    I'll have to look in my EEOC book.
11 Q.    Do you have some records of --
12 A.    I have, I have some, yes.
13 Q.    Okay.  Will you give those to your attorney?
14 A.    Yes.
15 Q.    How many places do you think you looked for a
16 job between March and June of '17?
17 A.    Oh, 12 maybe.  A lot of them was just word of
18 mouth, my husband making some contacts with people he
19 knew.
20 Q.    Do you remember where, any of those dozen or
21 so?
22 A.    Hillbelt (phonetic), Cameron.  It used to be
23 Orbit.
24 Q.    Cameron used to be Orbit?
25 A.    Yeah.  I think he contacted Fastenal for me,

Page 190

1  and Duvall (phonetic).
2  Q.    What is Ducall?
3  A.    A distributor.
4  Q.    Of what?
5  A.    Industrial tools.
6  Q.    Do you send resumes or fill out applications
7  for these?
8  A.    I did not on those.  That is the word of mouth
9  that they weren't hiring anybody at time.  I talked
10 to the school.
11 Q.    What?
12 A.    Both schools.
13 Q.    What school?
14 A.    All three schools.  I talked to Bryant Middle
15 School.  I talked to Collegeville Elementary, and
16 Bethel Middle School.
17        They didn't have anything.  They sent me to
18 some who did that -- anyway, they also said that they
19 didn't have anything at the time, trying to get the
20 job with the school, so I could at least be at one
21 school with the boys.
22 Q.    Any interviews with --
23 A.    No, sir.
24 Q.    Tell me how the depression has manifested
25 itself.

Page 191

1  A.    Well, I mean, due to all of my life
2  circumstances.
3  Q.    What are you going to ask the jury to award you
4  for compensatory damage for your discharge due in
5  part to your age?
6  A.    I think we came up with 148, 160.  I don't
7  remember.
8  Q.    Not, not wage loss damages, not back pay?
9  A.    Oh.
10 Q.    But like for your emotional upset because you
11 were discharged because of your age?
12 A.    I don't remember what, I don't remember what we
13 put in.  It's on something.
14        MS. MCHUGHES:  There's not an amount.
15 Q.    On Exhibit A-1, I guess, attached to your
16 Amended Discovery Responses, which is Exhibit 17 to
17 the deposition, you have 25,000 for mental anguish
18 due to the false imprisonment, and mental anguish for
19 walking by each employee after being fired 25,000.
20 How did you arrive at those numbers?
21 A.    I'm not sure.
22 Q.    How many places did you have to put in a
23 resume' or an application to be eligible for
24 unemployment?
25 A.    I think you have to do five a week, a four a

Page 192

1  week.

2  Q.    Did you ever do more than the minimum?

3  A.    Yes.

4  Q.    Would it be reflected on -- but what you're

5  telling me, though, is all of the places you looked

6  between November 18th of '16 and March 22nd of '17

7  would be reflected on Exhibit B-1 to your discovery

8  responses?

9  A.    It should be, to the best of my knowledge,

10 yeah.

11 Q.    And then after March, between March of '17 and

12 June of '17 you may have a few more records of a job

13 search --

14 A.    That is correct.

15 Q.    -- that you're going to provide to your

16 attorney?

17 A.    That is correct.

18 Q.    Look at paragraph 40 of the Amended Complaint.

19 This is where you, you allege the tort of outrage and

20 say that Jodi yelled at you, and then in paragraph 40

21 you say that both the Defendants were the direct

22 cause of the emotional distress Ms. McIntosh suffered

23 and continues to suffer.

24        Did I read that correct in paragraph 41?

25 A.    Yes, sir.

Page 193

1  Q.    So is it your testimony here today that because

2  Jodi yelled at you on November 18th, 2016, that you

3  continue to suffer emotional distress?

4  A.    Yes.

5  Q.    Because of the yelling, not because of the

6  discharge?

7  A.    Well, yelling was part of the discharge.

8  Q.    Well, that's what I am trying to get at.  Are

9  you saying that you have suffered emotional distress

10 in the two years, almost two years post-discharge

11 because she yelled at you, "You couldn't even sort

12 Four Ball," or because you were fired?

13 A.    Both.

14 Q.    Did you ever seek -- well, you have already

15 said you never saw a psychiatrist, or psychologist,

16 or counselor, or anybody like that; did you?

17 A.    No, sir.

18 Q.    When did you bury your two sons?

19 A.    I buried one in '94 and one in '15.

20 Q.    Which was more emotionally upsetting, burying

21 your son or getting fired?

22 A.    I can't answer that.

23 Q.    Why not?

24 A.    Well, those two are totally different.

25 Q.    How long did you grieve the passing of your

Page 194

1  son?

2  A.    Every day.

3  Q.    Do you have any documents related to any of the

4  symptoms of this emotional distress that you say was

5  caused by my client?

6  A.    Any documents, I have proof of blood pressure,

7  and I started taking the depression pills.

8  Q.    The depression pills prescribed by Dr. Shermer?

9  A.    Yes, sir.

10 Q.    Do you still have those medical bills over

11 there?  Can you -- do you have still have that copy,

12 too, Exhibit 18?

13        Can you tell by reference to Exhibit 18

14 what out-of-pocket medical expenses you're

15 attributing to conduct of my clients?

16 A.    Out of pocket, usually just the ten dollars.

17 Q.    Okay.

18 A.    And I pay a little more here or there, but

19 generally it was just the ten dollar co-pay.

20 Q.    So where it says check number, and the check

21 number is redacted, and that's fine.  But then under

22 the amount, you weren't paying $51 and $130, and you

23 were paying ten dollar co-insurance with those

24 checks?

25 A.    Correct.

Page 195

1  Q.    Okay.  Then that makes more sense.  Is United

2  Health Care, is that -- did you take COBRA

3  continuation coverage?

4  A.    Yes, sir.

5  Q.    All right.  That makes sense.  Thanks for

6  clarifying that.  You asked for punitive damages in

7  the Complaint, but then in the -- let me look again.

8        MR. HERRINGTON:  You don't have -- in

9        Exhibit A-1 in your discovery responses,

10       you don't -- well, I guess you do have

11       punitive damages.  That would be the false

12       imprisonment and the mental anguish, I

13       guess; is that right?

14       MS. MCHUGHES:  Yes.

15 BY MR. HERRINGTON:

16 Q.    Have you discussed damages with anyone else

17 other than your counsel?

18 A.    The guy, the EEOC asked me for them.

19 Q.    Other than the guy at the EEOC and your

20 lawyers?

21 A.    I am sure my husband.

22 Q.    Did he suggest the number, the 25,000 each?

23 A.    No.

24 Q.    Did he suggest a larger or smaller number?

25 A.    He didn't suggest anything.

Page 196

1    MR. HERRINGTON:  All right.  Let me
2    take a break for a minute.
3         (Six-minute break.)
4  BY MR. HERRINGTON:
5    Q.    What was the genesis of the investigation of
6  Keith Thms?
7    A.    I'm sorry.  What do you --
8    Q.    Well, you said you were asked to look into time
9  records and stuff; right?  What started the looking?
10   A.    Susan noticed something on the time sheets.
11   Q.    Susan Hill?
12   A.    Yes.
13   Q.    What did she -- do you remember?
14   A.    I don't remember what started it.  She said,
15 Look at this.  Am I reading this right?  But these
16 guys are all exactly -- and, and it spit out some
17 kind of an exception report about times that had been
18 changed when she started looking into it.
19   Q.    And so then did she report it to Jodi or
20 Blaine, and were y'all then asked to look into it
21 more carefully?
22   A.    I know she reported it to them, because Blaine
23 and I and Jodi, we all talked about it and had a
24 little meeting over it.
25   Q.    Did you -- what was the meeting?

---

Page 197

1    A.    About what -- well, I had color coded all of
2  the things I made it, and Blaine wants me to explain
3  the color coding in the meeting, and what do we think
4  this is, and we just need to know where all of the
5  hours.
6    Q.    Uh-huh.  The -- you sent out the resumes that
7  you have listed in your discovery responses or
8  applications.  I don't remember if it was one or the
9  other.
10   A.    Resume.
11   Q.    Did you, did you get any job interviews?
12   A.    No, sir.
13   Q.    You haven't been on a job interview since
14 November of 2016?
15   A.    Correct.
16   Q.    So those employers that didn't hire you
17 wouldn't know how old you were; would they?
18   A.    They shouldn't.
19   Q.    Before we conclude is there anything else that
20 you claim that the Defendants did that you are suing
21 for that we haven't talked about today?
22   A.    Harassment would have been a good one.
23   Q.    Well, I think your -- well, what do you mean?
24 What do you mean "harassment"?
25   A.    Well, I don't know.  Changing of the moods, the

---

Page 198

1  lie about this and don't tell this, and little fit
2  throwing.
3    Q.    Oh, fit throwing.
4    A.    The yelling and -- one minute it's okay; the
5  next minute it's not.
6    Q.    Is this all Jodi you're talking about?
7    A.    Pretty much, yes, sir.
8    Q.    Was she this mercurial with others or just you?
9    A.    I don't know how she was with all of the
10 others.  She -- mood changes all of the time up in
11 the department.
12   Q.    Okay.  So is it your contention that her mood
13 changes and yelling and fit throwing had anything to
14 do with your age?
15   A.    I don't think that would have.
16   Q.    What did she lie about?
17   A.    Telling us not to tell the truth about the
18 ankle, about the deposit.  She said that Blaine came
19 up with that idea, only it was her idea.  I had that
20 to go back through all of my notes.
21   Q.    Do you think she did that because she was
22 jealous of you and Susan?
23   A.    I think a lot of the moods was because she was
24 jealous of me and Susan, especially when she called
25 me into her office crying about the relationship that

---

Page 199

1  Susan and I had.
2    Q.    She was crying over the poor relationship that
3  you had, the good relationship?
4    A.    She was crying over the fact that she wasn't as
5  close.  She knows that I talk to Susan about things
6  that I don't talk to her about.
7         Well, I talk to different people about my
8  life.  Not every one person knows anything.  Jodi and
9  I didn't have an out-of-work relationship.
10   Q.    Are there any other actions or statements or
11 anything like that on the part of Jodi or Blaine or
12 anybody else at the club that you would point to to
13 say, That's evidence that they fired me because of my
14 age?  Anything that we haven't talked about?
15   A.    Other than I think the accolades prove that it
16 wasn't skill set.
17   Q.    Anything else?
18   A.    Not that I can think of at this very moment.
19   Q.    Yeah, same deal though, but if you remember
20 something, because that's sort of the meat of the
21 coconut, right, the evidence that you have that they
22 fired you because of your age?
23         So if there is something that we haven't
24 talked about, and you recall it today, tomorrow,
25 anytime before trial, you will let your attorneys

## Page 200

1  know so we can know; okay?

2  A.   Yes.

3  Q.   Thank you for your time.  Nothing further.

4  A.   You are through?

5  Q.   Yes, ma'am.

6  A.   Wow.

7                    EXAMINATION

8  BY MS. MCHUGHES:

9  Q.   I have just a few follow-ups, if you don't

10 care.  Karen, let's talk about the Excel

11 spreadsheet.  Are you capable of sorting an Excel

12 spreadsheet?

13 A.   Yes, ma'am.

14 Q.   Do you know how to format an Excel spreadsheet?

15 A.   Yes, ma'am.

16 Q.   Are you capable of entering formulas in an

17 Excel spreadsheet?

18 A.   Yes, ma'am.

19 Q.   Back to the schematic that was introduced

20 earlier.  When Jodi asked you to sit down, or did

21 Jodi tell you to sit down?

22 A.   I think she told me to sit down.

23 Q.   Did you feel free to leave the area at that

24 time?

25 A.   No, ma'am.

## Page 201

1  Q.   Okay.  You also mentioned earlier that there

2  was a change in software in the catering area.  Do

3  you recall that?

4  A.   Yes.

5  Q.   That was a new system they installed?

6  A.   Yes.

7  Q.   And you were capable of learning that new

8  system?

9  A.   Yes, ma'am.

10 Q.   And you just mentioned the accolade, so

11 Mr. Herrington asked you a lot of questions about

12 accolades written on your check stubs, and I just

13 want to make sure you understand what he was asking.

14      Do you believe that was evidence of you

15 being fired for age discrimination?

16 A.   No.  I think that was evidence that my skill

17 set was, was proven good.

18 Q.   So the accolades are evidence of your skill set

19 being up to par and sufficient to do your job?

20 A.   Correct.

21 Q.   From your employee -- you began employment in

22 2009.  From 2009 to 2014, did you ever have any

23 write-ups, or were there ever any incident reports

24 that you knew about?

25 A.   No, ma'am.

## Page 202

1  Q.   The incident reports that were introduced here

2  today, were they ever discussed with you?

3  A.   No, ma'am.

4  Q.   Did you ever see the incident reports before

5  you filed your EEOC claim?

6  A.   No, ma'am.

7  Q.   At the country club -- how many employees are

8  employed there; do you know?

9  A.   Well, a lot of them are seasonal, so maybe in

10 peak season 120.

11 Q.   120.  Is that a small community of employees?

12 In other words, would everybody know everyone?

13 A.   Usually just departmental.

14 Q.   Okay.  In your testimony you referred to

15 looking and feeling financially comfortable?

16 A.   Yes, ma'am.

17 Q.   Is that looking and feeling financially

18 comfortable a sign, in your mind, of age?  You reach

19 a certain age, and you're financially comfortable?

20 A.   As you get older, yes, you get more financially

21 comfortable.

22      MS. MCHUGHES:  I don't have anything

23      else.  Thank you.

24                    EXAMINATION

25

## Page 203

1  BY MR. HERRINGTON:

2  Q.   Do you think this financial comfort is always

3  positively correlated with your chronological age?

4  A.   I think it is if you plan.

5  Q.   Do you know folks in your age bracket who are

6  not ready to retire?

7  A.   Yes, but not necessarily because of the

8  finances.

9  Q.   Do you know people in your age bracket who

10 aren't ready to retire because of finances?

11 A.   Yes.

12      MR. HERRINGTON:  That's all I have

13      got.

14      (The deposition was concluded at 2:48 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Page 204

```
 1                COURT REPORTER'S CERTIFICATE
 2   STATE OF ARKANSAS)
                      )ss.
 3   COUNTY OF SALINE )
 4        I, JANESS FERGUSON SMITH, CCR, RPR, a
 5   Notary Public in and for Saline County, Arkansas do
 6   hereby certify that the facts stated by me in the
 7   caption of the foregoing matter are true; and that
 8   the foregoing matter was transcribed by me, to the
 9   best of my ability and understanding, from my machine
10   shorthand notes taken at the time and place set out
11   in the caption hereto.
12        In accordance with Rule 30(e) of the
13   Rules of Civil Procedure, review of the transcript
14   was waived by the deponent or a party thereto.
15        I FURTHER CERTIFY that I am neither
16   counsel for, related to, nor employed by any of the
17   parties to the action in which this proceeding was
18   taken; and, further that I am not a relative or
19   employee of any attorney or counsel employed by the
20   parties hereto, not financially interested or
21   otherwise, in the outcome of this action.
22        GIVEN UNDER MY HAND AND SEAL OF OFFICE on
     this, the 17th day of October, 2018.
23
24        JANESS FERGUSON SMITH, CCR
          Notary Public for Saline County
25        and Court Reporter.
```

---

**CCLR – Billing Clerk**

Job Title:    Billing Clerk
Reports to:   Controller
Hours:        9:00a.m. – 5:00p.m. Monday – Friday.

Job Summary:

This position maintains and is responsible for the billing functions of The Country Club of Little Rock.

Job Responsibilities/Performance Standards:

Interface each days billing transaction file from the following locations:
1) Tennis by diskette 2) Digital Dining  3) Golf Pro shop

Print out the interface file and match the totals between the reports produced out of each system to the interface report produced by the billing system.  Show any reconciling items on the billing report.  Reconciliation should reflect the matching totals with explanations attached as to what the reconciling items are.

Attach all reports together and file in cabinet each day in order to maintain organization.

Checks will be given to you each day from the receptionist.  There must by a check copy for every check received by the Club.  A deposit must by prepared and ready for the bank every day by 2:00p.m.  The documentation for the deposit must include copies of every check and two calculator tapes must by run to ensure that we are not missing a check.  Run one tape on the check copies and one tape on the actual checks.  These must match.  Include one tape with the deposit and one tape is to be attached to the check copies.

Each day's deposit must be entered into the Billing system by the end of the business day (5:00p.m.)  The Cash receipts report prepared after entering cash receipts must match to the deposit slip.  If the totals and detail match, update the batch and attach the cash receipts report and the G/L summary reports to the check copies and calculator tape.

The next day the yellow copy of the deposit slip (validated by the bank) must be attached to the check copies and calculator tape and turned in to the Controller, or assigned person in her absence, by 10:00a.m. that day.

5/13/2019



---

Bank drafts must by prepared, approved and sent the 15th of each month.  It must be posted in the billing system prior to sending to the bank.  This will help ensure accuracy.

You will provide customer service to all members that call or come to the Club questioning their bill.  You must respond to voice mail messages with in 24hrs.  If an adjustment is due to the member, it must be written up on a billing adjustment form and presented to the Controller, Clubhouse Manager, or the Club Manager for approval.  The billing adjustment form must be completely filled in and tickets pulled as backup.

All approved adjustments must be entered into the billing system within one day of approval.  All adjustments must by entered in before the month-end close.  Refer all golf and tennis adjustment to the Golf or Tennis Shop with in one day of receipt of complaint.  Fill out a billing adjustment form and send it to the appropriate Pro shop.

Delinquent letters must by mailed by the 21st of each month.  The delinquent list must be prepared each month the morning of the Board Meeting.  The letter must be approved by the Controller prior to turning into the Club Manager.

All new members and any transfers must be completed in the system within two days after receiving the information from the ~~Director of Member Services~~. *Kitchlenski*  A member transfer must also be completed to the dining system, Golf Shop, and Tennis Shop.

For junior members this means creating and setting up the payment schedule for entrance and equity fees and entering it into the installment-billing file.  It also includes the amortization of schedule for the assessment payouts.  File one copy in member file in admin office and one in accounting files.

Keep additional copies of entry fee checks in the member file.

Month-end billing must be completed on the first business day of each month.  It must be properly backed up, balanced and documented.  All bills must be matched up to the appropriate check recap report and must be in the mail by the 4th business day of each month.  Club statements must be matched up and mailed by the 6th business day of each month.

All month-end reports must be turned into the Controller by the 2nd business day of each month and filed in a binder by the 20th of each month.

All other duties as assigned.

---

May 2, 2016

After 7 years of working on the Four Ball golf tournament, Karen didn't follow standard procedures.  The procedure has always been that there is a final check with the Golf department to confirm the tournament players are as accurate as they can be for the last day of April in order to charge out the final billing, work up the tournament deposit and post all payments to the accounts.

Karen was shocked when I asked her if it was complete for me to review prior to running month end.  She said she thought it was done in May.  I discussed and confirmed with her that since she has been employed with CCLR that the procedure hasn't changed.  I instructed her to start the billing process and that I would help due to the fact that it was May 2nd and April month end billing needed to be completed and bills mailed out by May 3rd.

Jodi





7/31/15

Joan hired yesterday. Brought her into the Accounting dept to meet Karen. We approached her cubicle wall + I introduced Joan to her. Joan held out her hand to shake hands w/ Karen. Karen then turned completely away from us. Basically turned her back to us + I looked at Joan + we walked to her cubicle + started working



EXHIBIT B



DEPOSITION EXHIBIT B

April 14, 2016

Incident report as told to me by Joan Holder, Accounting clerk.  Wednesday, April 13, 2016, Mike Self, Dining Room Supervisor brought Karen McIntosh, Accounting clerk a check request for beverages.  Karen gave him a hard time because she was unaware there would be another order.  There wasn't enough funds in the Regions Revolving fund account to cover the check.  She wrote up the check and sent it with Mike to get signed by Blaine Burgess, General Manager.   Karen prepared another check request to fund the Revolving account.  She placed it in Joan's inbox on the cabinet.  Joan didn't see the check request right away.   All of a sudden, Karen comes over to her desk and says "you had better get that check request processed right now and if you have a problem with it we can go see Blaine".  Joan said Karen you worry about doing your job and I will worry about doing my job.   Joan indicated to me that Karen was using a threatening and angry tone and that her face was red.

Joan prepared the check and placed it in an interoffice envelope and walked it downstairs, however, Blaine was not in his office.  At this point, she believes that both check signers were not on property.  After a short time passed, Karen went downstairs retrieved the check from the interoffice envelope.  Left the backup in the envelope and put it back in the Accounting box in the main office.  Karen then prepared a deposit for the bank.

Jodi Reeves

Controller



EXHIBIT C



DEPOSITION EXHIBIT C

7/29/16

Incident Report

Karen's car was parked in the upper member parking lot against Club policy (see Attachment A).  I asked her to move her car.  She indicated that it was raining and I asked her again to move her car.

Jodi Reeves

Controller



EXHIBIT D



DEPOSITION EXHIBIT 5

EE Handbook          7/29/16

- Using loopholes in computer security systems or knowledge of a special password to gain access to any computer system over the Internet, damage it, obtain extra resources, or take resources from another user.
- Placing the Internet to acquire contacts for personal financial gain.
- Placing confidential information about our members on the Internet or otherwise disclosing their personal and/or financial information, including their names, addresses, account numbers, account status, payment history, phone numbers, planned or completed activities while at the Club.
- Disclosing trade secrets or other information protected by law or policy.  This would include a secret recipe or formula or confidential financial information.
- Using the Club's trademarks, logos, and the like for any commercial purpose or in a way so as to mislead people into believing the information is coming from the Club or otherwise violates the law.
- Posting or displaying comments about members, coworkers or supervisors or the employer that are vulgar, obscene, threatening, intimidating, harassing, or a violation of the employer's workplace policies against discrimination, harassment, or hostility on account of age, race, religion, sex, ethnicity, nationality, disability, or other protected class, status, or characteristic.
- Accepting Email from an unknown person.
- Opening attachments from unknown persons.
- Installing any software or program on any Club computer or other hardware without the express consent of network administrator or the General Manager.
- Posting video images or pictures of any Club activity on the web (or links to same) is expressly forbidden and may result in immediate termination.

Inappropriate use of electronic resources may result in discipline, up to and including discharge.  Employees should be careful to safeguard their passwords, log off their terminals when not in use and not permit others to access Club systems.  If you suspect that your password has been compromised notify the network administrator or general manager immediately.

Such use of the network is a privilege, not a right, and all activity on the Internet is monitored.  First and subsequent violations of this policy will result in discipline, up to and including discharge.

**5.6 PARKING**
Parking is provided for employees in the lot on the right after the Club entrance. Parking in other areas is not permitted.  The curb is painted green for easy identification.  Each employee will be assigned a parking permit sticker upon employment with the Club.  It is to be located in the bottom right corner of the vehicle's windshield.

**5.7 STANDARDS OF CONDUCT**
By accepting employment with us, you have a responsibility to the Club and to your fellow employees to adhere to certain rules of behavior and conduct essential for the safe and efficient operation of the Club.  Occasionally, performance falls short of our standards and/or expectations.  When this occurs, management must take prompt action, which, in its opinion, seems appropriate.

## ACKNOWLEDGEMENT OF RECEIPT OF EMPLOYEE HANDBOOK

I have received the current employee handbook and will read or have read and understand the material covered. I have had the opportunity to ask questions about the policies in this handbook, and I understand that any future questions that I may have about the handbook or its contents will be answered by anyone on the management staff or his or her designated representative upon request. I agree to and will comply with the policies, procedures, and other guidelines set forth in the handbook. I understand that the Club reserves the right to interpret, change, modify, or abolish any or all of the policies, benefits, rules, and regulations contained or described in the handbook as it deems appropriate at any time, with or without notice. I acknowledge that neither the handbook nor its contents are an express or implied contract regarding my employment.

I further understand that all employees of the Club, regardless of their classification or position, are employed on an at-will basis, and their employment is terminable at the will of the employee or the Club at any time, with or without cause, and with or without notice.

I further certify that I have read the drug free workforce policy and understand that if my performance indicates it necessary, I will submit to a drug and/or alcohol test. I also understand that failure to comply with a drug and/or alcohol testing request or a positive, confirmed result for the illegal use of drugs and/or alcohol may lead to discipline up to and including termination or employment and/or loss of workers' compensation benefits, pursuant to Arkansas Workers' Compensation Commission Rule 36.

Employee Signature: _____ Date: 2-16-16

Employee Name (Printed): _____

_____
Witness Signature

_____
Witness Name: Printed

45





**Subject:** Fw: Staff Parking

**From:** Jodi Reeves (jodi_reeves@sbcglobal.net)

**To:** joan.cclr@comcast.net; karen_mcintosh@comcast.net;

**Date:** Tuesday, August 9, 2016 12:11 PM

Please see email from Blaine below.

Thanks,

Jodi Reeves,
Controller
Country Club of Little Rock
4200 Country Club Blvd.
Little Rock, AR 72207
(501)664-1531, (501)664-1579 fax#

The information in this email is confidential and may be legally privileged. It is intended solely for the addressee. Access to this email by anyone else is not authorized.

If you are not the intended recipient, any disclosure, copying, distribution or any action, taken or omitted to be taken in reliance on it, is prohibited and may be unlawful.

--- On Tue, 8/9/16, Blaine Burgess <chefbab@aol.com> wrote:

> From: Blaine Burgess <chefbab@aol.com>
> Subject: Staff Parking
> To: randy_prieur@comcast.net, jodi_reeves@sbcglobal.net, darrell.shelton@sbcglobal.net,
Blake.Starkey@gmail.com, krissa.cclr@sbcglobal.net, tyler.cclr@comcast.net, Brandon.cclr@sbcglobal.net,
cclr@sbcglobal.net, maggie.cclr@comcast.net, mike_self@comcast.net, brant.cclr@sbcglobal.net,
paul.cclr@comcast.net
> Date: Tuesday, August 9, 2016, 12:07 PM
>
>
> All,
>
>
>
>
>
> Back on
> April 27, Randy sent the email below to assist with
> enforcing our parking situation.
>
>
>

> With my
> Clubhouse Manager, Banquet and Event Coordinator and Club
> Controller/CFO all following this policy, while also
> attempting to enforce the same with their respective staff,
> I would like to remind all of you that you should be parking
> in the employee lot daily. You are each responsible for
> assuring that your respective staff members are also parking
> in the right location.
>
>
>
>
> With
> school starting and families returning from vacation, we
> will see an uptick in activity here at the Club. We are also
> heading into a busier banquet season than we have been
> experiencing over the past couple of months, therefore
> parking will be at a premium for our members and their
> guests.
>
>
>
>
>
> I have
> asked Randy to make sure that Carlos is letting us know of
> any infractions so that they may be addressed
> accordingly.
>
>
>
>
> Thank you
> in advance for your cooperation.
>
>
>
>
>
>
> On Apr 27, 2016,
> at 4:31 PM, Randy_Prieur <randy_prieur@comcast.net>
> wrote:
>
>
>
>
>
> cclrgm@sbcglobal.net
>
> Chefbab@aol.com
>
>
>
>
>
>

> >
> >
> >
> >
> >
> With Spring and
> Summer upon us and the club getting busier by the day would
> you all please remind your staff that employee parking
> is to the right, by the tennis courts, when you
> come in the gate. There are more and more employees parking
> in the member lots and on the circle leaving our ownership
> and their guests without the convenience of a spot near the
> clubhouse.
> >
> >
> Thanks,
> >
> >
> >
> >
> >
> >
> Randy
> Prieur
> >
> Clubhouse Manager
> >
> The Country Club of Little Rock
> >
> 501-664-1531, ext. 102
> >
> >
> >
> >
> >
> >
> Blaine A. Burgess, CCM, CCE
> General Manager/COO
> >
> The Country Club of Little Rock
> >
> 4200 Country Club Boulevard
> >
> Little Rock, Arkansas 72207
> >
> 501-664-1531 (Club)
> >
> 501-952-2221 (Cell)
> >
> 501-664-1579 (Fax)
> >

July 27, 2016

After the June 2016 Board Meeting, I asked Natalie to prepare a membership section of the Board Book for Karen starting with the July meeting.  I also informed Karen of the changes.  Karen's response was that she needed the rest of the Board Book to know when to add members to the off course cart list and when to overturn late fees.  I informed her that I will tell her when that happens and that Darrell or Blaine informs us of the off course cart additions.

Karen went to Natalie directly to ask for a full Board Book after the July Board meeting.  Natalie didn't give Karen the book.

Issue:  Going behind my back to change policy.

Jodi Reeves





July 29, 2016 Incident:

Barrie Burnam, Tennis shop employee brought up a lot of paperwork to Accounting office.  There was billing information and a check request for Simeon Stefanov.  Once Joan started processing invoices, she asked me if she was to process the check request without the backup documentation.  I told her to call Barrie and ask her for the documentation.  Barrie thought it might have been in all the billing information that she handed to Karen.  At approximately 10:30am, Joan asked Karen to see if she could find a Home Depot and Lowe's receipt in all the billing paperwork.  Karen ignored her request.  After a few minutes, Joan asked Karen if she had found the receipts.  Karen responded that she was trying to figure out why Billing was not working (software issue).  Karen brought the software issue to my attention and I asked everyone to get out of Club Connect and let's see if it clears up.  At this point Karen, heads downstairs to the women's bathroom (which is the members bathroom) with her cell phone and stays gone for approximately 30 minutes.

At approximately 4:00pm, I asked Joan if she had received the receipts.  She informed me that she hadn't, so I asked Karen if she had found the receipts.  Karen informed me that she didn't have the receipts.

She never informed Joan about the missing receipts.   They were located attached to the original check request in Blaine's box.

Jodi Reeves

Controller







EXHIBIT E









3-11 SR came in 1105 in 1124      V.
8-16 SR out before 1:00 in 3:20
3-17 out 1:00 -1:48  -out 4:23
5-18 in 9:47 out lunch B4 1:00
3-24 not out 3:35
4-1 SR in 10:24 in 1:58
4-7 SR out 12:20 in 3:21
4-8 SR out B-4 12:17 in 1:47
SR off 4-14 to 4:15 - 4:18

SR out 3:00 in 8:31      4-20
SR out 4:41 1:48, 3:40
SR out 4-24 4:04

**B&B**
SOLUTIONS
Promotions • Embroidery • Printing • Furniture • Signs
www.bnbinc.com

8-23-16  JR leaving around
3:20 to go to bank 2cb
wire transfer before 4:00
SR - O'Benny shady yet?
M - no
JR - "Well if reimbursement
for recovery needs to
be done just leave me
a note. Finish up & go
ahead + get out of here
and y'all start early.
Have a good Time
M - thumbs up.

10:20
9:30  12-1:45   7:35 - 4:55     not 4:20 lst 2:57
M                /32      23  26        8-23  1:14  1:39.
11:10                        X    X        9- 26  11:03 ?
13:59 -2:48
3:29

gave employee wages to wrong
employee.

Stomping her feet telling me
to do as she didn't mind me
listening to music ( I had just
turned to talk radio) but I
needed to turn that down.
Stated I would as soon as
she quit stomping feet.

Employee meeting  I knew nothing
about it Natalie just happened to mention

8-28-16  12:30  requested SR
not copy of my vacation
request form.
12:33 answered copies
how changed. asked
not who changed my
house: N  I did schedule
you weren't here all
day Thursday. M you
had no right wasn't
your call. N  I asked
Jodi. M this will be
discussed. N  not just

time I've changed something
A - Jodi Jodi said go
ahead & change them
M what other payrolls do
mine have if you changed
N I haven't changed yours
M you said you make changes
all the time
N - not to yours but others
M you had no right to question
My Tina
N doesn't question yours+ mine
punch I just your vacation
under I talk to Jodi
M oh I intend to. Do
you go around checking
everyone's punch or
just mine?
N question vacation time

2-17-16    @ 1:30
JR could I need to speak to
you. C go in office (shut door)
JR we need to change an hour.
ME to what
JR 8:30 to 5:00   the lunch
someone has noticed we
aren't working  no hours
no early mins, weren't thru
JR They noticed you at today
bank deposit Well Carlos or
Sam is the teller, deposit he
is the Clubs teller, what
branch do you use, what
to use?
ME I don't care just so its
legems.

2-18-16

**B&B**
SOLUTIONS
Promotions • Embroidery • Printing • Furniture • Signs
www.bnbsinc.com

(1)

1:36 in Stairway
JR Hey you okay?
ME well yell  May depit
know it was you'd need
to think about not having
to go to the bank
JR I just made some blunes
actually brought it up
in my meeting yesterday
ME I kept it was your
ideal. Thanks to more
cold hot or Raining trips

**B&B**
SOLUTIONS
Promotions • Embroidery • Printing • Furniture • Signs
www.bnbsinc.com

(2)

2-17-16

Tyler - Karen Carlos is
coming up to set up with you
on bank deposit. Just tell
him shortly what to do.
me - say, just take the deposit
to the teller. Either go inside
or drive thru.
Tyler - no you have to tell him
step by step after he does
it once he will remember
Me - you're kidding. Tyler maybe
you need to tell him!

"B/ Natalie - he'll get it if you just
explain it (too much say)

Tylan - tell him to go inside

*American*
**Business Forms and Promotions**

Michael C. Graves, CFC
Sales Associate

AMERICAN BUSINESS FORMS, INC.
7821 Doyle Springs Road
Little Rock, AR 72209
DIRECT: (501) 565-0308
FAX: (501) 565-0025
CAE: (501) 680-6875
WATS: (800) 862-3690
E-MAIL: mgraves@americanbus.com
Thank You For Thinking Of Americabox
800-862-3690

7-16
Sometime in July - Sysco
rebate over $500 not got.
only My box never gave it
Save to m - but it my
error
Come get it

8-18-16 gave employee trainings
to wrong employer.

8-18-16 JR gave me Sysco rebate
to deposit

(left margin, vertical text)
Friday July 8-14 JR knows Natalie's whereabouts
8-4-16 9:24 - 500 meeting with Bill + Jodi
8-17-16 9:00 meeting the next day count 500
JR filing fraudulent check 750

Karen           k.mcintosh@att.net
McIntosh        501-454-8103

2009
1. Interview - 5.2009 warned
me sometimes yelling goes
on. Work in tight quarters

2. JR asked me to collect past
due Club bill from Darrell
Shelton - Golf pro Bill Cockapott.

3. JR told me to get with Heather
and remind her I do member
yelling & to transfer calls to me.

4. Easter billed 2x in April

2014
5. 3·2014  Jodi shredded Susan &
my records

6. 5·2014 Jodie's husband (Bob) gets
fired from Dillards

7. 9·2014 Bob moves to Fayetteville
& gets new job. Jodi shreds Susan
& I to save $.

8. 12·31·14 Susan buys new car

2015
9. 5· 2015 Jodi goes on job interview
at Belea Vista

10. 5-18-52-15 Jodi on vacation. My son dies 5-19-15. I asked Susan not to call Jodi. Nothing she could do & Jodi always said don't call her on vacation.

11. 5-20-15 Should'd Receive again (Jodi)

12. 6-20-15 Jodi, Susan & I at lunch at Brd. Broad. We discuss Natalie & her hours working. Susan rings up raises again stating it had been 2 years

13. 6-10-15 Susan & Jodi behind closed doors

14a. 6-15-15 Susan, I go to lunch come back around 1:15. Jodi & Blaine call Susan into Blaine's office & fire her

2016 15. 2-17-16 after nearly 7 years of taking bank deposit Jodi stated Blaine just noticed I was taking deposit & that Carlos would be taking it now

16. 2-18-16 Confronted Jodi about bank deposit

17. 2-19-16 Natalie goes to Jodi about an employee. Natalie later tells me Jodi told her it took her 5 years to get rid of Javier (former manager)

18. 3-23-16 Jodi leaving for the day. 3:20 told me to get out early & start my vacation said

19. 3-28-16 Joan changed my approved vacation hours from 12 hours to 16 hours.

20. 7-20-16 I had a rebate check to deposit from Sysco. Joan took it out of my inbox without telling me

21. 11-16-16 Employee meeting that I knew nothing about. Natalie just happened to mention it to me.

22. 11-16-16 Warren Simpson came

and sat at the table I was sitting at. Jodi was furious

23. 10:55 11-17-16 Jodi called me into her office about the & Joan and how I will need to help with accounts payable.

24. 11-18-16 around 10:00 Jodi & Blaine came into office met & back door. We go into Jodi's office & lock door & fire me

Broke my wrist & Jodi kept asking how much this would cost.

Jodi checking Club's employee insurance billing, & asked me if I knew who had a $1,200.00 insurance claim for broken foot. Wanted me to buy it/find out

2013 or 2014 Jodi wore platform

Broke shoes to work & twisted her ankle. Swore Susan & I again not to tell anyone she did it on CCLX [insurance & property]

Jodi made statement when Beth (Banquets cord) was hired that she was ok. (57)

2014 Susan putting her money back Joan retire next. Buys new car

2014 5-20-14 I buy new car 1-2016 I up my 401k & put rest of my check into savings

If I had a problem with members account caused by another employee Jodi was always say put it in email and give it up

6.a   In June 2014 Susan &
I had a few words in
front of Jodi & Jodi never
looked up from her desk

14.a   10 11 or 12 2015  Jodi asked
me what I thought of Joan
I replied she's okay a little
weird though Jodi said yell
this a little weird

11-18-16   10:05   2

JR   Met with BB last night
we are getting new soft ware
for banquets serves AR and
unfortunely you are soft don't
have the skills to move forward
There fore effetive immediately
your severate no longer needed.
me   you didn't even try
JR   you don't have the Skills
me   Blame Jodi Reeves is you problem
game   you don't hire someone new &
then never talk to counter unless
someone has said some something
to them and that She is you
Jodi Reeves.
me   Blame you don't know what goes
on up here
BB   I think I know what goes on
me   you don't know what skills I've got
me   oh no you don't someone new
does not not speak unless other wise
to do so. I've got pictures & notes.
JR   no one said anything
me   I'm not going to argue with you

me   Jodi Reeves you talk out of both sides
of your mouth

I get up walk out of office
JR   you couldn't even
soft 4 Ball
me   oh no you wanted to sort 4Ball
JR   shakes head
me   again I'm not gonna argue
with you.

JH phones rings she jumps up
& runs out of department

JR & BB come into department
and locks door. JR-can you
come into my office. Me-JH no
Hell no this ain't fair. BB you
don't know what this about.
Me-oh yes I do. Who is she
Jodi Reeves or HR. She can't
be both

letter of reference



**#7**

Interview

Jodi warned me sometimes there is yelling going on in office. Just to warn me.

At Bud Board for honor Jodi told Susan I that Natalie would be working from home (after giving birth) with full pay & benefits. We should cut her space. No need to tell me I don't do payroll.

1. Josie came into the department & said they hired a new Banquet Director & this old. She then stated that surprised her 5%.

2. Without my knowledge went behind my back & wouldn't cut Pheasant from Easter & asked him how I could get out of jury duty.



**#7**

1. Employees - Made me look bad within. Directed me to let Heather know that I was in charge of billing. Told me to be stern with her. She dissed me on several times to do this.

2. After a week on job she directed me to call Darrell about his personal past due club bill of $16,200. He was pissed. Darrell asked me if that was all I had to do? Medical.

1. Snoop around & see if you can find out who had a $30,000 ins claim on Knee surgery.

2. I had accident on weekend at a ball field. Knee my went into hospital I seek attorney. Jodi badgered me 3 times about ins. Gossip & blab on my knee.

3. Jodi twisted her ankle at work & broke. I gave me no sympathy - that told. I happen at work.

1. Informed me I would no longer be taking bank deposit. With the day before I had taken the deposit because it gave me a break from the office. Next day banks was taken bank deposit. Jodi lied about this said it was. She said so.

2. Joan changing my vac hours. Jodi stating she & Joan approved but didn't ask.

3. not notify of employee meeting.

4. not told of changing in comp office. Gossip how Becky cut systems aware.

5. 7-2014 Jodi's husband Bob got fired from Willards & moved to Fayetteville. She was looking for a job there & not to tell anyone.

6. Josie talked bad behind everyones back about them.

**CHARGE OF DISCRIMINATION**

Charge Presented To: ☐ FEPA ☒ EEOC

Agency(ies) Charge No(s): 493-2017-00763 and EEOC

Name (indicate Mr., Ms., Mrs.): Mrs. Karen J. McIntosh

Home Phone (incl. Area Code): Date of Birth: 1953

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.

Name: COUNTRY CLUB OF LITTLE ROCK
No. Employees, Members: 15 - 100
Phone No. (Include Area Code): (501) 664-1531
Street Address: 4200 Country Club Blvd., Little Rock, AR 72207

DISCRIMINATION BASED ON (Check appropriate box(es))
☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ RETALIATION ☒ AGE ☐ DISABILITY ☐ GENETIC INFORMATION

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 11-14-2016   Latest: 11-18-2016
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired May 11, 2009, as Accounts Receivable. I was discharged November 18, 2016. My 57-year old coworker who had over 16 years on the job was discharged, too

I was told a new software system was going to be used and I did not have the skillset to be trained on it.

I believe I was discharged because of my age (63) in violation of the Age Discrimination in Employment Act of 1967, as amended.

Date: Mar 07, 2017
Charging Party Signature: Karen McIntosh

MAR 0 7 2017

**DEPOSITION EXHIBIT 12**

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**INTAKE QUESTIONNAIRE**

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a." Please Print: **H3-2017-00763**

**1. Personal Information**
Last Name: M'Intosh    First Name: Karen    MI: Jean

Street or Mailing Address: _____    Apt Or Unit #: _____

City: _____    State: _____    Zip: _____

Phone Numbers: Home: ( )    Work: ( )

Cell: _____    Email Address: _____    Do You Have a Disability? ☐ Yes  ☐ No

Please answer each of the next three questions.  i. Are you Hispanic or Latino? ☐ Yes  ☐ No

ii. What is your Race? Please choose all that apply.  ☐ American Indian or Alaska Native  ☐ Asian  ☒ White
☐ Black or African American   ☐ Native Hawaiian or Other Pacific Islander

iii. What is your National Origin (country of origin or ancestry)? USA

Please Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:
Name: Don M'Intosh    Relationship: Spouse

Home Phone: ( )    Other Phone: ( )    Email Address (if other than above): _____

**2. I believe that I was discriminated against by the following organization(s):** (Check those that apply)
☒ Employer  ☐ Union  ☐ Employment Agency  ☐ Other _____

**Organization Contact Information** (If the organization is an employer, provide the address where you actually worked. If you work from home, check here ☐ and provide the address of the office to which you reported.) If more than one employer is involved, attach additional sheets.

Organization Name: Country Club of Little Rock    County: Pulaski
Address: 4300 Country Club Blvd
City: Little Rock    State: AR    Zip: 72207    Phone: (501) 664-1531
Type of Business: Country Club    Job Location (if different from Org. Address): _____
Human Resources Director or Owner Name: Jodi Reeves    Phone: 664-1531
Number of Employees in the Organization at All Locations: Please Check (✓) One
☐ Fewer Than 15   ☐ 15 - 100   ☒ 101 - 200   ☐ 201 - 500   ☐ More than 500

**3. Your Employment Data** (Complete as many items as you can)   Are you a Federal Employee? ☐ Yes  ☐ No
Date Hired: 5-11-9    Job Title At Hire: Accounts Rec.
Pay Rate When Hired: _____    Last or Current Pay Rate: May - 13
Job Title at Time of Alleged Discrimination: Acct Pay Judge    Date Quit/Discharged: 11-18-16
Name and Title of Immediate Supervisor: Jodi Reeves

[stamp] DEPOSITION EXHIBIT 13

---

If Job Applicant, Date You Applied for Job 4-2009    Job Title Applied For Account Rec.

**4. What reason(s) (basis) for your claim of employment discrimination?**
FOR EXAMPLE, if you feel that you were treated worse than someone else because of race, you should check the box next to Race. If you feel you were treated worse for several reasons, such as your sex, religion and national origin, you should check all that apply. If you complained about discrimination, participated in someone else's complaint, or filed a charge of discrimination, and a negative action was threatened or taken, you should check the box next to Retaliation.

☐ Race  ☐ Sex  ☒ Age  ☐ Disability  ☐ National Origin  ☐ Religion  ☐ Retaliation  ☐ Pregnancy  ☐ Color (typically a difference in skin shade within the same race)  ☐ Genetic Information; choose which type(s) of genetic information is involved:
☐ i. genetic testing  ☐ ii. family medical history  ☐ iii. genetic services (genetic services means counseling, education or testing)

If you checked color, religion or national origin, please specify: _____

If you checked genetic information, how did the employer obtain the genetic information? _____

Other reason (basis) for discrimination (Explain). _____

**5. What happened to you that you believe was discriminatory?**  Include the date(s) of harm, the action(s), and the name(s) and title(s) of the person(s) who you believe discriminated against you.  Please attach additional pages if needed.
(Example: 10/02/06 - Discharged by Mr. John Soto, Production Supervisor)
A) Date: 11-18-2016    Action: Discharged by Jodi Reeves, Supervisor/Controller
Name and Title of Person(s) Responsible: _____
B) Date: 11-18-2016    Action: Witnessed by Blaine Burgen, General Manager
Name and Title of Person(s) Responsible: _____

**6. Why do you believe these actions were discriminatory?** Please attach additional pages if needed.

**7. What reason(s) were given to you for the acts you consider discriminatory?** By whom? His or Her Job Title?

**8. Describe who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, who else had the same education, experience, etc. If you believe that individuals, if known, said it it relates to your claim of discrimination. For example, if your complaint alleges race discrimination, provide the race of each person; if it alleges sex discrimination, provide the sex of each person; and so on. Use additional sheets if needed.

Of the persons in the same or similar situation as you, who was treated better than you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Description of Treatment | | |
| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
| Description of Treatment | | |

---

Of the persons in the same or similar situation as you, who was treated worse than you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Description of Treatment | | |
| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
| Description of Treatment | | |

Of the persons in the same or similar situation as you, who was treated the same as you?

| A. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
|---|---|---|
| Description of Treatment | | |
| B. Full Name | Race, sex, age, national origin, religion or disability | Job Title |
| Description of Treatment | | |

Answer questions 9-12 only if you are claiming discrimination based on disability. If not, skip to question 13. Please tell us if you have more than one disability. Please add additional pages if needed.

**9. Please check all that apply:**
☐ Yes, I have a disability
☐ I do not have a disability now but I did have one
☐ No disability but the organization treats me as if I am disabled

**10. What is the disability that you believe is the reason for the adverse action taken against you?** Does this disability prevent or limit you from doing anything? (e.g., lifting, sleeping, breathing, walking, caring for yourself, working, etc.).

**11. Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability?**
Yes ☐  No ☐
If "Yes," what medication, medical equipment or other assistance do you use?

**12. Did you ask your employer for any changes or assistance to do your job because of your disability?**
Yes ☐  No ☐
If "YES", when did you ask?    How did you ask (verbally or in writing)?

Who did you ask? (Provide full name and job title of person)

Describe the changes or assistance that you asked for:

How did your employer respond to your request?

---

**13. Are there any witnesses to the alleged discriminatory incidents?** If yes, please identify them below and tell us what they will say. (Please attach additional pages if needed to complete your response)

| A. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| What do you believe this person will tell us? | | |

| B. Full Name | Job Title | Address & Phone Number |
|---|---|---|
| What do you believe this person will tell us? | | |

**14. Have you filed a charge previously on this matter with EEOC or another agency?** Yes ☐  No ☒

**15. If you have filed a complaint with another agency, provide name of agency and date of filing:**

**16. Have you sought help about this situation from a union, an attorney, or any other source?** Yes ☐  No ☒
Provide name of organization, name of person you spoke with and date of contact. Results, if any?

Please check one of the boxes below to tell us what you would like us to do with the information you are providing on this questionnaire. If you would like to file a charge of job discrimination, you must do so either within 180 days from the day you knew about the discrimination, or within 300 days from the day you knew about the discrimination if the employer is located in a place where a state or local government agency enforces laws similar to the EEOC's laws. If you do not file a charge of discrimination within the time limits, you will lose your rights. If you would like more information before filing a charge or you have concerns about EEOC's notifying the employer, union, or employment agency about your charge, you may wish to check Box 1. If you want to file a charge, you should check Box 2.

☐ Box 1 [I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.]

☒ Box 2 [I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination the information I provide here, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.]

Signature: Karen J M'Intosh    Today's Date: 3-7-17

**PRIVACY ACT STATEMENT:** This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:
1. FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (9/20/08).
2. AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626, 42 U.S.C. 12117(a), 42 USC §2000ff-6.
3. PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information about claims of employment discrimination, determine whether the EEOC has jurisdiction over those claims, and provide charge filing counseling, as appropriate. Consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge.
4. ROUTINE USES. EEOC may disclose information from this form to other state, local and federal agencies as appropriate or necessary to carry out the Commission's functions, or as permitted by law. The EEOC may also disclose information to respondents in litigation, to congressional offices in response to inquiries from parties to the charge, to disciplinary committees investigating complaints against attorneys representing the parties to the charge, or to federal agencies inquiring about hiring or security clearance matters.
5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. Providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge. It is not mandatory that this form be used to provide the requested information.

Oldest person to be Trained

6. They told me _____ didn't have the
skills to be trained on new software.
Everyone would have to be trained on new
software even Jodi Reeves (my boss). I
stated you don't even try. She said
you don't have the skills I was trained
for CCLR's software when hired with
no problems & never any complaint or
write ups. My son did 57475 coworker
Susan Hill was filed 6 - 7after 16 years
of service (57 years old). Jodi Reeves
told me I was to do part of Susan
Hill's job (accounts payable) She trained
me. Less than 30 days after I hired
my son. I did accounts payable for June
& July. She trained me for that. Never
any problems with accounts payable
and received a 500ºº bonus for good
job. No problems under those circumstances

better

8. All employees who would be required
to learn the new software

well trained #3 not sure when

work
no one

same
no one

13. B. Blaine Burgess General Manager
4200 CC Blvd
LR      72207
Hope he tells the truth

---

EEOC Form 161 (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**DISMISSAL AND NOTICE OF RIGHTS**

| To: Karen J. McIntosh | From: Little Rock Area Office |
|---|---|
| | 820 Louisiana |
| | Suite 200 |
| | Little Rock, AR 72201 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 493-2017-00763 | Rodney E. Phillips, Investigator | (501) 324-6473 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

**- NOTICE OF SUIT RIGHTS -**
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_William A. Cash, Jr._ /s/         SEP 2 9 2017

| William A. Cash, Jr. | (Date Mailed) |
|---|---|
| Area Office Director | |

Enclosures(s)

cc   Blaine A. Burgess
General Manager/COO
COUNTRY CLUB OF LITTLE ROCK
4200 Country Club Blvd.
Little Rock, AR 72207

Daniel L. Herrington
Attorney
FRIDAY, ELDREDGE, CLARK LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201

DEPOSITION
EXHIBIT
14

---

Enclosure with EEOC
Form 161 (11/16)

**INFORMATION RELATED TO FILING SUIT**
**UNDER THE LAWS ENFORCED BY THE EEOC**

(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)

**PRIVATE SUIT RIGHTS** --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you receive this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within **90 days** of the date this Notice was mailed to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** --   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit **before 7/1/10** -- not 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** --   **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** --   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request **within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

11/17/16

About 2pm, I started to walk out of my office and Karen was standing at the printer and had just grabbed a piece of paper. The printer is on top of a 2 door cabinet on the opposite side of Karen's cubicle and is a little taller than eye level. As I rounded my door frame, I witnessed Karen just staring at Joan as she started to walk back to her desk until I spoke to her pulling her attention back to me. Joan did not look up from her computer.

Joan has informed me on previous occasions that Karen just stares her down as she passes by (to and from) her desk to the printer. She just doesn't look up from her computer.

I actually witnessed the activity today.

Jodi

  

---



## PAYROLL STATUS FORM

Hire Date   /   /

Effective Date of Change  11/17 /2016

Employee Name   Karen McIntosh                     Payroll # 105

| ADDRESS | Street | FOR NEW EMPLOYEE ONLY | Social Security No. |
| | City, State, Zip | | |
| | Province, Country, Postal Code | | Date of Birth |
| | Telephone No. | | |

| | FROM (Does not apply to New Employee) | TO |
| --- | --- | --- |
| JOB POSITION | Accounts Receivable Clerk | |
| DEPARTMENT | #110 | |
| RATE | | |

### REASON

| ☐ Rehired | ☐ Transfer | ☐ Full Time |
| x Discharge | ☐ Retirement | ☐ Part Time (Less than 30 hours) |
| ☐ Resignation | ☐ Seasonal Position | ☐ Part Time to Full Time |
| ☐ Promotion | J1 Visa New Hire | ☐ Part Time to Full Time |
| ☐ Merit Increase | ☐ Other: | ☐ Full Time to Part Time |

Comments, if necessary

Upgrading computer systems with new software and technologies. Karen's skill set over the past seven years included mostly data entry. Templates were created for input in both Excel and Word. She was unable to create a Microsoft Excel spreadsheet and perform tasks such as sorting, formatting & formula calculations. She didn't demonstrate the comfort level or aptitude for mastering the current billing system as evidenced in the continuing questions regarding the system interface and revenue code file changes and setups even though I worked with her on the changes. Once a project or instruction was assigned, there was no follow up or communication as to status or when project completed. The new software uses SQL database report writing and queries and is a more complex system. There will be additional needs for advanced use of Excel spreadsheets for setting up and analyzing member data and revenue and expenses. Therefore, Karen is being terminated for a lack of the needed skill set for the Accounting Clerk position.

AUTHORIZED BY _____   APPROVED BY _____

**DEPOSITION EXHIBIT** 16

**EXHIBIT** A

---

**DEPOSITION EXHIBIT** 15

**EXHIBIT** H

---

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

KAREN MCINTOSH                                    PLAINTIFF

VS.                        CASE NO. 4:17-CV-757 DPM

THE COUNTRY CLUB OF LITTLE ROCK
AND JUDITH M. REEVES A/K/A JODI REEVES           DEFENDANTS

### PLAINTIFF'S AMENDED RESPONSES TO DEFENDANT'S INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Come now Plaintiff, Karen McIntosh, by and through her attorneys The McHughes Law Firm, PLLC and serves her responses to Defendant's Interrogatories and Notice to Produce as follows:

The filing of these responses to Defendant's discovery should not be construed in any manner to constitute a waiver of any of Plaintiff's earlier pled affirmative defenses. Plaintiff is merely complying with the discovery requirements of Arkansas Rules of Civil Procedure.

### RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify all persons responding to these discovery requests or providing information in response to these discovery requests; and, specify the interrogatory or document request, or sub-part, for which each was responsible.

**RESPONSE:** These objections and responses were drafted and prepared by the Plaintiff and her attorney and are believed to be true, correct and complete. The Plaintiff provided the responses to the best of her knowledge.

**INTERROGATORY NO. 2:** Identify by name, address and telephone number every person having knowledge of any facts related to the claims or defenses in this action, and for each person provide a brief summary of your understanding of that person's knowledge of discoverable matters



**DEPOSITION EXHIBIT** 13

---

or relevant facts.

RESPONSE:

1. Karen McIntosh, Plaintiff

   Has information relating to treatment in the workplace, actions and events taken place during termination, and CCLR's practice of discharging employees who are nearing retirement.

2. Susan Hill, Former Employee

   Has information relating to CCLR's practice of discharging employees who are nearing retirement.

3. Debi Davies, Former Employee

   Has information relating to CCLR's practice of discharging employees who are nearing retirement.

4. Blaine Burgess, CCLR General Manager/COO

   4200 Country Club Blvd.
   Little Rock, AR 72207
   Has information relating to the decision to discharge Mrs. McIntosh as well as the actions and events taken place during the termination.

5. Bonnie Burnam, Administrative Employee in Tennis Shop

   4200 Country Club Blvd.
   Little Rock, AR 72207
   Has information relating to Mrs. McIntosh's quality of work and treatment within the workplace.

6. Joan Holder, Accounting Clerk

   4200 Country Club Blvd.
   Little Rock, AR 72207
   Has information relating to Mrs. McIntosh's performance, quality of work and behavior with the workplace.

7. Judith M. Reeves, Defendant, CCLR Controller



4200 County Club Blvd.
Little Rock, AR 72207
Has information relating to Mrs. McIntosh's quality of work an Mrs. McIntosh's
treatment in the workplace as well as the actions and events taken place during
termination.

**INTERROGATORY NO. 3:** Identify by name, address and telephone number every person

you may call as a lay witness at the trial of this matter. Please state briefly the facts on which

you expect each person to testify.

1. Susan Hill



She has information relating to Mrs. McIntosh's termination and her skills to perform her
duties.

2. Debi Davies



She has information relating to Mrs. McIntosh's termination and her skills to perform her
duties.

3. Natalie Fielding



She has information relating to Mrs. McIntosh's termination and her skills to perform her
duties.

4. Amy Ramage



She has information relating to Mrs. McIntosh's termination and her skills to perform her
duties.

5. Bonnie Burnam,



He has information relating to Mrs. McIntosh's skill to perform her duties.

6. Joan Holder
4200 County Club Blvd.
Little Rock, AR 72207

She has information relating to Mrs. McIntosh's termination and her skills to perform her
duties.

7. Virginia Colbert



She has information relating to Mrs. McIntosh's termination.

8. Beth Elinsky



She information relating to Mrs. McIntosh's skills to perform her duties.

9. Keith Ims



He has information relating to Mrs. McIntosh's termination.

10. Heather Majors

She has information relating to Mrs. McIntosh's skills to perform her duties.

11. The office employees that knew on Thursday, November 17, 2016, that the Plaintiff was
to be terminated on Friday, November 18, 2016, stood in the hallway waiting on the
Plaintiff to leave. The Plaintiff had to walk past each and every one of the employees
knowing they knew she had just been terminated.

**INTERROGATORY NO. 4:** Please identify by name, address and telephone number each

person you may call as an expert witness or who may provide expert witness opinion testimony

at trial, and state as to each such person:

a. Name;

b. place of employment;

c. address, including street, city, state and zip code;

d. telephone number;

e. occupation and specialty;

f. whether or not the expert has been retained;

g. a description of the services the expert has been or may be employed to perform;

h. the remuneration for which you have employed or intend to employ him/her;

i. whether the expert has ever been a witness in any other lawsuit, and, if so, for
each lawsuit give the name of the suit, the kind of suit involved, the name of the
court, the date of the filing, and the name and address of the party for whom he
gave testimony;

j. the information required by Fed. R. Civ. P. 26(c)(2);

k. whether or not the expert has agreed to testify in person at the trial of this matter;
and the expert's hourly and daily fee for providing deposition testimony, for
consulting with your attorney, and for attendance at trial.

**RESPONSE:** The Plaintiff has not yet determined if an expert witness will be called. Plaintiff

reserves the right to supplement and/or amend her response to add the information requested when

it has been determined.

**INTEROGATORY NO. 5:** If you have ever been a party to any other lawsuit, bankruptcy or

other legal proceeding, please provide the following information for each action:

a. court or agency

b. case number and style of the suit,

c. nature of the case, and

d. disposition

**RESPONSE:** To the best of her knowledge, Plaintiff has not been a party to any other civil

lawsuit, bankruptcy or other legal proceedings.

**INTERROGATORY NO. 6:** Please state, in full detail, the factual basis for your allegation(s)

in Paragraph 23 of the Amended Complaint that "CCLR employees are fired when nearing

retirement", including but not limited to the identity of all the "employees" to whom you are

referring.

**RESPONSE:** Plaintiff contends that at least four employees who had been employed for years

were fired once they neared retirement age. Employees such as Susan Hill had been employed for

16 years before fired while nearing retirement age. Keith Ims, Debbie Davis and Virginia Colbert

were all employed for many years before fired near retirement.

**INTERROGATORIES NO. 7:** Please state in precise detail every admission against interest

concerning any matter at issue in this lawsuit that you claim was made by or on behalf of the

Defendants or anyone employed by, and for each please provide the following:

a. identify of the person(s) making such admission and purported authority of the
person(s) to make the statement on behalf of the Defendants,

b. identify by name, address and telephone number the person(s) to whom each
such statement was made; and

c. the manner in which such statement was made, specifying whether the
communication was oral or written, including the date when, and place where, it
was made.

**RESPONSE:** Please see the notes describing each instance and its date labeled "#7" at the top of each page, which were previously provided in Plaintiff's First Response to Defendant's Interrogatories and Requests for Production of Documents mailed on August 31, 2018.

**INTERROGATORY NO. 8:** Please describe each of your employment experiences from the ten years immediately preceding employment with defendant to present by specifying:

a. the name and address of each employer;

b. the inclusive dates of employment;

c. the principle business of your employer;

d. your initial and ending salary; and,

e. your reason for leaving.

**RESPONSE:**

a. BFI Waste Systems 1911 W. 65th Street Little Rock, AR 72209

b. 1984 to 2007

c. Waste Management

d. Does Not Recall

e. Became a new grandmother

**INTERROGATORY NO. 9:** Were you at any time(s) during your employment with the Defendant employed with an employer other than the Defendant? If yes, please describe each of those employment experiences by specifying:

a. the name and address of each employer;

b. the inclusive dates of employment;

c. the principle business of your employer;

d. your initial and ending salary; and

e. your reason for leaving

**RESPONSE:** No, Plaintiff worked solely for the Defendant while employed with them.

**INTERROGATARY NO. 10:** Since your employment with Defendant, CCLR, have you attempted to pursue business opportunities or secure employment with an employer other than the CCLR? If yes, please state each and every employer that you have applied to or contacted for a position and for each identified state the following:

a. the name and address of the employer and employer's representative contacted;

b. the date(s) contact was made

c. how the Plaintiff came to contact the employer (i.e. classified advertisement, word of mouth, etc.);

d. whether the Plaintiff submitted a resume or an application;

e. the type of position applied for;

f. the name of any person Plaintiff interviewed with at the employer;

g. whether Plaintiff was offered a position with the employer; and

h. whether Plaintiff accepted or rejected any offer of employment.

**RESPONSE:** See attached document labeled **Exhibit B-1**

**INTERROGATORY NO. 11:** Have you ever made allegations of discrimination against anyone, other than the defendants? If yes, please give a general description of those allegations, including but not limited to the when the allegations were made and the identity of all parties involved.

**RESPONSE:** Plaintiff once filed a complaint with the EEOC. Plaintiff was being harassed and bullied by her supervisor Richard Miksell at BFI. His supervisor suggested that she file a complaint with the EEOC to protect her job. No further action was taken in the matter.

**INTERROGATORIES NO. 12:** If you have ever been arrested, for each arrest, please provide the following information:

a. date

b. city, county and state

c. arresting law enforcement agency

d. charge

e. disposition

f. court, and

g. identify of any others arrested you with

**RESPONSE:** Plaintiff objects to this interrogatory as vague, ambiguous, overbroad, and unduly burdensome not reasonably expected to lead to relevant information. Without waiving the objection, the plaintiff states the following events which occurred before employment at CCLR and thus bears no relevance to the case.

a. January 1999;

b. Little Rock, Pulaksi, Arkansas;

c. PCSD;

d. DWI;

e. paid fine;

f. n/a

g. n/a

**INTERROGATORY NO. 13:** If you contend that you have been physically or mentally harmed by the conduct of the Defendants, please list all medical or psychological service providers, including but not limited to, primary care physicians, specialist or sub-specialty physicians, doctors of medicine, medical practitioners, nurse practitioners, psychiatrists, psychologists, therapists, counselors, social workers, and mental health professionals that you have seen as a result of your

alleged injuries and state the following:

a. provider's name;

b. provider's address including street, city, state and zip code;

c. provider's telephone number;

d. provider's occupation and specialty;

e. date you were first seen or treated by the provider;

f. date you were last seen or treated by the provider;

g. name of each practice location, clinic, hospital or other facility at which you were seen or treated by this provider;

h. general nature of reason for treatment or consultation

i. a list of all prescription medications that the provider has prescribed for you; and

j. the name, address and phone number of each and every pharmacy you use or have used to obtain your prescription medications.

**RESPONSE:**

a. Dr. Susanna Shermer, MD

b. 1100 N. University Ave #1 Little Rock, AR 72207

c. 501.552.7900

d. Family Practice Physician

e. – i. Information can be found in medical records which is now accessible to Defendant as Plaintiff authorized the disclosure of them in **Exhibit A**, Authorization for Release of Information Pursuant to 45 CFR § 164.508.

j. Will Supplement.

**INTERROGATORY NO. 14:** If you contend that you have been physically or mentally harmed by the conduct of the Defendants, please provide a full and accurate accounting for all costs of

medical care, therapy, whether physical or mental, or medications that the Plaintiff has required allegedly as a result of the conduct of the Defendants.

**RESPONSE:** Will Supplement by the end of the day on Friday September 21, 2018.

**INTERROGATORY NO. 15:** Please give an account, itemized as fully and as carefully as you can, of all losses, expenses and damages you seek to recover in this case which you claim were incurred by you or on your behalf as a result of any alleged discrimination by Defendants. Include the categories of damages that you are claiming, **giving dollar amounts** of such losses and damages for each category, and each method used to calculate such losses and damages. For example, if you allege you are owed back pay, provide an amount. It is not sufficient to describe the back-pay period or to generally allege "an amount to be determined at trial." If you allege compensatory or punitive damages state the amount you will ask the jury to award.

**RESPONSE:** See Attached Document labeled **Exhibit A-1.** Plaintiff reserves the right to supplement and/or amend her response to add medical damages when medical billing statement has been received.

<u>RESPONSES TO REQUESTS FOR PRODUCTION</u>

**REQUEST FOR PRODUCTION NO. 1:** Please produce any non-privileged written document that the Plaintiff has made regarding any of the facts and circumstances of this case, including but not limited to the contemporaneous notes referred to in Plaintiff's initial disclosures.

**RESPONSE:** Please see documents previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 2:** Please produce any statements, notes, memoranda

or other documents whether signed or unsigned, in your possession made by the defendants, their agents or employees that relate to this action or its subject matter.

**RESPONSE:** Please see documents previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 3:** Please produce all handbooks, manuals, leaflets, policies, procedures, guidelines, memos, bulletins, directives, photographs, and other documents upon which you may rely in this action, including but not limited to any that you claim were not followed by any defendant or anyone employed by CCLR.

**RESPONSE:** Please see documents previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 4:** Please produce all documents you have provided to or received from the Equal Employment Opportunity Commission, the United States Department of Health and Human Services, Office of Civil Rights, the Arkansas Employment Security Division, Appeal Tribunal, Board of Review or Court of Appeals, or any federal agency, or any agency or department of the State of Arkansas or any other person which relate in any way to this case.

**RESPONSE:** Please see documents previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 5:** Please provide all records and documents, including correspondence, applications, and resumes, relating to Plaintiff's efforts to secure employment after her employment with Defendant.

**RESPONSE:** Not Applicable, no such documents.

**REQUEST FOR PRODUCTION NO. 6:** If you contend that you have been physically or mentally harmed by the conduct of the Defendant, please execute a medical release in the form of the release attached as **Exhibit A.**

**RESPONSE:** See attached Medical Release labeled **Exhibit A.**

**REQUEST FOR PRODUCTION NO. 7:** Please execute an employment authorization in the form of the authorization and release attached as **Exhibit B.**

**RESPONSE:** See attached Employment Authorization and Release labeled **Exhibit B.**

**REQUEST FOR PRODUCTION NO. 8:** Please provide all documents such as W-2 forms and income tax forms reflecting Plaintiff's total compensation for the year 2003 through present with a breakdown of compensation by amount from each employer or other source of compensation.

**RESPONSE:** Plaintiff objects to this request for production as unduly burdensome not reasonably expected to lead to relevant information. While Plaintiff acknowledges your request for more information, Plaintiff objects to the request based on relevance.

**REQUEST FOR PRODUCTION NO. 9:** Please produce any and all reports, summaries or other documents prepared by, or which have been provided to, experts who have been retained by you in connection with this matter.

**RESPONSE:** No such documents at this time. Plaintiff reserves the right to amend her response to provide the information requested when it has been determined.

**REQUEST FOR PRODUCTION NO. 10:** Please produce all documents or evidence that you contend support the allegations you make in the Amended Complaint.

**RESPONSE:** Please see Plaintiff's Notes labeled **Exhibit E** previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 11:** Please produce any and all documents which you may introduce into evidence at the trial or at any hearing in this case.

**RESPONSE:** Plaintiff reserves the right to amend her response to provide the information requested when it has been determined.

**REQUEST FOR PRODUCTION NO. 12:** Unless previously provided pursuant to a different request for production, please produce any and all documents or evidence referred to, identified in, in support of or in any way relating to each of the foregoing Interrogatories, with specification as to which Interrogatory or Interrogatories the document(s) or evidence pertains.

**RESPONSE:** Please see documents labeled **Exhibits A through E** previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018.

**REQUEST FOR PRODUCTION NO. 13:** Please produce any and all documents not otherwise requested herein that in any way refer or relate to the allegations contained in Plaintiff's Complaint, including but not limited to all documents listed in your initial disclosures.

**RESPONSE:** Please see documents labeled **Exhibits A through E** previously provided in Plaintiff's Response to Defendant's Interrogatories and Requests for production of Documents mailed on August 31, 2018

SWORN VERIFICATION

Respectfully Submitted,
McHughes Law Firm PLLC
P.O.Box 2180
Little Rock, AR 72203
(501) 376-9131

STATE OF **Arkansas**          )
                               ) SS
COUNTY OF **Pulaski**          )

Attorneys for Plaintiff

BY _Becky McHughes_
Becky A. McHughes (03024)
Megan Chappelear(16063)

The undersigned, being duly sworn, states on oath that she has reviewed the above and that the
facts and matters contained therein are true and correct to the best of her knowledge and belief.

_Karen McIntosh_

Subscribed and sworn to before me this 17th day of September 2018.

_Terri L. Baker_
Notary Public

9-13-2025

---

**CERTIFICATE OF SERVICE**

I, Becky A. McHughes, certify that on the 17th day of September 2018, I have served a copy
of the foregoing Plaintiff's First Set Interrogatories and Request for Production of Documents on
the Defendant by sending, via electronic mail, a copy of the same to the following:

Daniel L. Herrington
herrington@fridayfirm.com
FRIDAY, ELDREDGE & CLARK, LLP
400 West Capitol Avenue, Suite 2000
Little Rock, AR 72201

By: _Becky McHughes_
Becky A. McHughes (03024)
Megan Chappelear(16063)

---

EXHIBIT A
**Authorization for Release of Information Pursuant to 45 CFR § 164.508**

Patient Name: **Karen McIntosh** _____

Patient may also be known to this facility as: _____

Patient Date of Birth: **7/10 /55** Patient Social Security Number: ▇▇▇▇▇▇▇▇▇

I, **Karen McIntosh** , hereby authorize the disclosure of individually identifiable health information as described below:

All information and records concerning my Protected Health Information as defined by the HIPAA regulations, including but
not limited to, all medical records; physician's records; surgeon's records; information and records concerning my physical and
mental condition and treatment; x-rays, CT scans, MRI films, photographs, and any other radiologic, nuclear medicine or
radiation therapy films; pathology materials, slides, tissues, cytology, histology, and laboratory reports; discharge summaries;
progress notes; consultations; prescriptions; pharmacy records; NDC numbers, drug information handouts/monographs; history
and physicals; nurse's notes; patient intake forms; correspondence; psychiatric records; social worker's records; psychotherapy
records; insurance records; consent for treatment, examination, periods or stays of hospitalizations, confinement; diagnosis;
cardiograms or other material in graphic form; all physical, occupational and rehab records; all disability, Medicaid or Medicare
records including claim forms and record of denial of benefits; and any information relating to sexually transmitted diseases,
HIV or AIDS-related illnesses, and substance abuse or treatment.

I also authorize the release of all records of other providers in your possession and all billing records.

I authorize the following persons to disclose my information: Physicians, hospitals and other health care
providers who have provided treatment to or who have medical records concerning the person identified above,
including:

Authorized Healthcare Provider: _____

The Release of Information is to be limited to the **Dates of Treatment** within the last fifteen (15) years.

Purpose of access or release: At request of the patient or individual authorized to act on behalf of the patient in connection
with a legal proceeding instituted by or on behalf of the patient.

I understand that once the above information is disclosed, there is potential for the designated recipient or recipients to re-
disclose the information and the information may no longer be protected by federal privacy laws and regulations.

I understand that this Authorization is voluntary and that I may refuse to sign this Authorization. Unless allowed by law,
my ability to obtain treatment, payment for my treatment, or eligibility for benefits cannot be conditioned on the signing
of or my refusal to sign this Authorization. I understand that the provider furnishing the copies may receive compensation
for doing so.

I understand that I may revoke this Authorization at any time by giving written notice to the persons authorized to receive
this information as designated below, except that a revocation of this Authorization will not apply to records and
information already released in reliance upon the Authorization.

A photocopy or facsimile of this signed Authorization shall constitute a valid Authorization. This Authorization will
expire two (2) years from the date signed below.

I authorize the following persons to receive my information: **Friday Eldredge & Clark, LLP**

_Karen McIntosh_                                    9/17/18
Signature of Patient, Guardian, or Legally Authorized Representative          Date

Capacity of Legally Authorized Representative to Patient: _____
(such as power of minor, court-appointed guardian, administrator of estate of deceased, attorney-in-fact appointed with power of attorney concerning
healthcare decisions, or healthcare proxy)

**PROVIDE A COPY OF THIS AUTHORIZATION TO PATIENT/LEGAL REPRESENTATIVE**

## EXHIBIT B

### RELEASE OF EMPLOYMENT INFORMATION

RE:   KAREN McINTOSH

I hereby authorize my employer(s) (both present and former) to release any and all information regarding my employment, including, but not limited to, my wages, projected wage increases, work history and loss of time, including disciplinary or investigation records, and the reasons for discharge, if any, to the law firm Friday Eldredge & Clark, 400 West Capitol Ave., Suite 2000, Little Rock, AR 72201.

*Karen McIntosh*

KAREN McINTOSH

MAY ALSO BE KNOWN TO THIS EMPLOYER AS

DATE:   9|17|18

DATE OF BIRTH   7/10/53

SOCIAL SECURITY NO

---

## EXHIBIT A-I

### DAMAGES CALCULATION from age 63 through 67

| | | |
|---|---|---|
| For the year 2016 (6 remaining weeks) (667.31*6) | = 4,003.86 | |
| For the year 2017 without pay raise   (age 64) | + 34700.12 | |
| For the year 2018 without pay raise   (age 65) | + 34700.12 | |
| For the year 2019 without pay raise   (age 66) | + 34700.12 | |
| For the year 2020 without pay raise   (age 67) | + 34700.12 | |
| | | |
| Employer 401K contribution for 2015 was $4,376.74 | | |
| 4,376.74 * 4 (2017, 2018, 2019, and 2020) | +17508.98 | |
| | = 160,311.13 | |
| | | |
| Medical | | |
| | | |
| Mental anguish (false imprisonment) | 25000.00 | |
| Mental anguish (from walking by each employee after being fired) | 25000.00 | |

---

## EXHIBIT B-I

### Plaintiff's Response to Interrogatory NO. 10:

Yes. Plaintiff contends that she has placed her resume on the website https://www.arjoblink.arkansas.gov, a website through the Arkansas Workforce Centers that purports to connect people with jobs. She has applied for position numbers provided below. Beyond this attempt to pursue business opportunities, she has not been able to secure employment with an employer other than CCLR.

| a. Name & Address of Employer and Employer's Representative | b. Date Contact was made | c. How Plaintiff came to contact the employer | d. Whether the Plaintiff submitted a resume or application | e. Type of Position applied for | f. The name of any person Plaintiff interviewed with at the employer | g. Whether Plaintiff was offered a position | h. Whether Plaintiff accepted or rejected any offer |
|---|---|---|---|---|---|---|---|
| North Little Rock, AR Job Order ID 1831622 | December 01, 2016 | Arkansas Job Link | | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock AFB Job Order ID 1834565 | December 04, 2016 | Arkansas Job Link | Resume | SR Acctg. Assoc BX (Cash Cage) | N/A | No | N/A |
| Little Rock, AR Job Order ID 1836347 | December 08, 2016 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1837188 | December 09, 2016 | Arkansas Job Link | Resume | Payroll Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1839237 | December 11, 2016 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1839485 | December 11, 2016 | Arkansas Job Link | Resume | Bookkeeper | N/A | No | N/A |

| Little Rock, AR Job Order ID 1844099 | December 21, 2016 | Arkansas Job Link | Resume | Bookkeeper | N/A | No | N/A |
|---|---|---|---|---|---|---|---|
| North Little Rock, AR Job Order ID 1846875 | December 23, 2016 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| North Little Rock, AR Job Order ID 1846902 | December 23, 2016 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1848610 | December 28, 2016 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Sherwood, AR Job Order ID 1848836 | December 28, 2016 | Arkansas Job Link | Resume | Full Charge Bookkeeper | N/A | No | N/A |
| Little Rock, AR Job Order ID 1852156 | January 04, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| North Little Rock, AR Job Order ID 1853255 | January 06, 2017 | Arkansas Job Link | Resume | Accounts Payable Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1853237 | January 06, 2017 | Arkansas Job Link | Resume | Accounting Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1854221 | January 07, 2017 | Arkansas Job Link | Resume | Accounting Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1855843 | January 10, 2017 | Arkansas Job Link | Resume | Mortgage Servicing Electronic | N/A | No | N/A |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Registration (MER) Specialist | | | |
| Little Rock, AR Job Order ID 1855871 | January 10, 2017 | Arkansas Job Link | Resume | Mortgage Servicing Bankruptcy Payment/Accounting Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1860304 | January 12, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1860335 | January 12, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1861720 | January 13, 2017 | Arkansas Job Link | Resume | Accounting Clerk II | N/A | No | N/A |
| Little Rock, AR Job Order ID 1862863 | January 14, 2017 | Arkansas Job Link | Resume | Mortgage Servicing Investor Claims Specialist I | N/A | No | N/A |
| Little Rock AFB, AR Job Order ID 1863561 | January 15, 2017 | Arkansas Job Link | Resume | SR. Accig Assoc (cash cage) | N/A | No | N/A |
| Conway, AR Job Order ID 1864367 | January 18, 2017 | Arkansas Job Link | Resume | Clerk, Chief | N/A | No | N/A |
| North Little Rock, AR Job Order ID 1866486 | January 20, 2017 | Arkansas Job Link | Resume | Accountant – Entry Level | N/A | No | N/A |
| Conway, AR Job Order ID 1867670 | January 22, 2017 | Arkansas Job Link | Resume | Accounts Payable-Assoc Accounting Oper Specialist | N/A | No | N/A |

3

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Little Rock, AR Job Order ID 1867430 | January 22, 2017 | Arkansas Job Link | Resume | Billing Operations Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1868996 | January 25, 2017 | Arkansas Job Link | Resume | Billing Operations Specialist | N/A | No | N/A |
| Conway, AR Job Order ID 1869426 | January 25, 2017 | Arkansas Job Link | Resume | Deposit Operation Rep I | N/A | No | N/A |
| Little Rock, AR Job Order ID 1869530 | January 26, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1870570 | January 27, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1870564 | January 27, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1874397 | February 02, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Conway, AR Job Order ID 1874675 | February 02, 2017 | Arkansas Job Link | Resume | Assoc Accounting Oper Spec | N/A | No | N/A |
| Little Rock, AR Job Order ID 1874909 | February 02, 2017 | Arkansas Job Link | Resume | Accounting Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1882494 | February 11, 2017 | Arkansas Job Link | Resume | Controller | N/A | No | N/A |
| Little Rock, AR Job Order ID 1882517 | February 12, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |

4

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Little Rock, AR Job Order ID 1883152 | February 12, 2017 | Arkansas Job Link | Resume | Assistant Controller | N/A | No | N/A |
| Little Rock, AR Job Order ID 1883218 | February 12, 2017 | Arkansas Job Link | Resume | Data Control Associate II | N/A | No | N/A |
| Little Rock, AR Job Order ID 1885854 | February 17, 2017 | Arkansas Job Link | Resume | Billing Operations Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1886858 | February 18, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1886864 | February 18, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1891631 | February 24, 2017 | Arkansas Job Link | Resume | Part-Time Data Control Associate II | N/A | No | N/A |
| Little Rock, AR Job Order ID 1891632 | February 24, 2017 | Arkansas Job Link | Resume | Data Control Associate II | N/A | No | N/A |
| Benton, AR Job Order ID 1893130 | February 25, 2017 | Arkansas Job Link | Resume | Accounting Clerk | N/A | No | N/A |
| Little Rock, AR Job Order ID 1895278 | March 01, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1895960 | March 01, 2017 | Arkansas Job Link | Resume | Accounting Clerk | N/A | No | N/A |
| Conway, AR Job Order ID 1900048 | March 07, 2017 | Arkansas Job Link | Resume | Deposit Operation Rep III | N/A | No | N/A |

5

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Little Rock, AR Job Order ID 1906422 | March 15, 2017 | Arkansas Job Link | Resume | Deposit Operations Representative | N/A | No | N/A |
| Conway, AR Job Order ID 1908688 | March 18, 2017 | Arkansas Job Link | Resume | Bookkeeper | N/A | No | N/A |
| Little Rock, AR Job Order ID 1909473 | March 19, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1909479 | March 19, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1909482 | March 19, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1910367 | March 22, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |
| Little Rock, AR Job Order ID 1910343 | March 22, 2017 | Arkansas Job Link | Resume | Fiscal Support Specialist | N/A | No | N/A |

6

```
ST VINCENT HEALTH SYSTEMS (GPA) INQUIRY  OPER: PEJOH RUN DATE 09/18/18 PAGE    1
ACCT: █████  KAREN J MCINTOSH

ACCOUNT:                    TEL:            MOBILE:              COUR %:  0
  KAREN J MCINTOSH
  8006 OLIVE HILL DR                             STMT GP:      TYP:
                                                 DUN CL: 1  RU 0
  MABELVALE AR 72103                             PYMT PLAN..:
  ACCOUNT MISC 1..                               ACCOUNT MISC 3..:
  COMMENT.......:        LAST NM OVERFLOW

        PERSONAL   INSURANCE   COLLECTION   WORK COMP  ACCOUNT TOTAL
          0.00       0.00         0.00        0.00      0.00
LAST STMT:          STMT DELAY:       STMT COUNTER: 0 LAST DATE: 03/27/17
LAST PERS PAY: 09/15/14 CUR PERS PAY:      50.00 YTD PERS PAY
CREDIT DATE:            STMT MESSAGE:                  BAD DEBT
PENDING LETTERS:                                      WR-OFF:        0.00
LAST LETTER....:
DATES.........:

    CHG# CTRL# PAT     DOC  VRNCODE/NO   DESCRIPTION  INS         AMOUNT  DATE
               POS    DR                 SRV% NAME    TYPE# HISTORY%
1528114  7451 PAT     414 99213          OFFICE VISIT 71  /IH    130.00  10/12/16
               44     38870  N9202        1 MEDICAL
                                          1*
 *PMT*   7453                COIN         COINSURANCE  71  /IH     10.00- 10/12/16
 *PMT*  10123               1011          UNITED HEALT                11.11- 11/09/16
               CHECK#:
               ABAB:
 *ADJ*  10123                2512         UNITED HEALT            68.89- 11/09/16
1528114  7451 KAREN   414 99214          OFFICE VISIT 71  /IH      0.00  AGE=  0
               44     2722  E782          1 MEDICAL               193.00  11/15/16
                                          1*
 *PMT*   7453                COIN         COIN         71  /IH     85.84- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            97.16- 12/14/16
1547782  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
1547783  7453 KAREN   414 36415          DRAWING BLOO 71  /IH      6.00  11/15/16
               44     2722  E782          1 MEDICAL
                                          1*
 *PMT*  10121               1011          UNITED HEALT             2.90- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT             3.10- 12/14/16
1547782  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
1547784  7453 KAREN   414 80061          LIPID PANEL  71  /IH     36.00  11/15/16
               44     2722  E782          1 MEDICAL
                                          1*
 *PMT*  10121               1011          UNITED HEALT            15.88- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            20.12- 12/14/16
1547784  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
1547785  7453 KAREN   414 82306          1 MEDICAL    71  /IH     83.00  11/15/16
               44     2689  E559          1 MEDICAL
                                          1*
 *PMT*  10121               1011          UNITED HEALT            24.82- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            58.18- 12/14/16
1547785  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
```

```
ST VINCENT HEALTH SYSTEMS (GPA) INQUIRY  OPER: PEJOH RUN DATE 09/18/18 PAGE    2
ACCT: 269292 KAREN J MCINTOSH

1547786  7453 KAREN   414 80053          COMP.METABOL 71  /IH     30.00  11/15/16
               44     2689  E559          1 MEDICAL
 *PMT*  10121               1011          UNITED HEALT            14.77- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            15.23- 12/14/16
1547786  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
1547787  7453 KAREN   414 85027          AUTOMATED HE 71  /IH    193.00  03/27/17
               44     2722  E782          1 MEDICAL
 *PMT*  10121               1011          UNITED HEALT             5.42- 12/14/16
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            12.58- 12/14/16
1547787  7453 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
1597396  7551 KAREN   419 99213          OFFICE VISIT 71  /IH    130.00  02/17/17
               44     6821  L03221        1 MEDICAL
 *PMT*   7551                COIN         COINSURANCE  71  /IH     10.00- 02/21/17
 *PMT*  10104               1011          UNITED HEALT            51.11- 03/15/17
               CHECK#:
               ABAB:
 *MSG*   7551                PR3          COPAY AMOUNT            68.89- 03/15/17
 *ADJ*  10104                2512         UNITED HEALT             0.00  AGE=  0
1597396  7551 KAREN   419 99214          OFFICE VISIT 71  /IH    193.00  03/27/17
               44     5110  R091          1 MEDICAL
 *PMT*   7550                COIN         COINSURANCE  71  /IH     85.84- 04/24/17
               CHECK#:
               ABAB:
 *ADJ*  10121                2512         UNITED HEALT            97.16- 04/24/17
1617160  7550 *TOTAL*        DUE FROM     71  /IH      0.00  AGE=  0
```



DEPOSITION EXHIBIT

---

Summary View                                              Page 1 of 2

Patient: MCINTOSH, KAREN J   DOB: 07/10/1953   Phone: ████
Address: ████
Claim Date: 06/09/2017   Encounter Date: 05/31/2017
Provider: Shermer, Susanna

Total Amount: $ 369.00   Payments/Adjustments: $ 369.00   Balance: $ 0.00
Claim Number: ████   Filing Status: Patient

ICD Codes:
110 HTN (hypertension).
F32.9 Depression.

| CPT Codes: Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|---|---|---|---|---|---|---|---|---|
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 5 - Diagnostic Lab | $18.00 | 1.00 | $18.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 5 - Diagnostic Lab | $30.00 | 1.00 | $30.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 5 - Diagnostic Lab | $36.00 | 1.00 | $36.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 5 - Diagnostic Lab | $83.00 | 1.00 | $83.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 2 - Surgical | $6.00 | 1.00 | $6.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 5 - Diagnostic Lab | $9.00 | 1.00 | $9.00 |
| | | 05/31/2017 | 05/31/2017 | 11-OFFICE | 1 - Medical Care | $187.00 | 1.00 | $187.00 |

| Insurances: Name | Group No | Subscriber No | Type | File Status |
|---|---|---|---|---|
| UNITED HEALTHCARE | 4R8558 | | C1 | |

| Payment: From | Date | Type | Check No | Payment |
|---|---|---|---|---|
| UNITED HEALTHCARE | 07/18/2017 | Check | | $134.45 |
| UNITED HEALTHCARE | 07/18/2017 | Check | | $18.92 |
| UNITED HEALTHCARE | 07/18/2017 | Check | | $4.32 |
| UNITED HEALTHCARE | 07/18/2017 | Check | | $10.40 |
| UNITED HEALTHCARE | 07/18/2017 | Check | | $24.20 |

Claim Data:
Symptom Indicator: No Symptom Date
Referring Provider: Shermer, Susanna NPI 1043236748

Claim Header:
Residence Type:
Student Status:

---

Summary View                                              Page 1 of 2

Patient: MCINTOSH, KAREN J   DOB: 07/10/1953   Phone: ████
Address: ████
Claim Date: 12/05/2017   Encounter Date: 12/04/2017
Provider: Shermer, Susanna

Total Amount: $ 467.00   Payments/Adjustments: $ 467.00   Balance: $ 0.00
Claim Number: ████   Filing Status: Patient

ICD Codes:
F32.9 Depression.
I10 HTN (hypertension).

| CPT Codes: Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|---|---|---|---|---|---|---|---|---|
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 5 - Diagnostic Lab | $18.00 | 1.00 | $18.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 5 - Diagnostic Lab | $30.00 | 1.00 | $30.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 5 - Diagnostic Lab | $36.00 | 1.00 | $36.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 5 - Diagnostic Lab | $6.00 | 1.00 | $6.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 5 - Diagnostic Lab | $45.00 | 1.00 | $45.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 1 - Medical Care | $261.00 | 1.00 | $261.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 2 - Surgical | $22.00 | 1.00 | $22.00 |
| | | 12/04/2017 | 12/04/2017 | 11-OFFICE | 1 - Medical Care | $43.00 | 1.00 | $43.00 |

| Insurances: Name | Group No | Subscriber No | Type | File Status |
|---|---|---|---|---|
| UNITED HEALTHCARE | 4R8558 | 858053721 | C1 | |

| Payment: From | Date | Type | Check No | Payment |
|---|---|---|---|---|
| Patient | 12/04/2017 | Credit Card (VISA) | | $10.00 |
| UNITED HEALTHCARE | 12/28/2017 | Check | 1TR15833481 | $16.98 |

## Top Left Panel

Summary View                                          Page 1 of 1

**Patient:** MCINTOSH, KAREN J   **DOB:** 07/10/1953   **Phone:** ▮▮▮▮
**Address:** ▮▮▮▮
**Claim Date:** 01/04/2018   **Encounter Date:** 01/04/2018
**Provider:** Shermer, Susanna

**Total Amount:** $ 193.00   **Payments/Adjustments:** $ 193.00   **Balance:** $ 0.00
**Claim Number:** ▮▮▮▮   **Filing Status:** Patient

**ICD Codes:**
I10 HTN (hypertension).

**CPT Codes:**

| Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|------|-----------|----------|--------|-----|-----|----------|-------|------------|
| | | 01/04/2018 | 01/04/2018 | 11-OFFICE | 1 -Medical Care | $193.00 | 1.00 | $193.00 |

**Insurance:**

| Name | Group No | Subscriber No | Type | File Status |
|------|----------|---------------|------|-------------|
| UNITED HEALTHCARE | 4R8558 | 858053721 | C1 | |

**Payment:**

| From | Date | Type | Check No | Payment |
|------|------|------|----------|---------|
| Patient | 01/04/2018 | Credit Card (VISA) | | $10.00 |
| UNITED HEALTHCARE | 02/01/2018 | Check | ▮▮▮▮ | $103.86 |

**Claim Data:**
**Symptom Indicator:** No Symptom Date

**Claim Header:**
**Residence Type:**
**Student Status:**
**Employment Status:**
**Primary Insurance:**
**Claim Type:** Medical

**Claim Log:**
01/05/2018   06:00 AM   Electronic Submission to UNITED HEALTHCARE

https://arvifcapp.eewcloud.com/mobiledoc/jsp/catalog/xml/getClaimSummary.jsp?claimI...   09/18/2018

## Top Right Panel

Summary View                                          Page 1 of 1

**Patient:** MCINTOSH, KAREN J   **DOB:** 07/10/1953   **Phone:** ▮▮▮▮
**Address:** ▮▮▮▮
**Claim Date:** 01/18/2018   **Encounter Date:** 01/15/2018
**Provider:** Gordon, Otis T

**Total Amount:** $ 372.00   **Payments/Adjustments:** $ 372.00   **Balance:** $ 0.00
**Claim Number:** 319730   **Filing Status:** Refund Patient

**ICD Codes:**
Z01.818 Encounter for other preprocedural examination.

**CPT Codes:**

| Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|------|-----------|----------|--------|-----|-----|----------|-------|------------|
| 99205 OV New Pt; comprehensive/high | | 01/15/2018 | 01/15/2018 | 11-OFFICE | 1 -Medical Care | $372.00 | 1.00 | $372.00 |

**Insurance:**

| Name | Group No | Subscriber No | Type | File Status |
|------|----------|---------------|------|-------------|
| UNITED HEALTHCARE | 4R8558 | 858053721 | C1 | |

**Payment:**

| From | Date | Type | Check No | Payment |
|------|------|------|----------|---------|
| Patient | 01/15/2018 | Credit Card (VISA) | | $10.00 |
| UNITED HEALTHCARE | 02/14/2018 | Check | ▮▮▮▮ | $264.47 |
| Patient | 03/12/2018 | Credit Card (VISA) | | ($10.00) |

**Claim Data:**
**Symptom Indicator:** No Symptom Date

**Claim Header:**
**Residence Type:**
**Student Status:**
**Employment Status:** Unknown
**Primary Insurance:**
**Claim Type:** Medical

**Claim Log:**
01/19/2018   06:00 AM   Electronic Submission to UNITED HEALTHCARE

https://arvifcapp.eewcloud.com/mobiledoc/jsp/catalog/xml/getClaimSummary.jsp?claimI...   09/18/2018

## Bottom Left Panel

Summary View                                          Page 1 of 1

**Patient:** MCINTOSH, KAREN J   **DOB:** 07/10/1953   **Phone:** ▮▮▮▮
**Address:** ▮▮▮▮
**Claim Date:** 02/06/2018   **Encounter Date:** 01/31/2018
**Provider:** Gordon, Otis T

**Total Amount:** $ 714.00   **Payments/Adjustments:** $ 714.00   **Balance:** $ 0.00
**Claim Number:** ▮▮▮▮   **Filing Status:** Patient

**ICD Codes:**

**CPT Codes:**

| Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|------|-----------|----------|--------|-----|-----|----------|-------|------------|
| | | 01/31/2018 | 01/31/2018 | 24-AMBULATORY SURGICAL CENTER | 2 -Surgical | $714.00 | 1.00 | $714.00 |

**Insurance:**

| Name | Group No | Subscriber No | Type | File Status |
|------|----------|---------------|------|-------------|
| UNITED HEALTHCARE | 4R8558 | 858053721 | C1 | |

**Payment:**

| From | Date | Type | Check No | Payment |
|------|------|------|----------|---------|
| UNITED HEALTHCARE | 02/28/2018 | Check | | $290.20 |

**Claim Data:**
**Symptom Indicator:** No Symptom Date

**Claim Header:**
**Residence Type:**
**Student Status:**
**Employment Status:** Unknown
**Primary Insurance:**
**Claim Type:** Medical

**Claim Log:**
02/07/2018   06:00 AM   Electronic Submission to UNITED HEALTHCARE

https://arvifcapp.eewcloud.com/mobiledoc/jsp/catalog/xml/getClaimSummary.jsp?claimI...   09/18/2018

## Bottom Right Panel

Summary View                                          Page 1 of 2

**Patient:** MCINTOSH, KAREN J   **DOB:** 07/10/1953   **Phone:** ▮▮▮▮
**Address:** ▮▮▮▮
**Claim Date:** 06/19/2018   **Encounter Date:** 06/18/2018
**Provider:** Shermer, Susanna

**Total Amount:** $ 323.00   **Payments/Adjustments:** $ 128.15   **Balance:** $ 194.85
**Claim Number:** ▮▮▮▮   **Filing Status:** ERA PAYER DENIED

**ICD Codes:**
I10 HTN (hypertension).

**CPT Codes:**

| Code | Modifiers | Start Dt | End Dt | POS | TOS | Unit Fee | Units | Billed Fee |
|------|-----------|----------|--------|-----|-----|----------|-------|------------|
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 5 -Diagnostic Lab | $0.00 | 1.00 | $0.00 |
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 5 -Diagnostic Lab | $0.00 | 1.00 | $0.00 |
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 5 -Diagnostic Lab | $0.00 | 1.00 | $0.00 |
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 5 -Diagnostic Lab | $0.00 | 1.00 | $0.00 |
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 5 -Diagnostic Lab | $0.00 | 1.00 | $0.00 |
| | NC | 06/18/2018 | 06/18/2018 | 11-OFFICE | 2 -Surgical | $6.00 | 1.00 | $6.00 |
| | | 06/18/2018 | 06/18/2018 | 11-OFFICE | 1 -Medical Care | $187.00 | 1.00 | $187.00 |
| | 25 | 06/18/2018 | 06/18/2018 | 11-OFFICE | 1 -Medical Care | $130.00 | 1.00 | $130.00 |

**Insurance:**

| Name | Group No | Subscriber No | Type | File Status |
|------|----------|---------------|------|-------------|
| CHAMPVA INSURANCE | | | C1 | |

**Payment:**

| From | Date | Type | Check No | Payment |
|------|------|------|----------|---------|
| CHAMPVA INSURANCE | 09/07/2018 | Check | | $53.54 |
| Patient | 09/12/2018 | Credit Card (VISA) | CK | $10.00 |

**Claim Data:**
**Symptom Indicator:** No Symptom Date

**Claim Header:**

https://arvifcapp.eewcloud.com/mobiledoc/jsp/catalog/xml/getClaimSummary.jsp?claimI...   09/18/2018